**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, and ALLSTATE COUNTY MUTUAL INSURANCE COMPANY, Plaintiffs | § § § § § § § § § | |
| vs. | § § § | Civil Action No. 1:26-cv-543 |
| KHIT CHIROPRACTIC AND REHABILITATION, PLLC, KHIT & ASSOCIATES, PLLC D/B/A KHIT CHIROPRACTIC & WELLNESS CENTER, SKAK INVESTMENTS, LLC D/B/A INSIGHT DIAGNOSTIC AND IMAGING CENTER, LLC, INSIGHT IMAGING CENTER, LLC KAY MEDICAL CENTER, PLLC, SPINAL DECOMPRESSION AND REMODELING CLINIC, PLLC, ELKAY ENTERPRISES, LLC D/B/A ELKAY TRANSPORT, IMPACT PROFESSIONAL SERVICES, LLC, KHIT PROPERTY MANAGEMENT, LLC, MIGUEL ONETO, M.D., P.A. D/B/A QI & INTERVENTIONS, LUIS KHIT, D.C., ALEJANDRA KHIT, D.C., ANNA GITTINS, ARTURO RESENDEZ, SUSAN FAN, M.D., MIGUEL ONETO, M.D., JULIETA ONETO, M.D., SANNICHIE QUAICOE, M.D., WILLIAM DONOVAN, M.D., JOSE NADAL, D.C., LIBRADO TORRES, D.C., JOHN GLADE, D.C., LIZ MOLINA, D.C., REYNALDO AMADOR, D.C., DEBBIE RIVERA, D.C., AND JONATHAN HERNANDEZ, D.C., Defendants | § § § § § § § § § § § § § § § § § § § § § § § § § § § | **PLAINTIFFS DEMAND TRIAL BY JURY** |

**<u>PLAINTIFFS' ORIGINAL COMPLAINT</u>**

# Table of Contents


**I. INTRODUCTION ........ 4**
**II. JURISDICTION AND VENUE ........ 8**
**III. PARTIES ........ 9**
A. Plaintiffs ........ 9
B. Defendants ........ 10
1. Entity Defendants ........ 10
2. Individual Defendants ........ 12
**IV. STATEMENT OF FACTS ........ 15**
**A. Formation of the Khit Entities ........ 15**
1. Chiropractic Entities ........ 15
2. Diagnostic Imaging Entities ........ 16
3. Medical Practice Entities ........ 16
4. Spinal Decompression and Remodeling Clinic, PLLC ........ 17
5. Elkay Enterprises, LLC d/b/a Elkay Transport ........ 18
6. Khit Property Management, LLC ........ 18
7. Impact Professional Services, LLC ........ 18
8. Khit Multidisciplinary Group, LLC ........ 19
**B. Practice Locations and Providers ........ 20**
1. Khit Chiropractic ........ 20
a. Harlingen ........ 21
b. Mission ........ 21
c. Weslaco ........ 22
d. Brownsville ........ 23
e. McAllen ........ 23
f. Austin ........ 24
g. Rio Grande City ........ 24
h. Kyle ........ 25
2. Insight ........ 25
3. Kay Medical ........ 28
4. Spinal Decompression ........ 34
**V. DEFENDANTS' OPERATIONS ........ 34**
**A. Khit Entities' Operations Before 2018 ........ 34**
**B. Significant Changes to Khit Operations in 2018 ........ 36**
1. QI&I ........ 36
2. Kay Medical ........ 39
**C. Khit Operations During Period at Issue ........ 41**
1. Patient Population ........ 41
2. 'Cookie-Cutter' Treatment for Personal Injury Patients ........ 48
**VI. TREATMENT PRACTICES AND PROCEDURES ........ 52**
**A. Recommendations and Referrals ........ 52**
1. Initial Evaluation at Khit Chiropractic ........ 52
2. X-rays Billed by Insight ........ 56
3. Treatment Provided by Chiropractic Assistants ........ 58
4. Evaluation by Nurse Practitioners at Kay Medical ........ 61

5. Re-Examination at Khit Chiropractic ... 66
6. MRI Referrals ... 68
7. Referral to Pain Management, Spinal Decompression or Orthopedic Consultation ... 71
8. Spinal Decompression & Remodeling Clinic ... 72
9. Kay Medical Orthopedics ... 73
10. Kay Medical Pain Management ... 74
11. Final Reports to Support Future Medical Expenses ... 77

**B. Uniformity of Care ... 77**
**C. Treatment Provided by Unlicensed and/or Unqualified Individuals ... 81**
**D. Unlawful Laypersons' Control of Healthcare Providers ... 84**
**VII. REPORTING PRACTICES AND PROCEDURES ... 88**
**A. Intentional Omission of Relevant Information ... 88**
1. Patient Intake Forms and Questionnaires ... 88
2. Examination Reports ... 91

**B. Templated Language to Support Recommendations and Referrals ... 101**
**C. Reuse of Prior Reports ... 105**
**D. Records Not Prepared by Service Provider ... 112**
**VIII. BILLING PRACTICES AND PROCEDURES ... 115**
**A. Medical Billing for Unnecessary Services ... 115**
**B. Fraudulent Misrepresentations in Patient Financial Agreements ... 116**
**C. Incomplete and Inaccurate Information ... 117**
**D. Billing for Timed Services Not Supported ... 118**
**IX. PRESENTMENT AND PAYMENT OF CLAIMS ... 119**
**A. Submission of Fraudulent Records and Bills to Allstate ... 119**
**X. DAMAGES ... 122**
**XI. CAUSES OF ACTION ... 124**
**A. COUNT ONE – THE ASSOCATION-IN-FACT ENTERPRISE ... 124**
**B. COUNT TWO – THE KHIT & ASSOCIATES, PLLC ENTERPRISE ... 133**
**C. THE PURPOSE OF THE SCHEME ... 141**
**D. THE PATTERN OF RACKETERING ACTIVITIES ... 141**
**E. EFFECT ON INTERSTATE COMMERCE ... 144**
**F. INJURY TO ALLSTATE ... 145**
**XII. COUNT THREE-CONSPIRACY TO VIOLATE SECTION 1962(c) ... 145**
**XIII. COUNT FOUR ... 146**
**XIV. COUNT FIVE ... 150**
**XV. COUNT SIX ... 151**
**XVI. COUNT SEVEN ... 152**
**XVII. JURY DEMAND ... 153**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Come now Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate County Mutual Insurance Company, (hereinafter referred to collectively as "Allstate") and file this Original Complaint and complain of Khit Chiropractic and Rehabilitation, PLLC, Khit & Associates, PLLC d/b/a Khit Chiropractic & Wellness Center, SKAK Investments, LLC d/b/a Insight Diagnostic and Imaging Center, LLC, Insight Imaging Center, LLC, Kay Medical Center, PLLC, Spinal Decompression and Remodeling Clinic, PLLC, Elkay Enterprises, LLC d/b/a Elkay Transport, Impact Professional Services, LLC, Khit Property Management, LLC, Miguel Oneto, M.D., P.A. d/b/a QI & Interventions, Luis Khit, D.C., Alejandra Khit, D.C., Anna Gittins, Arturo Resendez, Susan Fan, M.D., Miguel Oneto, M.D., Julieta Oneto, M.D., Sannichie Quiacoe, M.D., William Donovan, M.D., Jose Nadal, D.C., Librado Torres, D.C., John Glade, D.C., Liz Molina, D.C., Reynaldo Amador, D.C., Debbie Rivera, D.C., and Jonathan Hernandez, D.C. (collectively, "Defendants") and for such action would show the Court as follows:

## I.
## INTRODUCTION

1. Defendants operate ten chiropractic clinics in Austin and the Rio Grande Valley, and provide the same treatment protocol by "chiropractic assistants" to automobile accident patients referred to the clinics by personal injury attorneys. The clinics also refer these patients to a co-owned 'imaging facility' for unnecessary and unreasonable MRIs, which are evaluated by a teleradiology company involved in the scheme that provides inaccurate and embellished findings to support the patients' personal injury claims and further referrals by the clinics. These include clinic referrals to a "medical" practice owned by lay, non-physician Defendants for unnecessary medical examinations by nurse practitioners, orthopedic consults which result in unreasonable recommendations for future treatment, and since 2023 unnecessary pain management consultations and injection procedures. In short,

Defendants' fraud scheme provides unnecessary treatment and bogus claims of need for future care to 'build up' patients' personal injury claims, to continue the stream of attorney referrals, and to enrich themselves.

2. Allstate seeks to recover sums fraudulently procured by Defendants from Allstate from July 2018 through December 2024, by means of bodily injury claims based on medical billings for unnecessary and unreasonable services such as chiropractic and "medical" examinations, chiropractic treatment, imaging including x-rays and MRIs, treatment by nurse practitioners such as trigger point injections, orthopedic and pain management consultations, and surgical injection procedures such as epidural steroid injections. These medical bills, with related reports and other treatment documents, were submitted to Allstate as part of claims for personal injuries.

3. Defendants Luis and Alejandra Khit ("the Khits") are Texas chiropractors that organized, employed or contracted with the Defendant entities and individuals to operate a personal injury mill in South and Central Texas. Under the direction and control of Luis and Alejandra Khit, who are not licensed to practice medicine and may not legally own or operate a medical practice in Texas, the Khit-owned healthcare entities almost exclusively serve personal injury patients treating under letters of protection that give the Khits a direct financial interest in the outcome of the patient's personal injury claim. Using templated narrative reports and forms created by the Khits, the individuals they employ prepare fraudulent medical documentation misrepresenting the patient's condition to justify self-referrals to other Khit-owned entities to maximize per-patient revenue. Relying on treatment protocols established by the two chiropractors, the Khit-owned entities provide and bill for unnecessary, predetermined healthcare services for the sole purpose of inflating the value of the patients' personal injury claims and increasing the Defendants' profits, with no regard for the individual medical needs of the patients. In fact, the vast majority of the care patients receive at these clinics is provided by unlicensed staff with little or no oversight by a chiropractor or physician.

4. Since opening their first chiropractic clinic in 2006, the Khits have formed multiple entities through which they operate healthcare clinics and offices in Austin and the Rio Grande Valley. These include chiropractic clinics, imaging entities that bill for x-rays and MRIs provided to the chiropractic patients at actual imaging facilities under lease agreements with the entities, medical offices that employ physicians and nurse practitioners, and additional chiropractic ‘spinal decompression’ offices. The Khit-owned healthcare entities do business as Khit Chiropractic (Khit & Associates, PLLC and Khit Chiropractic & Rehabilitation, PLLC), Kay Medical (Kay Medical Center, PLLC), Insight (SKAK Investments, LLC and Insight Imaging Center, LLC), and Spinal Decompression (Spinal Decompression and Remodeling Clinic, PLLC). The Khits have also formed entities to perform various functions associated with the operation of these healthcare entities, including Elkay Enterprises, LLC d/b/a Elkay Transport, Impact Professional Services, LLC, and Khit Property Management, LLC.

5. By and through the operation of these businesses, the Khits and their co-conspirators, Miguel Oneto, M.D., P.A. d/b/a QI & Interventions, Anna Gittins, Arturo Resendez, Susan Fan, M.D., Miguel Oneto, M.D., Julieta Oneto, M.D., Sannichie Quaicoe, M.D., William Donovan, M.D., Jose Nadal, D.C., Librado Torres, D.C., John Glade, D.C., Liz Molina, D.C., Reynaldo Amador, D.C., Debbie Rivera, D.C., and Jonathan Hernandez, D.C. (collectively, “Defendants”) devised and executed a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices for unreasonable and unnecessary medical services purportedly provided to personal injury claimants through the U.S. mail seeking to obtain money from settlements paid by Allstate.

6. The period at issue in this suit began in mid-2018. At that time, the Khits formed Kay Medical to provide medical examinations and initiated a relationship with QI & Interventions for it to evaluate x-rays, MRIs, and CTs of patients under the Insight name.

7. The scheme described below was intentionally initiated, promoted, financed, operated and/or maintained by the Defendants.

8. The insurance fraud scheme perpetrated by the Defendants was designed to, and did in fact, result in payments from Allstate on personal injury claims to Defendants' benefit. During the period at issue, July 1, 2018 through December 31, 2024, there were 1,253 claims submitted to Allstate involving services allegedly provided to personal injury claimants by the Khit entities for billed charges exceeding $22 million.

9. During the period at issue, the Defendant healthcare businesses primarily saw patients treating under letters of protection ("LOPs"), giving Defendants a direct financial interest in the outcome of their patients' personal injury claims. The Defendants marketed their services to personal injury attorneys, who referred their clients to Khit Chiropractic clinics. From there, the personal injury patients are generally referred to other Khit-owned entities: Insight for diagnostic imaging, Kay Medical for "medical" evaluations and often for later orthopedic or pain management evaluations, and/or the specialty clinic Spinal Decompression for spinal decompression treatment and additional chiropractic modalities. At least some of the referrals require the patient's attorney's authorization before the service is performed. These referrals are not based on individual medical necessity, but are instead Defendants' standard practice to generate the maximum possible per-patient revenue and maximize the patients' financial recovery for their personal injury claims.

10. The Defendants' scheme involved intentional fraudulent conduct, including:

a. Engaging in medically unnecessary self-referral of patients to other Khit-owned entities without disclosing the shared ownership or financial interest;

b. Ceding medical decision-making to unlicensed or otherwise unqualified persons who dictate and control the healthcare services provided to Allstate claimants;

c. Billing for healthcare services that were not reasonable or medically necessary;

d. Utilizing and billing for a predetermined treatment protocol regardless of the Allstate claimants' individual medical needs;

e. Billing for services that were not rendered as represented; and

f. Creating or causing to be created medical records that misrepresented the Allstate claimants' conditions to justify the predetermined treatment protocol and maximize financial recovery in the claimants' personal injury claims.

11. By this Complaint, Allstate asserts claims against the Defendants for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et. seq.;* (2) common law fraud; (3) civil conspiracy to commit fraud; (4) unjust enrichment, and (5) restitution of money had and received.

12. Allstate also seeks declaratory relief that no pending claims submitted to it by or on behalf of the Defendants are compensable.

13. As a result of Defendants' conduct, Allstate has been damaged by the payment of sums related to the claims at issue, which are identified in **Appendix A** to this Complaint.[1] To obtain just compensation for this organized fraudulent activity, Allstate seeks treble damages, plus interest thereon, and the costs of this suit, including reasonable attorneys' fees, pursuant to Title 18, United States Code, Sections 1962 (c) and (d), and Section 1964. Allstate also seeks compensatory and exemplary damages under applicable Texas state law.

## II.
## JURISDICTION AND VENUE

14. Pursuant to Title 28, United States Code, Section 1331, this Court has subject matter jurisdiction over the claims alleged in Counts One through Three because such claims arise under the

[1] **Appendix A** represents all claims at issue in this suit. Those claims are further delineated by provider and include the claimant/patient's first date of service as follows: (**A-1**) Khit Chiropractic and Rehabilitation, PLLC and Khit & Associates, PLLC d/b/a Khit Chiropractic & Wellness Center; (**A-2**) Insight Imaging Center, LLC and SKAK Investments, LLC d/b/a Insight Diagnostic and Imaging Center, LLC; (**A-3**) Kay Medical Center, PLLC; and (**A-4**) Spinal Decompression and Remodeling Clinic, PLLC.

laws of the United States, specifically Title 18, United States Code, Sections 1962(c) and (d), and Section 1964(c). Pursuant to Title 28, United States Code, Section 1367, this Court has subject matter jurisdiction over the state common law fraud, conspiracy, unjust enrichment, and money had and received claims alleged in Counts Four through Seven, because they are so related to the RICO claims they form part of the same case or controversy.

15. Venue is proper in this District pursuant to Title 28, United States Code, Section 1391(b) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District, and a number of the Defendants reside in this District. Venue is also proper pursuant to Title 18, United States Code, Section 1965.

## III.
## PARTIES

### A. Plaintiffs

16. Plaintiff **Allstate Insurance Company** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

17. Plaintiff **Allstate Fire & Casualty Insurance Company** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

18. Plaintiff **Allstate Indemnity Company** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

19. Plaintiff **Allstate Property & Casualty Insurance Company** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

20. Plaintiff **Allstate County Mutual Insurance Company** is a corporation incorporated under the laws of Texas, with its principal place of business in Texas.

## B. Defendants

### 1. Entity Defendants

21. Defendant **Khit & Associates, PLLC d/b/a Khit Chiropractic & Wellness Center** is organized under the laws of the State of Texas, with its principal place of business in Mission, Texas. The company is owned by Luis Khit, D.C. and Alejandra Khit, D.C. **Khit & Associates, PLLC d/b/a Khit Chiropractic & Wellness Center** may be served through its registered agent for service Luis Khit, 401 N. Bryan Road, Mission, TX 78572-6201.

22. Defendant **Khit Chiropractic & Rehabilitation, PLLC** is organized under the laws of the State of Texas, with its principal place of business in Austin, Texas. The company is owned by Luis Khit, D.C. and Alejandra Khit, D.C. **Khit Chiropractic & Rehabilitation, PLLC** may be served through its registered agent for service Alejandra Khit, 11800 N. Interstate 35, Austin, TX 78753-2211.

23. Defendant **SKAK Investments, LLC d/b/a Insight Diagnostic and Imaging Center, LLC**, is organized under the laws of the State of Texas, with its principal place of business in Mission, Texas. The company is owned by Luis Khit, D.C. and Alejandra Khit, D.C. **SKAK Investments, LLC d/b/a Insight Diagnostic and Imaging Center** may be served through its registered agent for service Luis Khit, 401 N. Bryan Road, Mission, TX 78572-6201.

24. Defendant **Insight Imaging Center, LLC**, is organized under the laws of the State of Texas, with its principal place of business in Austin, Texas. The company is owned by Luis Khit, D.C. and Alejandra Khit, D.C. **Insight Imaging Center, LLC** may be served through its registered agent for service Luis Khit, 11800 N. Interstate 35, Austin, TX 78753-2211.

25. Defendant **Kay Medical Center, PLLC**, is organized under the laws of the State of Texas, with its principal place of business in Mission, Texas. The company is owned by Luis Khit, D.C. and

Alejandra Khit, D.C. **Kay Medical Center, PLLC** may be served through its registered agent for service Luis Khit, 401 N. Bryan Road, Mission, TX 78572-6201.

26. Defendant **Spinal Decompression and Remodeling Clinic, PLLC**, is organized under the laws of the State of Texas, with its principal place of business in Mission, Texas. The company is owned by Luis Khit, D.C. and Alejandra Khit, D.C. **Spinal Decompression and Remodeling Clinic, PLLC** may be served through its registered agent for service Luis Khit, 301 N. Bryan Road, Mission, TX 78572-6201.

27. Defendant **Khit Property Management, LLC**, is organized under the laws of the State of Texas, with its principal place of business in McAllen, Texas. The company is owned by Luis Khit, D.C. and Alejandra Khit, D.C. **Khit Property Management, LLC** may be served through its registered agent for service Alejandra Khit, 5410 N. 10th St., McAllen, TX 78504-2711.

28. Defendant **Elkay Enterprises, LLC d/b/a Elkay Transport,** is organized under the laws of the State of Texas, with its principal place of business in McAllen, Texas. The company is owned by Luis Khit, D.C. **Defendant, Elkay Enterprises, LLC d/b/a Elkay Transport** may be served through its registered agent for service Luis Khit, 5410 N. 10th St., McAllen, TX 78504-2711.

29. Defendant **Impact Professional Services, LLC**, is organized under the laws of the State of Texas, with its principal place of business in Mission, Texas. The company is owned by Alejandra Khit, D.C. **Impact Professional Services, LLC** may be served through its registered agent for service Alejandra Khit, 1320 Reynosa St., Mission, TX 78572-5949.

30. Defendant, **Miguel Oneto, M.D., P.A. d/b/a QI & Interventions**, is organized under the laws of the State of Texas, with its principal place of business in Dallas, Texas. The company is owned by Miguel Oneto, M.D. **Miguel Oneto, M.D., P.A. d/b/a Quality Imaging & Interventions, PLLC** may be served through its registered agent for service Miguel Oneto, 28430 W. Valencia Cir., Harlingen, TX 78552-2241.

**2. Individual Defendants**

31. Defendant **Luis Khit, D.C.** is a citizen and resident of the State of Texas. **Luis Khit, D.C.** has an ownership interest in each of the corporate entity Defendants identified in paragraphs 21-28 above. **Luis Khit, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic & Wellness Center during the period at issue. **Luis Khit, D.C.** may be served at 401 N. Bryan Rd., Mission, TX 78572-6201, or wherever he may be found.

32. Defendant **Alejandra Khit, D.C.** is a citizen and resident of the State of Texas. **Alejandra Khit, D.C**. has an ownership interest in each of the corporate entity Defendants identified in paragraphs 21-27 and 29 above. **Alejandra Khit, D.C.** may be served at 401 N. Bryan Rd., Mission, TX 78572-6201, or wherever she may be found.

33. Defendant **Anna Gittins** is a citizen and resident of the State of Texas. She served as the Regional Manager for the Khit entities from 2015 through 2021 and is currently the Khits' Chief Operating Officer. **Anna Gittins** may be served at 401 N. Bryan Rd., Mission, TX 78572-6201, or wherever she may be found.

34. Defendant **Arturo Resendez** is a citizen and resident of the State of Texas. He served as the Chief Operating Officer for the Khit entities during much of the period at issue. **Arturo Resendez** may be served at 2303 S. 49th Lane, McAllen, TX 78503, or wherever he may be found.

35. Defendant **Miguel Oneto, M.D.** is a citizen and resident of the State of Florida. **Miguel Oneto, M.D.** is the owner of Miguel Oneto, M.D., P.A. d/b/a QI & Interventions. **Miguel Oneto, M.D.** individually and through his business, Miguel Oneto, M.D., P.A. d/b/a QI & Interventions, provided teleradiology services and prepared medical documentation for Insight during the period at issue. **Miguel Oneto, M.D.** may be served at 17371 Balaria St., Boca Raton, FL 33496, or wherever he may be found.

36. Defendant **Julieta Oneto, M.D.** is a citizen and resident of the State of Florida. **Julieta Oneto, M.D.** is a radiologist who provided teleradiology services and prepared medical documentation for Insight during the period at issue **Julieta Oneto, M.D.** may be served at 17371 Balaria St., Boca Raton, FL 33496, or wherever she may be found.

37. Defendant **Susan Fan, M.D.** is a citizen and resident of the State of Texas. **Susan Fan, M.D.** is a radiologist who provided teleradiology services and prepared medical documentation for Insight during the period at issue. **Susan Fan, M.D.** may be served at 319 Hawthorne Street, Houston, TX 77006, or wherever she may be found.

38. Defendant **Sannichie Quaicoe, M.D.** is a citizen and resident of the State of Texas. **Sannichie Quaicoe, M.D.** is a pain management physician who provided medical services and prepared medical documentation for Kay Medical during the period at issue. **Sannichie Quaicoe, M.D.** may be served at 1406 S. Bryan Rd., Mission, TX 78572, or wherever he may be found.

39. Defendant **William Donovan, M.D.** is a citizen and resident of the State of Texas. **William Donovan, M.D.** is an orthopedic surgeon who provided medical services and prepared medical documentation for Kay Medical during the period at issue**. William Donovan, M.D.** may be served at 1227 Ripple Creek Drive, Houston, TX 77057, or wherever he may be found.

40. Defendant **Jose Nadal, D.C.** is a citizen and resident of the State of Texas. **Jose Nadal, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **Jose Nadal, D.C.** may be served at 602 E. Harrison Avenue, Harlingen, TX 78550, or wherever he may be found.

41. Defendant **Librado Torres, D.C.** is a citizen and resident of the State of Texas. **Librado Torres, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **Librado Torres, D.C.** may be served at 401 N. Bryan Road, Ste. 103, Mission, TX 78572, or wherever he may be found.

42. Defendant **John Glade, D.C.** is a citizen and resident of the State of Texas. **John Glade, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **John Glade, D.C.** may be served at 5344 E. U.S. Hwy 83, Ste. B4, Rio Grande City, TX 78582, or wherever he may be found.

43. Defendant **Liz Molina, D.C.** is a citizen and resident of the State of Texas. **Liz Molina, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **Liz Molina, D.C.** may be served at 1401 S. Cage Blvd. Unit 324, Pharr, TX 78577, or wherever she may be found.

44. Defendant **Reynaldo Amador, D.C.** is a citizen and resident of the State of Texas. **Reynaldo Amador, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **Reynaldo Amador, D.C.** may be served at 708 W. Nolana Ave., McAllen, TX 78504, or wherever he may be found.

45. Defendant **Debbie Rivera, D.C.** is a citizen and resident of the State of Texas. **Debbie Rivera, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **Debbie Rivera, D.C.** may be served at 900 N. Austin Ave., Suite 502, Georgetown, TX 78626, or wherever she may be found.

46. Defendant **Jonathan Hernandez, D.C.** is a citizen and resident of the State of Texas. **Jonathan Hernandez, D.C.** is a chiropractor who provided chiropractic services and prepared medical documentation for Khit Chiropractic during the period at issue. **Jonathan Hernandez, D.C.** may be served at 1325 George Dieter Dr., e04, El Paso, TX 79936, or wherever he may be found.

## IV.
## STATEMENT OF FACTS
## Relevant to All Causes of Action

### A. Formation of the Khit Entities

47. The Khits are licensed Texas chiropractors. This is their sole healthcare licensure; for example, they have never been licensed physicians or nurses. The Khits operate various chiropractic clinics and other healthcare offices in Austin, Texas and in the Rio Grande Valley in South Texas ("the Valley"),[2] with a new facility recently opened in Kyle, Texas.

48. Luis Khit graduated from Texas Chiropractic College in 2004 and was licensed to practice chiropractic in Texas that year. Alejandra Khit graduated from Texas Chiropractic College in 2005 and was licensed to practice chiropractic in January of 2006. They married in Hidalgo County on March 31, 2005.

#### 1. Chiropractic Entities

49. On November 16, 2007, the Certificate of Formation for Khit & Associates, PLLC was filed with the Texas Secretary of State, identifying 409 N. Bryan Road, Ste. 103, Mission, Texas as its principal place of business. The certificate identified Luis and Alejandra Khit as managing members. Khit & Associates, PLLC began doing business under the fictitious business name "Khit Chiropractic & Wellness Center, LLC." Khit & Associates, PLLC d/b/a Khit Chiropractic & Wellness Center, LLC was assigned National Provider Identifier ("NPI") number 1841448800 on September 3, 2008. The Khit Chiropractic clinic in Mission later moved to 401 N. Bryan Road.

50. On December 9, 2014, a Certificate of Formation was filed with the Texas Secretary of State for Khit Chiropractic & Rehabilitation, PLLC, identifying its principal place of business as 11800 N. Interstate 35, Austin, Texas 78753, which would be the location of the Khit Chiropractic North Austin clinic. Luis and Alejandra Khit are identified as the company's managing members.

---

[2] In Starr, Hidalgo, and Cameron Counties.

Khit Chiropractic & Rehabilitation, PLLC owns the business personal property located at that address, as well as the property at the South Austin clinic that opened in 2017, first at 4404 Merle Drive and later moving to 2800 S. Interstate 35.

**2. Diagnostic Imaging Entities**

51. On December 17, 2009, a Certificate of Formation was filed with the Texas Secretary of State for SKAK Investments, LLC, identifying its principal place of business as 409 N. Bryan Road, Ste. 103, Mission, Texas. Luis and Alejandra Khit were identified as managers of the company. SKAK Investments, LLC filed an Assumed Name Certificate on December 18, 2009 and began doing business as Insight Diagnostic and Imaging Center, LLC.

52. On February 14, 2019, the Certificate of Formation for Insight Imaging Center, LLC was filed with the Texas Secretary of State, identifying its principal place of business as 11800 N. Interstate Hwy 35, Austin, Texas 78753.

53. As detailed below, while the Insight entities are presented in imaging reports, bills, etc. as 'imaging centers,' they have no actual facility with MRI or CT equipment and instead (per Luis Khit's 2024 deposition testimony) "lease" time from imaging centers such as Longhorn Imaging and Central Park Imaging in Austin, and Baaxten Imaging and Daystar Open MRI in the Rio Grande Valley.

**3. Medical Practice Entities**

54. On March 26, 2018, the Certificate of Formation was filed with the Texas Secretary of State for Kay Medical Clinic, PLLC, identifying its principal place of business as 401 N. Bryan Road in Mission, Texas. Luis and Alejandra Khit were identified as managers, along with Roberto "Prado," M.D. (actually Roberto Pardo, M.D.). Dr. Pardo was an internal medicine physician born in 1942 and was thus about age 75 at the time. He appears to have closed his own practice by this point. Dr. Pardo saw some Khit Chiropractic patients for medical examinations, on information

and belief at the chiropractic clinics. His medical license expired on August 31, 2018, just five months after Kay Medical Clinic, PLLC was formed, and he then ceased seeing patients. The entity was ultimately voluntarily dissolved on June 21, 2021.

55. On September 30, 2018, the Certificate of Formation was filed with the Texas Secretary of State for Kay Medical Center, PLLC, identifying 401 N. Bryan Road in Mission, Texas as its principal place of business. Luis and Alejandra Khit were the only managing members identified in the filing. No medical doctor was named as a member as with the prior Kay entity. Although no amendment has ever been filed regarding membership, as of October 21, 2021, public information reports filed with the Texas Secretary of State also identified an entity, Andrew Levine, M.D., P.A., as a member, but not a managing member, of Kay Medical Center, PLLC. Dr. Levine is a nephrology (kidney) specialist. He is one of the owners of Baaxten Imaging, which consists of several imaging facilities in the Rio Grande Valley that were used to perform MRIs for Insight's patients, that were billed under Insight's name. On information and belief, Dr. Levine was also the titular delegating physician to Kay Medical Center nurse practitioners through April 2021 but provided no actual oversight of the nurse practitioners.

**4. Spinal Decompression and Remodeling Clinic, PLLC**

56. On April 29, 2019, the Certificate of Formation was filed with the Texas Secretary of State for Spinal Decompression and Remodeling Clinic, PLLC, identifying its principal place of business as 301 N. Bryan Road in Mission, Texas. The certificate identifies Luis and Alejandra Khit as the company's managing members.

**5. Elkay Enterprises, LLC d/b/a Elkay Transport**

57. On January 24, 2013, the Certificate of Formation was filed with the Texas Secretary of State for Elkay Enterprises, LLC, identifying its principal place of business as 5410 N. 10th Street, McAllen, Texas 78504.[3]

58. Elkay Enterprises, LLC provides transportation services for the Khit healthcare entities to transport patients to appointments at the Valley-area clinics.

**6. Khit Property Management, LLC**

59. On May 8, 2013, the Certificate of Formation was filed with the Texas Secretary of State for Khit Property Management, LLC, identifying its principal place of business as 5410 N. 10th Street, McAllen, Texas 78504.

60. Khit Property Management, LLC owns most of the properties where the Khit healthcare entities do business, as well as properties where construction of new clinics are planned.

**7. Impact Professional Services, LLC**

61. On February 12, 2014, the Certificate of Formation was filed with the Texas Secretary of State for Impact Professional Services, LLC, identifying its principal place of business as 1320 Reynosa Street in Mission, Texas. However, there is no structure located at that address; it is simply a mailbox at the entrance of a parking lot across the street from Khit Chiropractic's Mission clinic.

62. Impact serves as the custodian of records for all the Khit healthcare entities. The Khit Multidisciplinary Group website advertises Impact as follows:

[3] Although Khit Chiropractic's McAllen clinic was previously located at this address, as of 2024, the building was listed as available for rent and appeared to be vacant.




63. As of 2023, Impact also served as the billing department for the Khit healthcare entities.

64. Recently, Impact placed job advertisements for a "care coordinator," whose primary responsibilities would include "assist[ing] clinics with preauthorizations,[4] scheduling, billing, and appointment management[,]" as well as helping patients remain compliant with their treatment plans and "support[ing] attorneys with case-related questions[.]" Although the position was specific to Impact, the posting encouraged applicants to "stop by" any of the Valley-based Khit Chiropractic offices to complete an application and provide their resumes. The posting advises that "people with a criminal record" are encouraged to apply, as well as "rehab techs, medical assistants, massage therapists, etc."

**8. Khit Multidisciplinary Group, LLC**

65. On October 17, 2024, the Certificate of Formation was filed with the Texas Secretary of State for Khit Multidisciplinary Group, LLC, identifying its principal place of business as 401 N.

[4] Yet none of the Khit entities accept insurance in the period at issue. In this context, "preauthorizations" appear to refer to attorney approval prior to scheduling additional appointments and/or procedures.

Bryan Road in Mission, Texas. The certificate identifies Luis and Alejandra Khit as the company's managing members.

66. The original 2024 website for Khit Multidisciplinary Group provided the following history, in which Chiropractors Luis and Alejandra Khit admit to forming imaging and medical offices, etc., to refer their chiropractic patients:

> Khit Chiropractic and Wellness Center was established in 2006 by founders Luis I Khit and Alejandra G Khit, with its initial practice location in Harlingen, Texas. . . . Over the years, Khit Chiropractic and Wellness Center continued to grow and added additional locations[.] . . . Since 2011, we have partnered with Insight Diagnostics and Imaging Center to offer a comprehensive range of imaging services. . . . As we encountered the complexities of our patients' clinical presentations, it became apparent that expanding our healthcare services was necessary to meet their diverse needs. In response to this need, we established Kay Medical Center in 2013,[5] which has allowed us to adopt a holistic approach to patient care. . . . Recognizing that some patients require more advanced care, we expanded our offerings and founded Kay Medical Center – Orthopedics and Spinal Decompression and Remodeling Center. . . . In 2023, we further expanded our services by establishing Kay Medical Center – Pain Management. . . . We recognize the importance of accurate, safe, and compliant medical records management. For this purpose, Impact Professional Services was created. . . . Khit Multidisciplinary Group (KMDG) was established in 2023[.] . . . This strategic merger aims to unite our expertise and resources, enabling us to deliver even higher levels of care to our patients...

**B. Practice Locations and Providers**

67. Defendants' practice and headquarter offices are in Travis, Hays, Starr, Hidalgo, and Cameron Counties. Specifically:

**1. Khit Chiropractic**

68. Khit Chiropractic's website in the period at issue, and currently, advertises "8 convenient locations."[6] Those chiropractic clinics are in North Austin, South Austin, Mission, Brownsville,

[5] While this history states Kay Medical Center was established in 2013, Kay Medical Center, PLLC was not formed until 2018, and there is no indication of patients being seen at Kay Medical prior to 2018.

[6] Although the Khit websites still reference eight locations, the number of Khit offices has increased to ten, including new offices in Edinburg and Kyle, Texas.

Harlingen, Rio Grande City, Weslaco, and McAllen. Two more clinics were recently under construction in Kyle and Edinburg.

69. All but one of the first eight clinics have moved from their original locations to substantially larger, upgraded facilities. Aside from Harlingen (2015), the expansion occurred in late 2017 (Brownsville) through 2021. The facilities' expansion coincided with the period at issue and the expansion of the Defendants' enterprise generally, including the formation of Kay Medical, Spinal Decompression, and the relationship between Insight and QI&I. The Khits own most of the properties outright through their property management company, Khit Property Management, LLC, and most of the debts incurred for purchase of the properties have been paid in full or otherwise discharged.

**a. Harlingen**

70. The Khits opened the first Khit Chiropractic clinic in Harlingen in 2006. The clinic was located at 2202 S. 77 Sunshine Strip before moving to its current location at 602 E. Harrison Avenue in 2015.

71. In the period at issue and continuing to the present, Jose Nadal, D.C. has been the primary chiropractor responsible for seeing patients and supervising chiropractic assistants at the Harlingen office. He has been working with the Khits since 2014.

**b. Mission**

72. In 2007, the Khits opened a second chiropractic clinic in a strip center at 409 N. Bryan Road, Ste. 103 in Mission, Texas.

73. In July of 2009, Khit & Associates, PLLC purchased property located at 401 N. Bryan Road in Mission, Texas.[7] After facial renovations, the Mission clinic moved into this larger

[7] Khit Property Management, LLC later purchased the property from Khit & Associates, PLLC for $10 on or about July 30, 2014.

standalone building at that address around Spring of 2011. The 401 N. Bryan Road clinic underwent major reconstruction in 2018 to 2019, including acquisition and demolition of a house behind the property, substantially expanding the size of the clinic, and adding a second floor. It appears during this reconstruction, clinic operations were transferred to the building across a parking lot at 301 N. Bryan Road, which Khit Property Management purchased in June of 2018 and at which Kay Medical and Spinal Decompression offices were opened after the chiropractic clinic moved back into 401. N. Bryan Road.

74. Librado Torres, D.C. has been the primary chiropractor responsible for seeing patients and supervising chiropractic assistants at the Mission office since before the period at issue. He has been working with the Khits since 2011.

**c. Weslaco**

75. The third Khit Chiropractic office was opened in Weslaco, Texas. It was initially located in a strip center at 915 S. Utah, along with the offices of nephrologist Andrew Levine, M.D. and Dr. Levine’s Baaxten Ambulance. As noted previously, Insight leased Dr. Levine’s Baaxten Imaging facilities to perform MRIs, and Dr. Levine was the supposed delegating physician to Kay Medical nurse practitioners.

76. By the beginning of 2022, the Weslaco office had moved to a new facility at 3202 W. Expressway 83. Sometime that year, Daystar Open MRI, an imaging facility that Insight also “leased” to perform MRIs for Insight patients, began operating at that location next to Khit Chiropractic. By 2023, Kay Medical also had an office adjoining Khit Chiropractic equipped to perform pain management injections such as epidural steroid injections.

77. Jonathan Hernandez, D.C. was the primary chiropractor at the Weslaco location in the period at issue, until May or June of 2024. When Hernandez was deposed in April of 2025, he

testified that he left Khit Chiropractic because of "unethical practices," refusing to elaborate further. There is currently no designated chiropractor overseeing patient care at the Weslaco office.

**d. Brownsville**

78. By May of 2011, there was a Khit Chiropractic open in Brownsville, Texas at 115 North Street.

79. By October of 2017, the Brownsville office had moved to a much larger building at 62 E. Price Road, which was purchased by Khit Property Management, LLC on January 12, 2018. The Khits lease space at the Brownsville clinic to another personal injury provider in the Rio Grande Valley, 911 Pain Management.[8]

**e. McAllen**

80. Khit Chiropractic's McAllen office was initially located in a strip center at 5410 N. 10th Street.

81. Like the other locations, the McAllen clinic later moved to a larger and more impressive building located at 708 W. Nolana Avenue, which was purchased by Khit Property Management, LLC on April 9, 2020. The clinic started operating at the new location around May 2021. By October of 2021, Kay Medical and Spinal Decompression also had prominent adjoining offices at this location.

82. Reynaldo Amador, D.C. was the primary chiropractor responsible for seeing patients and supervising chiropractic assistants at the McAllen office in the period at issue and continuing to the present.

---

[8] Before Kay Medical hired a pain management physician, Khit Chiropractic routinely referred its patients to 911 Pain Management, and, in turn, 911 Pain Management regularly referred its patients to Kay Medical for orthopedic evaluations.

**f. Austin**

83. In the Fall of 2014, Khit Property Management, LLC purchased what was originally a residence that had been converted to business space at 11800 N. Interstate Highway 35 in Austin, Texas. As noted previously, on December 9, 2014, Khit Chiropractic & Rehabilitation, PLLC, formed, identifying its principal place of business as that address. The Khits opened their North Austin clinic at that location by April of 2016. 512 Pain Management, P.A., a sister company of 911 Pain Management, also operates out of the Khits' North Austin office.[9]

84. In the summer of 2017, Khit Chiropractic opened a second Travis County office in South Austin. It was initially located at 4404 Merle Drive, a converted residence. In the summer of 2022, the clinic moved to its current location in a strip center at 2800 S. Interstate Highway 35, Ste. 110.

85. During the last half of the period at issue, starting in late 2021, Debbie Rivera, D.C. was the primary chiropractor practicing at the North Austin clinic. Khit Chiropractors from South Texas, including John Glade, D.C. and Liz Molina, D.C. also saw patients at the Austin clinics.

**g. Rio Grande City**

86. By October of 2017, Khit Chiropractic began operating in a small, converted residence located at 100 S. San Antonio Street in Rio Grande City.

87. During the summer of 2021, the Rio Grande City office moved to a new location at 53444 E. Highway 83, Ste. B4.

88. Liz Molina, D.C. worked as the primary chiropractor at the Rio Grande City clinic for majority of the period at issue, until she stopped working for Khit Chiropractic in or about 2023. The website for Khit Chiropractic now lists John Glade, D.C. as the clinic's chiropractor.

---

[9] Austin-based Khit Chiropractic patients are often referred to 512 Pain Management.

**h. Kyle**

89. The Khits announced that the newest Khit Chiropractic clinic will be located at 6151 E. Post Road in Kyle, Texas. Khit Property Management purchased this property in 2021. Construction has now been completed, and the Khits advertise that the Kyle office is operational.

**2. Insight**

90. The two Insight entities' home offices are within the North Austin and Mission Khit Chiropractic clinics. An Insight website in the period 2022-2024 stated that Insight offered x-rays, MRIs, CTs, and diagnostic sonography. The website represented Insight performed these services itself. For example: "… our MRI scans provide clear and detailed images …," and "Our CT scans offer cross-sectional images of the body."

91. Luis Khit, D.C. has also represented in testimony that Insight has actual imaging centers outside of Khit Chiropractic Clinics. When Khit was asked what Insight does during a March 2023 deposition,[10] he testified:

> Q. Okay. And then what does Insight do?
>
> A. It is an imaging center, so we do X-rays, CT scans and MRIs and ultrasounds.

Khit denied that Insight was located inside any of the eight Khit Chiropractic clinics, instead testifying that Insight had three separate locations in McAllen, Weslaco, and Brownsville.

92. In a May 2024 deposition, Jose Nadal, D.C. testified Insight is a "conglomeration" of different imaging centers, including Baaxten and Daystar, and he did not know the location of Insight's main office. Chiropractor Nadal testified that since the Insight referral form mentioned Mission, Insight's main office was probably there. Nadal further testified if he referred a patient for MRI and the patient asked him to recommend a facility, he would recommend Insight, and "So

[10] *The Estate of Everardo Abrego, Deceased*; Cause No. P-39,093-A, Probate Court of Hidalgo County, Texas.

if they finally choose to go to Insight, okay, they do the MRI at Insight." In a June 2024 deposition, John Glade, D.C. testified the plaintiff's x-rays were done at the Mission Khit Chiropractic Clinic. Chiropractor Glade testified Insight had MRI equipment at its separate imaging center:

> Q. Okay. Does Khit -- I mean, does Insight Diagnostics actually have MRI equipment of its own someplace?
>
> A. Yes. Insight Diagnostics is an imaging center, and they have MRI equipment there.

Glade claimed this Insight imaging center was in McAllen.

93. However, other depositions taken in personal injury cases against Allstate's insureds in 2024 and 2025 established that, in fact, Insight does not have—and has not had at any point since the Khits started the first Insight company in 2009—its own store front, office space, MRI equipment, or employees. In another June 2024 deposition, Librado Torres, D.C. testified the plaintiffs' MRIs were done at an imaging facility "but we bill it under Insight." Insight did not have an MRI machine, at any location, but contracts with an actual MRI facility. In a July 2024 deposition, Luis Khit, D.C. testified that the plaintiff's Insight x-rays were taken at the same location as the Mission chiropractic clinic. The x-ray equipment belonged to Insight. Khit initially again claimed that Insight had its own MRI and CT equipment, at a separate Insight facility in McAllen.

> Q. Okay. Does Insight have its own MRI or CT equipment, other types of imaging?
>
> A. X-ray -- X-ray, MRI, CT.
>
> Q. So it has a different facility somewhere else with an MRI and a CT machine?
>
> A. Yes.
>
> Q. Okay. Where is that at?
>
> A. In McAllen, Texas.

However, when directly asked if this was an actual Insight facility, Khit stated it was a shared facility. When asked the name of the facility, he identified it as Daystar Open MRI.

94. Insight bills for x-rays taken by Khit Chiropractic personnel inside the Khit Chiropractic clinics. Insight bills for other imaging studies, usually MRIs, that are performed at "leased" imaging facilities not otherwise connected to the Khit entities.

95. When he was deposed as Insight's corporate representative in September of 2024, Luis Khit, D.C. testified that the x-ray equipment at the Khit Chiropractic clinics belonged to Insight, but the x-ray equipment was operated by clinic employees. Insight has just three employees—himself, Alejandra Khit, and a man named Joel. MRIs, CTs, and sonograms billed by Insight are performed at another imaging facility under a lease agreement with Insight. In that case, the patient's MRIs were done at a Baaxten facility. Insight also has lease agreements with Daystar Open MRI. Khit testified Insight pays *monthly* fees exceeding $20,000 *per center* to "lease" existing imaging facilities for specific periods of time:

> Q. How much would Daystar be paid under the lease on a monthly basis?
> A. Right now?
> Q. Yes.
> A. I don't know the exact figure, but for MRI facilities probably more than 20,000.
> Q. About $20,000 a month?
> A. Yes.
> Q. Okay. And that's for all the Daystars or is it just, you know...
> A. No, per center.
> Q. Per center. Do you know how much time you get under that lease?
> A. No.

96. When its patients are referred to Insight for MRIs or CTs, Khit Chiropractic schedules the patients' appointments and instructs them to travel to the leased facilities. The scans are performed by the leased facilities' technicians using the leased facilities' equipment.

97. However—despite the purported substantial monthly fees paid for the use of the space(s), equipment, and staff— the studies are not interpreted by the radiologists at the leased facility. Instead, imaging studies performed for Insight are read by teleradiologists selected by Luis Khit, D.C. with whom Insight contracts to interpret the images and prepare reports on Insight letterhead for a flat per-study fee. Insight then charges the patient a single global fee that includes both the technical and professional components.[11]

98. The chiropractors who regularly refer patients to Insight for imaging studies know Insight is a co-owned entity of Khit Chiropractic. In 2024 depositions, John Glade, D.C. and Librado Torres, D.C. testified that Luis Khit owns Insight. Glade and Torres agreed Khit would benefit financially from MRI referrals to Insight. Jose Nadal, D.C. testified that "I believe [Insight] is a part of Khit Chiropractic." However, when Jonathan Hernandez, D.C., was deposed in April of 2025 after working at Khit Chiropractic for more than four years, he testified:

> Q. So do you know the owners of Insight Diagnostics?
> MR. MIRELES: Objection, form.
> A. I'm going to say no. Because, like I said, I don't know who the official owner is.
> Q. (By Ms. Frank) Okay. Were you ever told anything about the ownership of Insight Diagnostics?
> A. No.

**3. Kay Medical**

99. The short-lived Kay Medical Clinic provided examinations by Dr. Roberto Pardo, M.D., for several months starting in March 2018. These examinations were apparently done at one or more of the Khit Chiropractic clinics. Dr. Pardo's final primary practice address listed by the Texas Medical Board was in fact the address of the McAllen Khit Chiropractic clinic.

[11] When billed separately, the charges associated with an MRI involve a technical component, which includes costs associated with the facility, equipment, and supplies used to perform the scan, as well a professional component which covers the radiologist's fees for interpreting the scan and preparing a report.

100. When Kay Medical Center formed in September 2018, its nurse practitioners began performing examinations at the chiropractic clinics. Kay Medical referral forms listed eight cities, corresponding to the location of the Khit Chiropractic clinics. In a July 2024 deposition, Luis Khit, D.C. was asked about the referral form and testified he had a Kay Medical location at each of his eight Khit Chiropractic clinics.

> Q. Okay. And I believe you said earlier, you're the owner of Kay Medical, correct?
>
> A. I am.
>
> Q. Okay. So do you have a Kay Medical location at each of your eight Khit Chiropractic clinics?
>
> A. Yes, we do.

After dedicated Kay Medical offices opened in the 2020s, the nurse practitioners continued to see patients at the various clinics without an adjacent Kay Medical office. Valerie Cruz, a nurse practitioner that saw patients at five locations for Kay Medical from October of 2022 through October of 2023, testified:

> Q. You worked inside of Khit Chiropractic?
>
> A. Uh-huh.
>
> Q. Okay. So did Kay Medical not have its own office space separate?
>
> A. They finally had their own office space in Weslaco a couple of months before I quit.
>
> Q. But otherwise when you traveled, it would be to other Khit Chiropractic locations.
>
> A. Correct.
>
> Q. And how -- did you just have an office within that space?
>
> A. Correct.

101. Around June 27, 2018, Khit Property Management, LLC purchased property located at 301 N. Bryan Road in Mission, Texas, across a parking lot south of the Khit Chiropractic clinic at 401 N. Bryan Road. Around 2020, after renovations to the chiropractic clinic were complete and it resumed operations at 401 N. Bryan Road, Kay Medical and Spinal Decompression offices opened at 301 N. Bryan Road, and Kay Medical listed this address as its principal place of business.

102. By October of 2021, Kay Medical had an office next door to Khit Chiropractic's McAllen clinic. By 2023, Kay Medical also had an office next to Khit Chiropractic's Weslaco clinic.

103. In addition to the nurse practitioner examinations, starting in late 2020, Dr. William F. Donovan, M.D. began doing "orthopedic consultations" for some Kay Medical patients. Some were conducted in person, presumably at the 301 N. Bryan Road Kay Medical office that had recently opened, or telephonically from Houston, where Dr. Donovan resides.

104. Through the beginning of 2021, the nurse practitioners' services were limited to initial and follow-up examinations and writing prescriptions. Around Spring 2021, the Kay Medical examination report form was modified to allow recommendations for trigger point injections, therapeutic intramuscular injections, and iontophoresis, and the nurse practitioners began to perform these services on some patients.

105. Kay Medical offices do not keep regular business hours and are staffed sparingly. Valerie Cruz testified the offices only were staffed when she and her medical assistant were at the particular office. Cruz testified "100%" of the patients she saw at Kay Medical were referred there by chiropractors at Khit Chiropractic or the patients' attorneys. While the vast majority were personal injury patients, there were some cash patients treating at the clinic who then also came to Kay Medical.

106. Kay Medical nurse practitioners use a form evaluation report, in which they largely check entry selections. From 2018 through April 2022, Dr. Andrew Levine, M.D., was listed on these

pre-printed evaluation report forms for Kay Medical along with varying nurse practitioners as a provider that could be ‘checked’ as having examined the patient. Dr. Levine is a nephrologist and would have little to offer to most patients injured in automobile accidents. His name was likely included because he was the titular designating physician to the Kay Medical nurse practitioner. Dr. Levine already had a relationship with the Khits and Insight, as he was an owner in the Baaxten imaging centers where some “Insight” MRIs were performed. In any event, Dr. Levine was the provider in very few—if any—Kay Medical examinations.

107. In 2021, Dr. Kannan Ramamurthy, M.D., was added to the list of potential examiners on the Kay Medical evaluation forms. Dr. Ramamurthy was born in 1948, and his practice areas were internal medicine and geriatrics. Like Dr. Levine, Dr. Ramamurthy was the provider in very few—if any—Kay Medical examinations.

108. Around April 2022, Dr. Levine’s and Dr. Ramamurthy’s names were replaced on the list of potential Kay Medical examiners on the evaluation report forms with Dr. Donovan. Dr. Donovan also became the delegating physician for the Kay Medical nurse practitioners.

109. Dr. Donovan was 79 years old at that time. Dr. Donovan, an orthopedic surgeon, previously operated Northshore Orthopedics in Houston for a number of years, but it appears that practice had closed by April 2022. As noted above, Dr. Donovan had examined patients for Kay Medical for orthopedic consultations on occasion since late 2020, although the examinations were typically conducted via telemedicine since he resides in Houston.

110. Texas law requires nurse practitioners to have at least one delegating physician at each of their practice locations. Delegating physicians are supposed to provide oversight, which includes working with nurse practitioners on treatment protocols, issuing prescriptive authority agreements setting forth the medications the nurse practitioner may or may not prescribe, and periodically

meeting with the nurse practitioner to discuss patient matters.[12] The protocols and prescriptive authority agreements must be signed by the physician and nurse practitioner and reviewed and re-signed at least annually. The periodic meetings must include sharing information relating to patient treatment and care, changes needed in care plans, referral issues, and discussion of patient care improvement.[13] These meetings must be documented and take place monthly.[14] These requirements were not followed at Kay Medical. In fact, Chiropractor Luis Khit directed the nurse practitioners.

111. In a December 2024 deposition, Valerie Cruz, FNP testified that she was a nurse practitioner at Kay Medical from October 2022 to October 2023. Although she initially could not recall the name of her supervising physician at Kay Medical, she confirmed it was Dr. Donovan when prompted with his name. She thought Dr. Donovan was based in Houston. Cruz testified that she met Dr. Donovan *on only one occasion* during the year she worked for Kay Medical, and that was the only time she ever spoke with him. While Cruz thought there was a written prescriptive authority agreement, this was only because she saw his name on their DEA accounts. She described Dr. Donovan's supervision:

> Q. Okay. And what all did Dr. Donovan do as your supervising physician at Kay Medical Center?
> A. He would review our charts, and he would also do orthopedic consultations online.
> Q. And how often did he discuss your charts with you?
> A. Zero.

112. Julio Rios, FNP was a Kay Medical Nurse practitioner when Dr. Levine was presumably the delegating physician. Rios stated on social media that he was a joint employee of Kay Medical

[12] Tex. Occ. Code §157.0512; 22 Tex. Admin. Code §221.13(d); 22 Tex. Admin. Code §222.5.

[13] Tex. Occ. Code §157.0512(f)(1); 22 Tex. Admin. Code §222.5(d)(1).

[14] Tex. Occ. Code §157.0512(f)(2) and (3); 22 Tex. Admin. Code §222.5(d)(2) and (3).

and Khit Chiropractic. Although he claimed he worked with a chiropractor, he did not mention any physician:

**Family Nurse Practitioner**
Kay Medical Center/ Khit Chiropractic
Dec 2019 - Apr 2022 · 2 years 5 months
Personal injury, MVA, slip & fall, etc. Work alongside chiropractor

113. Texas law prohibits lay ownership of a medical practice.[15] Yet when Luis Khit, D.C.—a licensed chiropractor, not a medical doctor—was deposed in 2023, he admitted that the Khits own Kay Medical, a medical practice. He testified that Kay Medical was staffed by two doctors and two nurse practitioners, and further confirmed that these individuals are salaried, W-2 employees. In a July 2024 deposition, Khit testified that he was the owner of, and Clinical Director for, Kay Medical. He later identified Dr. Donovan as the Medical Director. However, Valerie Cruz, FNP testified that certain universal treatment protocols were established by Luis Khit, D.C. Khit himself testified that he created the examination report forms used to document evaluations at Kay Medical and that he trained the nurse practitioners regarding how to complete them.

114. Since Kay Medical nurse practitioners saw patients in the chiropractic clinics, Khits' chiropractors were aware of the relationship between the Khits and Kay Medical, and knew that their referrals to Kay Medical would benefit the scheme. In a 2024 deposition, John Glade, D.C. testified that Luis Khit owned Kay Medical, and agreed that Khit would benefit from referrals to Kay Medical. Glade knew Dr. Donovan was the orthopedic doctor for Kay Medical, and that Donovan, who was in Houston, usually did consultations "through telehealth." In another 2024 deposition, Librado Torres, D.C. also testified that Luis Khit owned Kay Medical. In her 2024 deposition, Valerie Cruz, FNP testified that "Mr. Khit and Mrs. Khit" owned Kay Medical.

[15] *See* Tex. Occ. Code §155.001

**4. Spinal Decompression**

115. In addition to its principal office established at 301 N. Bryan Road in Mission, Texas when the company was formed in April 2019, Spinal Decompression had an office next to Khit Chiropractic's McAllen clinic by October 2021. On information and belief, Spinal Decompression also operates out of the other Khit Chiropractic clinics. In May 2024, the Spinal Decompression website also listed locations at the addresses of the Brownsville and Weslaco clinics. In June 2024, it revised the website to delete any specific address and instead merely stated, "Available by appointment Monday through Friday, Call us to book an appointment," without a listed address. Now, the website advertises offices at the same addresses as the eight original Khit Chiropractic clinics (North and South Austin, Bryan, Harlingen, McAllen, Rio Grande City, Brownsville, and Weslaco).

116. Luis Khit, D.C. testified that Spinal Decompression is primarily staffed by Khit Chiropractic's chiropractic assistants who receive additional training related to the spinal decompression equipment. Although all medical bills from Spinal Decompression identify the provider as Luis Khit, D.C., the associated medical records reflect that *all* services at this facility are provided by chiropractic assistants, who often deviate from the prescribed treatment plan without any indication that changes were made at the instruction or with the approval of a chiropractor. There are no assigned chiropractors at Spinal Decompression. After treatment begins there, re-exams continue to be done and billed by Khit Chiropractic.

## V.
## DEFENDANTS' OPERATIONS
## <u>Relevant to all Causes of Action</u>

### A. Khit Entities' Operations Before 2018

117. Although the Khit Chiropractic clinics have seen personal injury patients since the first clinic opened in 2006, the clinics also treated many patients under workers' compensation and health

insurance. In a 2023 deposition, Luis Khit, D.C. testified that sixty percent of the patients were workers' compensation patients and patients treating under healthcare insurance.

118. Changes to the Texas workers' compensation laws and rules went into effect in 2011 and 2012, including required disclosure of financial interests by referring providers, required preauthorization for physical and occupational therapy services after the first six visits and for any treatment in excess of or not covered by the adopted treatment guidelines or treatment plan approved by the carrier, and requiring the non-prevailing party in a medical fee dispute to reimburse the Division of Workers Compensation for the cost of dispute resolution proceedings. The Khit Chiropractic clinics eventually stopped treating workers' compensation patients, but still saw a variety of patients, including—but not limited to—patients injured in auto accidents. In his 2023 deposition, Khit noted the "biggest factor that changed our model" was when workers compensation laws changed. There was a gradual change, and about 2012 was when the clinics started doing more personal injury cases.

119. From 2016 through mid-2017, the Khit Chiropractic website did not emphasize treating automobile accidents. The "About" section stated that "[d]uring the past ten years of service, the doctors and staff at Khit Chiropractic and Wellness Center have treated thousands of patients for a wide range of injuries to help them heal and return to enjoying their lives." The "Our Practice" section included "Auto Accident Injuries" in a list of conditions treated, along with other matters such as sports injuries and school sports physicals. In October of 2017, the "mission statement" on the home page for Khit Chiropractic's revised website stated:

> The mission of Khit Chiropractic and Wellness Center is to evaluate, educate, and provide the highest quality of skilled care to our patients in a professional, friendly and caring environment. We are dedicated to provide individualized healthcare specifically for your needs to help you achieve better health and optimal human functioning. Through the use of the latest knowledge, tailored treatment, diagnostic tools such as X-Rays, MRI, CT Scans, Sonograms and the collaboration with other healthcare providers we strive for the best possible outcome.

There was no mention of auto accidents or personal injury on the home page.

120. During this period, the only other Khit-owned healthcare entity the clinics referred patients to was Insight. Insight billed for x-rays done at the clinics, and at some point, began billing for other imaging such as MRIs.

**B. Significant Changes to Khit Operations in 2018**

121. Two critical changes in the Khit operations occurred in 2018: (1) Khit contracted with QI&I to evaluate x-ray, CT, and MRI scans, and issue radiology reports under Insight's name, and (2) the Khits formed Kay Medical and began having nurse practitioners perform medical examinations and follow-up examinations on patients referred from the Khit Chiropractic clinics. ***These changes initiated the scheme and period at issue***. The relationship with QI&I allowed the Khits to control the interpretation of diagnostic imaging studies for the "liability cases" treated at their clinics, instructing the QI&I radiologists to describe natural and degenerative (age-related) findings using highly technical terms to conceal the fact that such findings were not "injuries" caused by the accident, also allowed Insight to bill higher charges, as it would now bill MRIs globally, instead of line-item billing for the technical, facility, and professional fees. Forming Kay Medical allowed the Khits, who were not medical doctors, to effectively practice medicine and to bill for examinations and other medical services.

**1. QI&I**

122. At the beginning of 2018, Insight charged $2,100 per CT scan or MRI. The charge was increased to $2,400 around Spring 2018. These charges were only for the technical portion of the MRI. Radiologists reviewing the MRIs or CTs and issuing reports independently billed for their professional "read." Insight billed the complete charge for x-rays, and there was apparently no evaluation of x-rays by outside radiologists.

123. Beginning in the Summer of 2018, nearly all imaging studies Insight billed for, including x-rays, were interpreted by radiologists with QI&I. The interpreting radiologists were almost always Miguel Oneto, M.D., Julieta Oneto, M.D., or Susan Fan, M.D. Luis Khit, D.C. testified in 2024 that he used QI&I to interpret imaging studies for Insight because Dr. Miguel Oneto, one of QI&I's owners, "is a doctor that I completely trust."

124. By late 2018, Insight's referral forms for x-rays and MRIs often included the pre-printed statement "READ ONLY BY DR. ONETO" at the bottom. Unlike the prior radiologists, QI&I *did not* bill separately for the professional fees for interpreting the imaging studies. Instead, Insight billed a single global fee for imaging studies, increasing the charges for an MRI or CT to $3,000.

125. Screenshots of MRI reports produced during a deposition of Dr. Fan in 2024 included a partial view of an underlying "facility note" in the QI&I record. The Facility Note advised that, "All MRIs are liability cases." There were also instructions that could only partially be seen, including "Please descr…" and "Degenerative changes should n…"

126. When Luis Khit, D.C. was deposed in the same case in September of 2024, he testified that Insight never asked Dr. Fan to make particular findings. Khit denied that Dr. Fan was advised the patient at issue was making a personal injury claim, commenting that such information should not matter at all when interpreting an MRI.

> Q. Is Dr. Fan ever asked to make particular findings in the MRI?
>
> A. Never, sir.
>
> Q. Never?
>
> A. Never.
>
> Q. Is she advised that the patient is a patient who is making a personal injury claim?
>
> A. All that I know is that on the referral, we do have a diagnosis, which is the most important to her from our part and that's it. Everything else, it's irrelevant to her.

Khit later confirmed that it should not matter to Dr. Fan whether the patient was in an automobile accident or had another condition for which a cervical MRI was ordered. When shown a copy of the facility note produced at Dr. Fan's deposition, Khit testified that he had never seen it before, and did not know what it was or from where it came.

> Q. You note it says, "All -- under facility note, "All MRIs are liability cases." And do you see that, Doctor?
>
> A. Yes, sir.
>
> Q. Okay. A liability case, would that be a case with a personal injury claim?
>
> A. I mean, I guess.
>
> Q. Okay. Why would Dr. Fan need to know the MRIs coming from this facility are liability cases?
>
> A. I don't know, sir.
>
> Q. Because earlier we discussed that it shouldn't matter to Dr. Fan whether it was an automobile accident or just a nonaccident condition for the reason -- for the MRI being done, right?
>
> A. Right.

127. Miguel Oneto, M.D. testified in June of 2025 that he decided to include this facility note after Luis Khit disclosed that all imaging studies performed for Insight were related to personal injury cases. He claimed that the radiologists were instructed to provide detailed descriptions of degenerative changes in their reports because Khit "wanted QI&I to use detail." But instead of simply describing degenerative changes in more detail, the QI&I radiologists that interpreted studies for Insight omitted any mention of the word, using obscure technical terms to describe findings that would ordinarily be classified as degenerative. The term "degenerative" and other common terminology like "disc desiccation" and "loss of disc height" typically used by radiologists – and understood by most insurance adjusters and defense attorneys – to indicate that

changes are due to wear and tear over time (degeneration), rather than recent trauma, does not appear in their reports.

128. The relationship with QI&I continued throughout the period at issue, ending only in December 2024.

**2. Kay Medical**

129. After Kay Medical Center, PLLC was formed in 2018, Khit Chiropractic began referring patients to Kay Medical for medical evaluations done by nurse practitioners.

130. As previously noted, the referral forms for Kay Medical used by Khit Chiropractic in 2018 (and continuing throughout the period at issue) offered a choice of eight "Kay Medical" locations by city, which corresponded with the locations of the Khit Chiropractic clinics. There was no address listed on the medical reports from Kay Medical during this period, although the medical bills initially listed 401 N. Bryan Road, in Mission. This was changed to 301 N. Bryan Road once a Kay Medical office was established at that address.

131. The initial examinations with the nurse practitioners were billed as CPT 99204 at $400, and follow-up examinations as CPT 99213 at $200.[16] These charges increased to $465 and $240 around April 2019. Notably, the CPT 99204 coding represented at the time a comprehensive history, comprehensive examination, and medical decision making of moderate complexity were done, presenting problems were of moderate to high severity, and typically, 45 minutes were spent with the patient. Kay Medical employed no more than two or three nurse practitioners at any given point during the period at issue. At times, there was just a single Kay Medical nurse practitioner.

[16] The Defendant entities billed services using Current Procedural Terminology (CPT) codes. The CPT coding system was developed and is published by the American Medical Association ("AMA"). The 5-digit codes allow providers to identify services and level of service and are commonly utilized in medical billings. The AMA defines the criteria to bill the service, such as the components of the service, anticipated time, etc.

132. The nurse practitioners' form reports often have a line-number slip affixed to the bottom of the first page, with a pre-printed number and the patient's name written in. In a 2024 deposition, Luis Khit, D.C. was shown such a page where the number was "18," and was asked if this meant the plaintiff was the eighteenth patient seen that day. Khit responded, "Maybe, yes." Where times are also entered on the slip, morning patients have low numbers, while afternoon patients can have numbers in the high teens. With that level of patient volume, it would be impossible for the nurse practitioner to actually perform comprehensive examinations as represented in the billing. The Kay Medical form reports that Luis Khit, D.C. created and trained the nurse practitioners to complete allow a limited number of nurse practitioners to perform a large number of examinations.

133. While Kay Medical services were initially limited to nurse practitioner examinations, Kay Medical's services and bills increased over time.. In late Summer 2020, Dr. Donovan began performing orthopedic consultations, initially billed at $1,600, and providing opinions that the patients would need extensive – and expensive – treatment in the future such as injection procedures and surgeries. In Spring 2021, the nurse practitioners began to recommend and perform trigger point injections, other intermuscular injections, and iontophoresis on some patients.[17] Starting in 2023, Defendants outfitted the Mission and Weslaco Kay Medical offices with fluoroscopy equipment, and Dr. Sannichie Quaicoe, M.D. began conducting pain management evaluations and performing injection procedures such as epidural steroid injections.

---

[17] Trigger point injections are a pain management technique where a needle is used to inject medication, typically a local anesthetic, sometimes combined with a steroid, into a muscle knot or "trigger point." Intermuscular injections use a needle to install medications quickly by injecting the large muscle masses that have the most blood supply. Iontophoresis is a technique that uses a mild electrical current to deliver medication or other substances through the skin. It is commonly used to treat excessive sweating but also has applications in pain management.

### C. Khit Operations During Period at Issue

#### 1. Patient Population

134. By the period at issue, concerning treatment from July 1, 2018 through December 31, 2024, the Khit entities were mostly serving patients involved in automobile accidents treating under letters of protection ("LOPs"). An LOP is a written agreement by a patient's personal injury attorney, promising to pay a healthcare provider from the proceeds of any settlement or recovery from the patient's tort claim or lawsuit.

135. Recovery of damages for past medical expenses in Texas is limited to the amount "actually paid or incurred" by or on behalf of the claimant.[18] The Texas Supreme Court has clarified that this means expenses that "have been or will be paid," and excludes the difference between such amounts and charges that the provider bills but has no right to be paid, such as charges that the provider is required by law or contract to reduce because the claimant is covered by insurance.[19]

136. Healthcare providers that treat patients under LOPs agree to wait until the patient's claim is resolved to be paid for their services out of the patient's recovery. Many providers do so presumably so they will continue to receive patient referrals from personal injury attorneys. And since the providers are not submitting claims to a government healthcare program or health insurer for reimbursement, there is no reduction of the billed charges required by law or contract. This allows for at least the possibility of payment in excess of what the providers would be paid by a government healthcare program or health insurer for the same services. As recognized by the Texas Supreme Court, a provider treating a patient under a LOP has "a direct financial stake in the resolution" of and has "invested themselves in the outcome" of the claim.[20]

---

[18] Tex. Civ. Prac. & Rem. Code §41.0105.

[19] *Haygood v. De Escabedo*, 356 S.W.3d 390, 396-397 (Tex. 2011).

[20] *In re K&L Auto Crushers, LLC*, 627 S.W.3d 239, 254 (Tex. 2021).

137. Khit Chiropractic marketed its LOP services. By August of 2020, the Khit Chiropractic website had been revised. The website still advertised that the clinics treated a variety of conditions, such as sports injuries, arthritic pain, back pain from repetitive daily activities, pain from degenerative spinal discs, restless legs syndrome, and headaches including migraines, but it clearly emphasized automobile accidents. The home page for the website prominently advertised “We specialize in auto accident and personal injury chiropractic care.” The home page featured two navigation tabs at the top: “Car Accident Injury?” and “Personal Injury?”

138. The Car Accident Injury page helpfully provided prospective patients with a detailed description of the injuries and symptoms that may result from a car accident, and extolled the benefits of chiropractic manipulations and adjustments:

## We Help Auto Accident Injuries

Every day thousands of people are injured from auto accidents, ranging from small fender benders to very severe auto accidents, causing **whiplash** and **dislocation** as well as **neck**, **back** and **shoulder misalignment**.

While many difficulties of pain, swelling and loss of function caused by injuries can be eased with rest and medication, there are many that can be helped with natural solutions that restore the alignment of the body back to its natural frame to alleviate the pain and inflammation caused by an injury.

Chiropractic spinal manipulation helps return the spine and neck vertebrae back into is proper order to reduce inflammation and pain cause by the effects of an auto accident as well as decrease the recovery time of the patient. Returning the vertebrae, discs and spinal column back to its original alignment reduces the strain put on other muscles, tendons and ligaments that often overcompensate for the injury.

**We Help Auto Accident Injuries**
A chiropractic adjustment helps increase proper blood circulation to the injured area, encourages range of motion and flexibility and alleviates pain to speed the recovery time that will allow a patient to return to normal activity.

Our car accident chiropractors can help you!

What Are the Common Injuries That Our Chiropractors Treat?

- **Neck Injuries.** You may experience various symptoms, including a decreased range of motion, a nearly immobilizing crick, debilitating pain, trouble walking, and even weakness in your arms and legs.
- **Back and Spinal Injuries.** Patients often experience a muscle strain in their lower back after an auto accident, but there are other potential issues at stake. Symptoms of back and spinal injuries include stiffness, soreness, decreased mobility, and inability to function normally.
- **Whiplash Injuries.** Symptoms of whiplash may look similar to those of neck and back injuries, but whiplash takes everything to another painful and distressing level. Monitor yourself for neck pain, dizziness, inflammation, arm pain, numbness or tingling, stiffness, reduced concentration and clear thought, TMJ or jaw pain, depression, spinal and disc issues, and lower back pain and stiffness.

139. The Personal Injury page represented that in addition to relieving pain, the chiropractors at Khit help patients discover and recover from "hidden" injuries that could threaten their future health:

> ## We Help Personal Injuries
>
> Slips and falls are very common and can result in a personal injury that requires chiropractic attention.
>
> Our personal injury chiropractic treatments are about more than just making pain disappear. Our personal injury chiropractor will help you recover from hidden injuries that could threaten your future health. In helping you discover these unseen injuries, we can help you fully recover from your accident so that you can lead a normal, active life, both now and in the future.
>
> If you've suffered from a personal injury our chiropractors can help!

140. This version of the Khit Chiropractic website remained the same until early 2025, shortly after the period at issue. The home page of the current version of Khit Chiropractic's website downplays the emphasis on automobile accidents. However, the Auto Accident page of the new website reads like a script for personal injury claims:

> Auto accident injuries can have a lasting impact on your body, even if symptoms don't appear right away.
>
> The sudden force of a crash can cause whiplash, spinal misalignments, herniated discs, concussions, muscle strains, and joint injuries, leading to neck pain, back pain, headaches, numbness, and reduced mobility.
>
> Concussions, a type of traumatic brain injury, may cause confusion, memory problems, dizziness, fatigue, and sensitivity to light and sound, further impacting daily life.
>
> Without proper treatment, these injuries can worsen over time, resulting in chronic pain and long-term dysfunction.
>
> If you've been in an accident, seeking prompt care is key to achieving a full and lasting recovery.

141. The Slip/Fall Injuries page instructs prospective patients that slip and falls can cause significant damage even if the fall was minor and/or the patient does not have symptoms right away:

> Slip and fall injuries can cause significant damage, even if symptoms don't appear immediately.
>
> The sudden impact and sudden movements can result in spinal misalignments, muscle strains, ligament sprains, herniated discs, or joint injuries affecting the back, neck, shoulders, hips, or knees.
>
> Many people experience pain, stiffness, swelling, or mobility issues after a fall, and untreated injuries can lead to chronic pain and long-term dysfunction.
>
> Even minor falls can create hidden injuries that worsen over time.

142. The current website includes a new navigation tab for "Common Injuries." Clicking the listed injuries explains specifically how an accident commonly causes that type of injury and how the symptoms may present, and warns that, if left untreated, the injuries may result in chronic pain and disability. For example, selecting "Headaches" reveals:

> Headaches are a common consequence of accidents, often caused by whiplash, concussions, or neck injuries.
>
> The sudden impact of a car crash, fall, or other trauma can lead to muscle tension, nerve irritation, and restricted blood flow, triggering persistent headaches.
>
> These headaches may present as dull aches, sharp pain, pressure around the temples, or migraines, often accompanied by dizziness, nausea, or sensitivity to light and sound.
>
> If left untreated, they can become chronic and interfere with daily life.

143. Job listings posted on Indeed in 2025 for various clinic locations in Austin and the Rio Grande Valley state that one of the "essential job functions" for chiropractors at Khit Chiropractic is to "participate in marketing practices as needed to help in growing and expanding the practice…" The posts note "Personal injury experience preferred."

144. The Khits market their services to personal injury attorneys, who are encouraged to send their clients to Khit Chiropractic. The vast majority of personal injury patients seen at Khit Chiropractic are attorney referrals. When an unrepresented patient comes to a clinic, the clinic will refer them to an attorney.

145. Although it is not clear what the Defendants promise or offer attorneys as incentives for referrals, in the last five years, the Khit entities have engaged in aggressive litigation tactics against law firms and personal injury patients seeking to recover treatment charges they allege they are owed. Although the Khit entities operate in multiple counties throughout the Rio Grande Valley and Central Texas, all forty-seven of the lawsuits to date have been filed in Hidalgo County. Before September of 2024, verified petitions filed by the various Khit entities (Khit Chiropractic, Insight, and/or Kay Medical) against law firms allege that there was an enforceable oral or written contract (LOP) to provide services to the attorneys' clients which the attorneys agreed to pay for out of their client's recovery, asserting "[t]o obtain any positive outcome for its clients in a lawsuit, it was necessary for Defendant to contract for Plaintiffs' medical services."

146. When asked about treating patients under LOPs during a deposition in July of 2024, Luis Khit, D.C. testified:

> Q. Okay. And I've been using the phrase "letter of protection."
>
> For the jury's sake, could you explain what a -- a letter of protection is?
>
> A. From my understanding, is that when a person is involved in a car accident or personal injury incident where they get hurt, and they do not have the means to pay for medical care, some of these patients are forced to find legal representation to help them through -- with the process of -- of getting the care they need.
>
> And when they get this legal care or these attorneys -- or their -- they get an attorney, their attorney will usually send us a letter stating that the patient was involved in an incident that caused injury to them, and that at the time, they don't have any means to be able to pay for their medical care. And so they're asking us to delay in the

collections of payment -- in -- delay in collections until, you know, they get this issue resolved with the insurance.

Once they get the issue -- the claim or the case resolved with the insurance, then they pay us.

147. But the Khit entities treat personal injury patients under LOPs or oral agreements with their attorneys regardless of whether the patient has insurance coverage available. In fact, in the period at issue, *none of the Khit-owned healthcare entities accepted insurance of any kind.*

148. Nevertheless, by October of 2022, each Khit-owned healthcare entity required patients to sign a two-page, single-spaced "Agreement To Pay/Contractual Lien and Assignment By Patient" avowing that there is no government healthcare program or private insurance carrier "offering" coverage for the patient's treatment, *or if there is, the patient is instructing the provider not to submit bills to the insurance carrier.* The agreement states, in pertinent part:

> No governmental healthcare program, health insurance, or worker compensation carrier is offering coverage for my medical care, or if such coverage is available, I will not submit, and am specifically instructing Provider to not submit its charges to such insurance or governmental healthcare program. If Provider were to submit its charges to such health insurance or governmental healthcare program, it would cause financial hardship to me because I cannot afford the co-pay, coinsurance, or deductible payments required under the policy. Additionally, making such a claim would further reduce my lifetime benefits and/or potentially prompt the carrier to cancel or not renew my policy.[21]
>
> …
>
> The liability insurance for the third-party who injured me (or my UM/UIM insurance carrier, if any) is not offering to pay Provider's charges. If these insurance carriers were to pay Provider its charges at the time of treatment or promptly thereafter, Provider would offer such carriers any discounts that may be available to patients who can pay cash or health insurers or governmental healthcare programs. But, because the liability insurance for the third-party who injured me

[21] Even if the Khit entities actually accepted any type of health insurance, this language is neither factually nor legally correct. There is no lifetime limit on medical benefits under Medicare or workers compensation in Texas. There is no cost to the patient, including co-pays or deductibles, for any treatment provided under workers compensation in Texas. If private health insurers elect to pay medical expenses on behalf of an insured that are the result of a third-party's negligence, they have a subrogation right to reimbursement from the liable third party's insurance carrier if the claim is accepted and/or the insured's recovery if the claim is litigated.

> (or my UM/UIM carrier, if any) is refusing to pay,[22] I am forced to obtain care from Provider on a deferred-payment basis. Because I am not able to pay Provider until my injury claim is resolved, Provider cannot offer me any discounts that may be available to patients who can pay cash at the time of service or health insurers or governmental healthcare programs.

The agreement – which does not require a signature from the patient's attorney -- waives all objections to the provider assigning the lien to a third party, and provides that any and all disputes arising under the agreement are subject to binding arbitration, waiving the patient's right to a trial.

149. The reason for this subterfuge is simple. Treating under an LOP allows the patient to claim the full amount of the grossly inflated billed charges as damages for medical expenses "incurred" as a result of the accident, and the Khit entities to claim that they are owed the full amount of the grossly inflated billed charges, rather than the reasonable amount a provider would be paid for the services under Medicare/Medicaid, workers' compensation, or negotiated contracts with private insurance carriers.

150. However, evidence attached to the pleadings filed in the Khit entities' lawsuits to recover outstanding fees reveals that once the patient's personal injury claim is resolved—or to assist with resolving the claim—the Khit healthcare entities routinely approve virtually *any* reduction of their fees requested by the patient's attorney, accepting as little as four percent of the billed charges as full payment for the services reportedly provided to the patient. If the settlement or jury award for past medical expenses is based on the full amount of the billed charges, or substantially more than the provider agrees to accept as payment, this results in a windfall for the personal injury attorneys and their clients and operates as an incentive for future referrals.

151. Although Luis Khit, D.C. testified in 2023 that reductions are approved as a courtesy to the patient on a case-by-case basis considering various factors, including the amount of the settlement

---

[22] Similarly, even if the Khit entities actually accepted these types of insurance, in most personal injury claims where the claimant is represented by an attorney, the third-party's liability carrier and/or the claimant's UM/PIP carrier is not asked - or authorized - to pay for any of the claimant's medical expenses until a demand package is submitted by the claimant's attorney after treatment is completed.

offer and the total medical expenses incurred, the 96 pages of correspondence documenting approved reductions with two letters per page attached as exhibits to a Motion for Summary Judgment filed by Loncar & Associates in Cause No. C-3365-20-H in October 2022[23] does not support that. None of the reduction requests stamped "Approved by Dr. Luis Khit" showed or alleged that a proposed settlement was insufficient to cover the client's medical expenses. Instead, the law firm's form letters generically stated: "Tort reform has hit our State and many others hard. As a result, the insurance industry offers less and less to the injured citizens of Texas making it harder and harder to settle these types of cases without substantial reductions in (1) the client's expectations and (2) their outstanding medical bills," before specifying the reduction requested.

152. In addition, by requiring patients to waive their right to use any available insurance coverage, the Khit entities avoid having to establish that treatment is medically necessary before providing it, since providers treating patients under LOPs are not required to comply with all treatment guidelines and preauthorization requirements that apply to care covered by government programs or private health insurance. They are also not subject to state and federal regulations regarding disclosure of financial interests, documentation, and billing that apply to providers submitting claims for reimbursement to government or private insurers.

**2. 'Cookie-Cutter' Treatment for Personal Injury Patients**

153. During the period at issue, the Khits essentially operated as a business supporting personal injury claims under LOPs. They saw a high volume of personal injury patients. John Glade, D.C., who has worked for Khit Chiropractic since 2013, testified that by 2019, the Mission Khit Chiropractic clinic was seeing around 100 patients per day, and the Brownsville clinic 70 to 80 patients a day.

---

[23] *See* Exhibit 4 to Defendant's Motion for Summary Judgment filed October 28, 2022 in *Khit Chiropractic Wellness Center and Insight Diagnostic & Imaging v. Loncar & Associates*, Cause No. C-3365-20-H, In the 389th Judicial District Court of Hidalgo County, Texas

154. The Khits applied cookie-cutter treatment to these hapless personal injury patients. Instead of accurately recording the patients' medical history and condition and providing medically necessary care specifically tailored to each unique patient's individual needs, care was documented with pre-printed evaluation forms and templated reports prepared using "macros" created by Luis Khit, making the patients' records nearly indistinguishable from each other. In virtually every examination report, Khits' chiropractors conclude that "[i]t should be noted that [the patient's] injuries came as a result of the above mentioned accident." Their goal was to justify referral to other Khit-owned entities for diagnostic imaging studies, "medical" evaluations, injection procedures, and surgical recommendations which would inflate the patient's personal injury claim and enrich the defendants.

155. The vast majority of the treatment purportedly provided to personal injury patients at Khit Chiropractic is medically unnecessary and outside of any acceptable standard of care. Treatment is not tailored to the unique needs of each individual patient; to the contrary, patients receive essentially the same evaluation and treatment regardless of the nature and severity of their injuries or response to care. Most of the services Khit Chiropractic bills for are performed by "chiropractic assistants," who are unlicensed individuals without appropriate oversight by the delegating chiropractors, who cannot and do not provide adequate management of the patients in their care.

156. Regardless of the patient's reported subjective complaints, exam findings, and response to treatment, the evaluation and treatment of personal injury patients referred to Khit Chiropractic during the period at issue generally proceeded as follows:

a. The patient is examined by a chiropractor at Khit Chiropractic and diagnosed with a long list of "injuries" that the chiropractor relates to the subject accident. The chiropractor recommends the standard treatment protocol of visits (five per week for two weeks prior to March of 2023, three per week for three weeks thereafter).

b. Unless already done before the patient presented to Khit Chiropractic, x-rays of all affected areas are ordered at the initial visit, and the patient is referred to Kay Medical for a "medical" evaluation.

c. X-rays are performed at Khit Chiropractic or perhaps one of the outside facilities leased by Insight and interpreted by one of the radiologists with whom Insight contracts, particularly in the period at issue QI&I. The radiologist recommends MRI of each affected area "if symptoms persist" or "if pain persists."

d. The patient receives "chiropractic" care at Khit Chiropractic that consists almost exclusively of passive modalities performed by unlicensed chiropractic assistants. Many of these modalities, such as electric stimulation, hot packs, and a roller table, are unattended and the patient is left on a timer. Patients at Khit Chiropractic almost never receive chiropractic manipulations or adjustments, and only see a chiropractor for examinations.

e. The patient is evaluated by a nurse practitioner at Kay Medical, who diagnoses (via a form report with a series of check boxes to list symptoms and corresponding diagnoses) an even longer list of "post-traumatic" conditions that the nurse practitioner relates to the subject accident. No actual narrative report is generated. The nurse practitioner "prescribes" medications which occasionally include muscle relaxers, but mostly consist of pain relievers and anti-inflammatories that can be purchased over-the-counter. The nurse practitioner recommends that the patient continue chiropractic care and return in two to three weeks (two weeks prior to March of 2023, three weeks thereafter).[24]

f. The patient is re-examined by a chiropractor—not necessarily the same one—at Khit Chiropractic about two weeks after the initial examination and reported to be

[24] In a 2024, former Kay Medical Nurse Practitioner Cruz testified that it was Luis Khit who directed this change.

"progressing slower than expected" to support referral for MRIs, generally to Insight, regardless of any improvement of the patient's symptoms reflected in earlier parts of the chiropractor's report.

g. The patient has two or more MRI scans done at an outside imaging center "leased" by Insight. The images are interpreted by the radiologists Insight contracts with, who report findings of disc bulges and herniations, but avoid any mention of degenerative findings.

h. Based on the reported results of the MRIs, the chiropractor may send the patient to Spinal Decompression & Remodeling Clinic for additional therapy and refer the patient to Kay Medical for pain management[25] and orthopedic evaluations.

i. The patient receives vertebral axial decompression therapy (a type of motorized traction), often accompanied by additional low-level laser therapy and therapeutic exercises provided by chiropractic assistants, at Spinal Decompression & Remodeling Clinic.

j. Starting in Summer 2023, pain management physician Sannichie Quaicoe, M.D. evaluates the patient for Kay Medical. He recommends and performs ESIs and other costly pain management injections/procedures.

k. Orthopedic surgeon William Donovan, M.D. evaluates the patient for Kay Medical. He recommends—but never performs—surgical interventions and provides an estimate of costs to support future medical expenses.

l. The patient has a final examination with the chiropractor. The chiropractor prepares a final report that includes templated statements that all treatment was necessary due to the accident at issue. The final report states that the patient will continue to need

[25] Before Kay Medical contracted with Dr. Quaicoe to provide pain management services in August of 2022, patients were often referred to 911 Pain Management.

chiropractic care over the next one to two years at an estimated cost between $2,000 and $5,000 per year.

## VI.
## TREATMENT PRACTICES AND PROCEDURES
### Relevant to All Causes of Action

### A. Recommendations and Referrals

157. Patients referred to the Khit-owned healthcare entities receive essentially the same evaluation and treatment regardless of the nature and severity of their injuries or their response to care. Patient care generally follows an established protocol of treatment recommendations and referrals.

#### 1. Initial Evaluation at Khit Chiropractic

158. At the initial visit to Khit Chiropractic, before they are ever seen by a healthcare provider, personal injury patients are given paperwork to sign. This includes the "Agreement To Pay/Contractual Lien and Assignment By Patient" described above as well as Khit Chiropractic's "Assignment of Benefits: Assignment of Cause of Action: Contractual Lien." Although the Khit healthcare entities do not accept insurance, this document "irrevocably" assigns Khit Chiropractic the exclusive right to any cause of action that exists in the patient's favor against any insurer for the terms of the policy, purports to require the insurer for any liable third party to issue payment directly to Khit Chiropractic, grants Khit Chiropractic a limited power of attorney to endorse the patient's name on checks or drafts from any insurer issued as payment for the patient's treatment, and waives the statute of limitations on Khit Chiropractic's claims for payment, including collection fees, attorney's fees, and court costs.

159. Neither of these documents affecting the patient's legal rights and obligations require a signature from the patient's attorney. When asked whether anyone at Khit explains these documents to the patient, Librado Torres, D.C., testified:

Q. Does anyone at Khit explain these documents to the patient before the patient signs them?

A. Well, we do instruct them to read them over and any questions they might have, we're more than -- they're welcome then to answer their questions.

Q. Okay. So it's sort of up to the patient to ask a question about it if they have a question?

A. That's correct.

160. Patients are required to sign identical documents for Insight, and occasionally also Kay Medical, at the first visit to Khit Chiropractic. When asked during a deposition why patients are asked to sign the assignment for Insight before the chiropractor has even seen them or referred them there, Jose Nadal, D.C. testified that this is standard practice:

Q. Okay. So why would Ms. [redacted] have filled this out at her first appointment at Khit Chiropractic?

A. Well -- because they fill out the forms, ma'am.

Q. Okay. So the Insight intake is just a standard part of Khit Chiropractic's intake forms?

A. Yes, ma'am.

161. Luis Khit, D.C. created limited health questionnaires for patients to complete to support personal injury claims and omit pertinent information that could be inconsistent with the damages claimed. For example, patients are not asked to disclose who referred them, the reason they are being seen, their occupation/employment, work status, whether the injury is work-related, or whether there is any insurance coverage available. Patients are asked few details regarding the motor vehicle accident besides when it occurred. They are asked to mark where their pain is on a diagram of the body, but are not asked about the onset, nature, severity, frequency, duration, or progression of symptoms. They are not asked to identify their primary care physician or whether they were treated for any injuries or complaints to the affected areas of the body prior to the accident.

162. Khits' patients are purportedly seen by a chiropractor for an initial evaluation. The examiner records symptoms, purported "objective" findings, and the results of orthopedic testing by marking pre-printed examination forms and/or making their own notes during the examination. Most patients evaluated at Khit Chiropractic allegedly complain of headaches, neck pain radiating to the upper extremities, and back pain radiating to the lower extremities.

163. Although virtually every patient evaluated at Khit Chiropractic is reported to have decreased range of motion ("ROM") in the affected areas to support the need for further chiropractic care, providers at Khit Chiropractic do not actually measure or record the patient's ROM to support this assessment. Luis Khit, D.C. testified:

> Do you know how Dr. Torres measures range of motion?
>
> A. This is global, range of motion is visual. We do not use the -- a measurement tool.
>
> Q. Okay. So there -- there is no measurement about the exact degree of -- of restriction?
>
> A. No.
>
> Q. Okay. Might there have been in any of the handwritten notes that Dr. Torres took that day?
>
> A. No. I do not think so. The way -- it's not part of our -- our treatment protocol or examination protocol.

164. When asked to describe the "visual range of motion testing" performed at Khit Chiropractic, Jonathan Hernandez, D.C. testified that he would "watch[] the patient perform different motions to see if there's any restriction or any grimace, anything like that."

165. Regardless of the patient's actual reported subjective complaints or "objective" exam findings, the templated narrative reports prepared by the providers at Khit Chiropractic paint a dire

clinical picture to justify treatment recommendations and referrals to other Khit-owned entities for further evaluation.

166. Even where the patient failed to report or specifically denied the same complaints to providers they saw before presenting to Khit Chiropractic, patients are routinely diagnosed with *ten or more* injuries/conditions at the initial evaluation. Khit Chiropractic's diagnoses typically include post-traumatic headache, muscle spasm of back, sprain/strains of the cervical, thoracic, and lumbar spine, intervertebral disc disorder or displacement, cervical radiculopathy, and lumbar radiculopathy.

167. Despite the diversity of the patient population with respect to age, weight, chronic medical conditions, mechanism of injury, time between injury and seeking care, reported symptoms, etc., ***the same standard treatment protocol is recommended for every personal injury patient at the initial visit to Khit Chiropractic*** with stated goals to "decrease swelling and edema, decrease pain, decrease muscle spasms, and prevent re-injury." The standard treatment plan in initial reports at the beginning of the period at issue consisted of four modalities—hot packs, ultrasound, unattended electrical muscle stimulation ("EMS"), and manual therapy, each purportedly provided in one unit of 8-22 minutes. For example:

- **Hot Pack (97010):** hot moist pack to cervical and thoracic region(s) for 1 Unit (8-22 minutes)
- **Ultrasound (97035)** ultrasound with contact medium to cervical and thoracic/ RT LAT LOWER RIBS FLANK region(s) for 1 Unit (8-22 minutes)
- **EMS unattended (97014)** Interferential EMS to cervical and thoracic region(s) for 1 Unit (8-22 minutes)
- **Manual Therapy (97140):** myofascial release, trigger point therapy and joint mobilization to the following areas: cervical and thoracic for 1 Unit (8-22 minutes)

This was the case for every single Khit Chiropractic clinic location. Around May 2021, "massage" replaced manual therapy as an initial modality in the initial reports. "Low level laser" started to be used as an initial modality at the end of 2020 and by early 2021 was used throughout the clinics, and also at the Spinal Decompression offices. For example:

We will administer the following procedures and modalities as indicated by that visit's observations and findings:

- **Therapeutic Modality: Hot Pack (97010):** hot dry pack to cervical spine and thoracic spine region(s) for 8-22 minutes
- **Therapeutic Procedure: Massage (97124):** Massage to the following area(s): cervical spine and thoracic spine for 8-22 minutes
- **Therapeutic Modality: EMS (97014):** interferential EMS to the cervical spine and thoracic spine region(s) for 8-22 minutes
- **Therapeutic Modality: Ultrasound (97035):** ultrasound with contact medium to right shoulder region(s) for 8-22 minutes
- **Therapeutic Modality: Low Level LASER Photobiomodulation (S8948):** performed on the to cervical spine region(s) for 8-22 minutes

168. Before March 2023, Khit Chiropractic employed a standard treatment protocol for every personal injury patient of five visits per week for two weeks. In March 2023, Khit Chiropractic modified this standard protocol to three visits per week for three weeks.

169. Unless the patient was evaluated by a physician and had x-rays done before the first encounter at Khit Chiropractic, x-rays are ordered at the initial visit and billed by Insight, and the patient is referred to Kay Medical for a medical evaluation.

170. Khit Chiropractic bills the initial evaluation as CPT code 99203, at the start of the period charging $240 for the evaluation, increasing to $325 in 2019, and to $410 in late 2022.

**2. X-rays Billed by Insight**

171. The patient has x-rays done, usually of multiple areas of the body, at one of the Khit Chiropractic clinics or an outside imaging facility "leased" by Insight.

172. Although chiropractors are specifically trained to read x-rays and frequently do in the course of treating patients, the films are instead sent to radiologists that Insight contracts with for interpretation. Luis Khit, D.C., claimed that this is due to time constraints:

Q. Okay. It's true that chiropractors are trained to read X-rays, correct?
A. Yes, we are.
Q. Very well trained to -- to read them?
A. We're the best.
Q. And I have heard that. I've had another chiropractor say that the level of X-ray training we get in chiropractic school is -- is better than the standard medical doctor, what they would get in medical school.

Would you agree with that?
A. From my understanding, yes.
Q. 'Cause you have to have X-rays for -- sometimes to rule out whether you should do chiropractic manipulations or --
A. Yeah. They're very useful to us.
Q. Yeah.
Why have -- why did Dr. Phan get chosen to read, you know, the X-rays that were taken at Insight?
A. She is part of Dr. Oneto's group, Dr. Miguel Oneto, so it's Dr. Miguel Oneto and Dr. Susan Phan that -- that read for us. And the reason why they got picked is because it's just I don't have time to be reading these X-rays, so I have them reading for us.

(the referenced "Dr. Phan" is Dr. Susan Fan of QI&I).

173. However, Khit admitted that Insight sends x-rays to the contracted radiologists for interpretation even if the treating chiropractor has already read them:

Q. Now, this report indicates that Dr. Phan did not read the X-rays until April the 5th, 2022.
A. Yes.
Q. So that would have been about six days after the visit when the X-rays were taken?
A. Yes.
Q. If there was -- if Dr. Torres had thought there was a real need for the X-rays to be taken that day, couldn't he have read them himself that very day?
A. Yeah. They always have the option of looking at the images.
Q. If Dr. Torres had looked at the images himself, would it even have been sent on to Dr. Phan?
A. Yes.

174. On information and belief, the radiologists Insight contracts with interpret the x-ray films for a flat fee of around $10 per study. They prepare reports on Insight's letterhead using a template. Regardless of the patient's clinical history or the findings reported, most x-ray reports from Insight include recommendations for MRIs "if symptoms persist," or "if pain persists."

175. Insight bills the personal injury patient $210-$480 per x-ray for both the technical component (the scan) and the professional component (interpretation of the image). Those bills do not identify the facility where the scans were performed or the providers who took or interpreted the scans. Insight itself does not have a national provider identifier ("NPI") number.[26] This is likely because, despite its representation on letterheads of reports and bills, Insight provides no healthcare services. Instead, Insight's bill identifies the referring chiropractor from Khit Chiropractic as the rendering provider, including their name, license number, and individual NPI.

**3. Treatment Provided By Chiropractic Assistants**

176. Most of the services for which Khit Chiropractic bills are not performed or supervised by any licensed clinician. Khit Chiropractic clinics have just a single chiropractor seeing patients on any day. In fact, despite their high patient volume, in the period at issue Khit Chiropractic actually had *fewer chiropractors than chiropractic clinics*. For example, the Rio Grande City clinic did not appear to have a dedicated chiropractor after chiropractor Liz Molina left, and the Austin clinics appear to have at times split one chiropractor between them. Both Molina and chiropractor John Glade saw patients in Austin and in the Rio Grande Valley in the same period. The current Khit Chiropractic website still lists one chiropractor for Austin generally.

177. To treat the high volume of patients, each chiropractic clinic has a substantial number of "chiropractic assistants" or "CAs" on duty at any time. In a 2024 deposition, Luis Khit testified the

---

[26] An NPI is a government credential available only to licensed healthcare providers. The federal government issues NPIs to healthcare providers so the federal government can identify and pay those healthcare providers who treat people on Medicare and Medicaid. 45 C.F.R. § 162.406.

Mission and McAllen clinics both have eight to ten CAs on duty at any one time. In a 2025 deposition, chiropractor Jonathan Hernandez testified the Weslaco clinic had five to ten CAs on duty at any one time. Patients can see multiple CAs during their course of treatment. The CAs perform virtually all treatment modalities, with the chiropractors' services generally limited to examinations. ***These CAs have no license or recognized certification***.[27] Khit Chiropractic job postings for CAs have no educational requirements for applicants. Luis Khit and other chiropractors and CAs train the new CAs 'in house' on how to apply modalities.

178. Between examinations, which are generally two to three weeks apart, the chiropractor generally has no interaction with the patient when they come in for treatment days. Therefore, the chiropractor does not verify whether the patient has improved, determine whether a modality may cease or treatment to a particular part of the body should be modified, etc. It is questionable that one chiropractor could adequately supervise five to ten CAs. Given the lack of chiropractors compared to clinics in the period at issue, it seems likely that patients at times were treated when no chiropractor was at the clinic.

179. Although the website for Khit Chiropractic advertises "Chiropractic care [that] focuses on realigning the spine," and job listings for various Khit Chiropractic clinics posted on Indeed include "provide a high volume of chiropractic adjustments as needed for the patient caseload" as an essential job function for the chiropractors, in fact, ***automobile accident patients at Khit Chiropractic almost never receive chiropractic manipulations or adjustments***.

180. Jose Nadal, D.C., the supervising chiropractor at Khit Chiropractic's Harlingen clinic since 2014, claimed in a May 2024 deposition that he performed chiropractic manipulations or adjustments on approximately 50-55% of his patients. Jonathan Hernandez, D.C. the supervising

[27] In a 2024 deposition, Luis Khit stated Khit Chiropractic itself issues a certification to the CAs, but he admitted this "certification" is not recognized by the State of Texas.

chiropractor at the Weslaco office from 2021 through May or June of 2024, stated in an April 2025 deposition that he performed chiropractic manipulations or adjustments on around 25% of the patients he saw at Khit Chiropractic.

181. However, contrary to such testimony, analysis of claims submitted to Allstate that involved treatment at Khit Chiropractic during the period at issue reveals that ***in almost all visits, patients did not receive chiropractic manipulations or adjustments when they were seen at Khit Chiropractic***.

182. This is not surprising, since all therapy treatments provided to at least automobile accident patients at Khit Chiropractic is performed by the CAs. CAs may not legally perform chiropractic manipulations or adjustments.[28] But, although manipulations are rarely provided to these patients, records submitted to Allstate indicate that CAs at Khit Chiropractic sometimes provide that service when it is provided.

183. For example, daily treatment notes produced regarding one patient's visit to Khit Chiropractic on May 2, 2023 represent that the patient received manual therapies and chiropractic manipulation that day, and that therapy was performed by a CA:

> **Plan:**
> **<u>Therapeutic Treatment Plan:</u>**
> - Specific **spinal adjustments** will be performed in 3 to 4 regions to improve the function of the segments of the spine that were fixated. (C, T, L: Diversified)
> **- Therapeutic Procedure: Manual Therapy (97140):** myofascial release and trigger point therapy to the following area(s): cervical spine, thoracic spine and lumbar spine for 8-22 minutes
>
> **<u>Today's Modalities & Procedures:</u>**
> The following are the procedures that were performed today on Mr. [redacted] manual therapies and chiropractic manipulation.
>
> Today's therapy performed by Kimberly Llanas, CA
>
> Note entered by **YG**

[28] *See* 22 T.A.C. §78.3(b) ("A licensee may not delegate responsibility to render a diagnosis, prescribe a treatment plan, or perform adjustments or manipulations under this section.")

184. After the initial examination, the chiropractor generally does not see the patient until the first re-examination two or three weeks later. In the interim, Khit Chiropractic's CAs provide passive therapies (treatments where the patient does not actively participate in the movement or exercise). These including hot/cold packs, electrical muscle stimulation ("EMS"), ultrasound, mechanical traction, photobiomodulation (low-level laser) therapy, manual therapies, and massage.[29] The majority of these are unattended (therapies that do not require constant, one-on-one contact and supervision) and the ***CAs often perform multiple therapies at the same time***, such as applying hot/cold packs while the patient is receiving EMS or some other unattended modality.

185. On average, patients have around twenty visits at Khit Chiropractic, although some bills submitted to Allstate reflect as many as forty visits. CA visits take around 15 to 30 minutes. Khit Chiropractic bills an average of $390 per visit for the treatment provided by these unlicensed, unsupervised CAs.

**4. Evaluation by Nurse Practitioners at Kay Medical**

186. A family nurse practitioner with Kay Medical typically evaluates the patient within two to three weeks after the initial visit to Khit Chiropractic. The patient completes new patient forms and signs an "Assignment of Benefits: Assignment of Cause of Action: Contractual Lien" and "Agreement to Pay/Contractual Lien and Assignment by Patient" for Kay Medical.

187. The patient completes a brief two-page health questionnaire. Like the intake forms given to personal injury patients at Khit Chiropractic, Kay Medical's forms only request information to support personal injury damages, while omitting pertinent information inconsistent with the templated opinion that all conditions Kay Medical diagnoses directly result from the subject accident. The forms ask patients to list history of certain listed symptoms and medical conditions,

[29] John Glade, D.C. testified that "massages" billed under CPT code 97124 are done by a machine called a "thumper" rather than by a licensed massage therapist. Librado Torres, D.C. testified that CAs sometimes perform massages by hand even if they are not licensed massage therapists.

which notably ***do not include*** neck, back, or extremity pain, stiffness, weakness, numbness, or tingling, or potentially contributory medical conditions such as arthritis, fibromyalgia, neuropathy, degenerative disc disease, or scoliosis. The forms ask patients to disclose current medications, allergies, and any surgeries or hospitalizations, but do not ask about treatment for similar complaints or injuries in the past. The only information the forms request about the accident is the date it occurred.

188. The nurse practitioners use a pre-printed "Trauma Patient Examination" form, created by Luis Khit, D.C., to mark the symptoms reportedly endorsed by the patient during the exam at Kay Medical, which routinely includes headaches, anxiety "due to MVA," "alteration in mental state at time of trauma or any time after that," sleep disturbance, and radiating pain in the cervical, thoracic, and lumbar regions in addition to any other reported complaints.

189. *Neither the new patient forms the patient completes or the examination form the nurse practitioner completes ask about or document the onset, frequency, duration, severity, or progression of the patient's complaints*. The forms do not ask patients to rate their pain on a scale from one to ten. Instead, the nurse practitioner asks the patient whether they've experienced any of the listed symptoms since the subject accident. Valerie Cruz, FNP, testified:

> Q. So under Dizziness, would Ms. [redacted] have told you when she began experiencing this dizziness?
>
> A. I would always start this questionnaire with, since your accident on this date, have you been having these types of symptoms, or, what kind of symptoms have you noticed? And that's how I would go through -- we go through the questions, and then they would tell me any additional things.

190. If Kay Medical sees the patient at the time of their examination at Khit Chiropractic, the vitals recorded in the Kay Medical and Khit Chiropractic records for that day are identical. Exam "findings" reported on the Trauma Patient Examination form are not necessarily based on an actual physical examination or testing. For example, Valerie Cruz, FNP testified that she "examined"

patients for visual disturbances by asking whether they'd noticed any changes to their eyesight since the accident.

191. The nurse practitioners virtually always report the same findings—pain, tenderness, hypertonicity, restricted ROM, spasms and/or trigger points on exam of the cervical, thoracic, and lumbar spine.

192. Like Khits' chiropractors, Kay Medical's nurse practitioners use no tools or devices to measure the patient's ROM, relying solely on visual observation to assess mobility. They do not document any specific results for ROM or orthopedic testing performed to support the findings of "restricted ROM" and "radiating pain" reported for most of the patients they see.

193. Although neurological examination is a key component of evaluating a patient for possible injury to the spinal cord or peripheral nerves, the neurological examinations performed by nurse practitioners at Kay Medical are cursory at best. At minimum, neurological examinations generally include evaluation of: 1) mental status; 2) cranial nerve; 3) motor strength, coordination, and muscle tone; 4) deep tendon reflexes ("DTRs"); 5) sensation; 6) gait, balance, and mobility. While some of these evaluations may be based on observation during the exam, such as gait and mental status, most involve some type of physical testing. For example, evaluating cranial nerves includes tests that track eye movement and assess strength of facial muscles, hearing, sense of smell, and taste. The finger-to-nose test is commonly used to evaluate balance and coordination. Motor strength is evaluated by testing and rating activation of the major muscle groups against resistance on a numerical scale from 0 (no activation) to 5 (full activation against full resistance/normal strength). The examiner may also measure and compare the circumference of the patient's limbs on each side to check for muscle atrophy. Evaluation of DTRs involves tapping the tendons at certain locations and rating the response on a scale of 0 (no response) to 4 (hyperactive response), with 2 indicating a normal response. Sensation is typically evaluated by testing the patient's ability to sense a light pin prick to the face,

torso and limbs ("pinwheel" test), and distinguish between two simultaneous, closely placed pin pricks on the fingertips ("two-point discrimination" test).

194. It is not clear what exactly nurse practitioners at Kay Medical do to perform the neurological examination referenced in their forms. They document the patient's neurological exam simply by checking a box to report that the neurological exam was normal, abnormal, or not done. Valerie Cruz, FNP testified that to perform a patient's neurological exam "usually with the cardinal signs we would check the—their eyes, their eye movement, if there was, like, any nystagmus, things like that."

195. The Trauma Patient Examination form includes a limited list of potential 'injury' diagnoses that the nurse practitioner can select, such as "post-traumatic" headache, PTSD, contusion, abrasion, sprain, strain, and disc displacement, but does not include any diagnoses that could not result from an automobile accident. In fact, Kay Medical specifically instructs the nurse practitioners ***not*** to treat—or even note—other medical conditions. Valerie Cruz testified:

> Q. Okay. So when you saw Ms. [redacted]s blood pressure was 152 over 76, did that concern you?
> A. It did. It can. It could be a symptom of pain.
> Q. Okay. And if so, would you have noted that anywhere on your record from this visit?
> A. Notice it? Like, note about concern of blood pressure?
> Q. Noted it as in marked it or wrote something about it as a concern.
> MR. MIRELES: Objection; form.
> A. No.
> Q. (BY MS. FRANK) Okay. And why is that?
> A. We were told not to treat medical conditions, just directly towards symptoms from the accident.

196. Based on the initial examination, which takes around 20 minutes, the nurse practitioners at Kay Medical frequently diagnose the patient with *twenty* or more conditions. Diagnoses typically include post-traumatic headache, acute stress disorder, and sprain, strain, disc displacement, and intervertebral disc disorder with radiculopathy of the cervical, thoracic, and lumbar regions.

197. The nurse practitioners consistently report the patient's prognosis as "guarded." They recommend continued chiropractic care at Khit Chiropractic and a follow up in two to three weeks.[30] They occasionally prescribe muscle relaxers, but the majority of the medications they "prescribe" are anti-inflammatories, pain relievers, and/or topical analgesics that patients could purchase over-the-counter at a fraction of the cost charged by the LOP pharmacies to which the prescriptions are sent.

198. Although the examination form includes no details about the accident other than the date it occurred and *no information about the patient's medical history*, on the last page of the form above the provider's signature, the nurse practitioner virtually always checks a box to endorse the statement "It is my medical opinion that all the injuries documented are a direct result of this accident."[31] There are no other options on the form with respect to the cause of the patient's symptoms:

☑ It is my medical opinion that all the injuries documented are a direct result of this accident.

☐ Patient has reached static maximum medical improvement. It is my opinion that this patient will need probable/ definite future medical care in the amount of $__________ for the next two years.

199. Kay Medical nurse practitioners do not write narrative reports. Instead, the pre-printed examination forms described above, which Kay Medical provides them are ***the only records*** of the patient's initial evaluation and any follow-up visits with the nurses at Kay Medical. The report forms list the address for Kay Medical's corporate office at 301 North Bryan Road in Mission, but do not identify the address where the patient was actually seen.

[30] Valerie Cruz, FNP, testified that continuation of chiropractic care is "the standard recommendation." She estimated that she saw 200-300 patients at Kay Medical during her one-year tenure, and that she recommended otherwise on less than five occasions. She testified that it was also the standard recommendation at Kay Medical for patients to follow up in two weeks until Luis Khit, D.C. decided to change it to three weeks.

[31] Ms. Cruz was unable to remember whether there was ever an occasion when she did not check that box.

200. Kay Medical billed personal injury patients around $410-$590 for the initial medical evaluation with the nurse practitioner and $240-$300 for follow-up visits.

**5. Re-Examination at Khit Chiropractic**

201. A chiropractor—not necessarily the same one who saw them on initial examination – "re-examines" the patient within two to three weeks after the initial visit to Khit Chiropractic. The chiropractor spends ten to twenty actual minutes re-examining the patient. Most subjective complaints and "objective" findings reported at the first re-examination are identical to those reported at the initial evaluation. The chiropractors rely on their initial examination reports to prepare their re-examination reports, repeating verbatim language and updating to reflect if any complaints or symptoms have improved.

202. The chiropractors typically refer the patient for MRIs at the first re-examination. *Regardless of the patient's reported response to treatment*, Khit chiropractors prepare narrative reports using templated language stating that the patient is "progressing slower than expected" and "should have made more progress" to justify referring the patient to Insight for MRIs. The chiropractors consistently order more than one MRI during this re-examination: two or at times three or even four MRIs are ordered for a patient.

203. Additional re-examinations typically occur every two to three weeks thereafter. The chiropractors typically add mechanical traction (a roller table) and therapeutic exercise to the treatment plan. Khit Chiropractic bills almost all adult re-examinations as CPT 99213, at the start of the period at issue charging $160 for the re-examination, increasing to $205 in 2019, and to $260 late 2022.

204. The chiropractor generally only see patients for initial examination and re-examinations. However, over time during the period at issue, Khit Chiropractic added and billed separately for additional 'services.' Starting around late 2020, Khit Chiropractic began billing for "Self-Care

Management" for many patients as CPT 97533, initially at $100 and increasing to $130 in late 2022. It usually billed this service on the final treatment date, but sometimes earlier. Under the AMA definition, CPT 97533 represents patient management such as activities of daily living, meal preparation, safety procedures, and instructions in use of assistive technology devices/adaptive equipment. Khit Chiropractic generally does not document this service. The following paragraph is sometimes included in the chiropractor's report:

> **97535 Self-Care/Home Management Training**
>
> Activity of daily living training and compensatory training to improve functional performance in a progressive manner and to address the specific functional needs of the patient. The patient demonstrated and has the capacity to learn from my instructions.

In a 2024 deposition, John Glade, D.C. described the self-care management service billed the first day at the clinic in that case:

> Yeah. Okay. That's --that would be advising the patient to -- you have to include frequency, you know, giving them home- -- home-care advice. Like, for example, "I recommend putting an ice pack on the area for 15 minutes per day for seven days." That way, you're – you're telling them a time amount, a frequency and duration. So that would be self-care management.

The chiropractor's report for that day included a stand-alone sentence, "I advised Ms. [redacted] to apply ice and/or heat for 15 minutes for 7 days to the areas of concern."

205. Around late 2021, Khit Chiropractic began to bill for CPT 99358 "Prolonged Evaluation and Management Service" for some patients, initially charged at $250 and increasing in late 2022 to $320. The chiropractors documented this service as brief statements under the chiropractor's name for review of records of another provider, such as Kay Medical, either in the body of an exam report or a separate brief document. An example is:

> **Review of Records (99358):**
>
> Today I have conducted a thorough review of the Kay Medical's records for Mr. [redacted]. The review of these records is directly related to the care of Mr. [redacted].
>
> DOS: 06/16/2023 & 08/07/2023

DR DEBBIE RIVERA
9/14/2023

At times, the chiropractor issued these statements after they had already released the patient from chiropractic treatment, which calls into question any benefit of the alleged review.

**6. MRI Referrals**

206. MRIs are almost always ordered in the first re-examination. The referrals are primarily to Insight, although at times some referrals are made directly to an imaging facility, which billed the imaging itself. However, approval for the MRIs must be obtained from the patient's attorney before the studies are performed. In a 2023 deposition in a case involving claims by Khit entities against an attorney's estate for money allegedly owed under LOPs, Luis Khit, D.C. testified a MRI appointment was made only after the attorney's office was contacted and advised the clinic to go ahead with MRI:

> Q. So when Insight Diagnostic came into be, there was no separate agreement, it just continued as if you were operating Khit Chiropractic, correct?
>
> A. No. So the practice is I see a patient and I'll -- let's say I want to refer that patient out for an MRI, we call the attorneys office and let them know. You know, your client needs an MRI, we need to set them up. And then at that point, the attorney would say, well, yeah, you can, you know, set them up for the MRI. And then we'll make the appointment. And there would -- you know, we would request an LOP from the attorney.

In 2024 depositions in personal injury cases, Khit and John Glade, D.C. denied attorney authorization was needed for MRIs. However, Librado Torres, D.C. admitted attorney approval was needed:

A. I believe it's our -- our personnel. We -- our personnel calls for availability, and we can get a slot. They give us -- the facility gives us a -- a time and date, and we notify our patient when they need to go.

Q. Does Khit advise the patient's attorneys that MRIs are being ordered?

A. Yes, sir. We do.

Q. Does Khit need approval from the attorney before proceeding with the MRIs?

A. They do.

207. If approved by the attorney, the MRIs are performed, regardless of the patient's response to care in the interim. For example, when Torres was deposed in 2024, the claimants in the case, a mother and daughter, were referred for MRIs on the first re-examination on September 21, 2022. The MRIs were not performed by "Insight" until October 21, 2022, by which time there had been two more re-examinations. Torres confirmed both reported that the frequency of their pain had decreased from "constant" (75-100% of the time) at the initial visit on September 8, 2022 to "occasional" (1-25% of the time) by the third re-evaluation on October 18, 2022, but insisted that it was nevertheless necessary to proceed with the MRIs ordered for both patients at the first re-exam on September 21, 2022:

Q. Okay. Was there really a reason to proceed with all these MRIs given, you know, the type of improvement that these patients were exhibiting?

A. Again, Mr. Weatherford, we -- remember that even though we're seeing improvement, that is subjective, and our assessment we got to see, again, a positive orthopedic test, positive palpation evaluation. If there's still positive findings, we do recommend we go forward with -- with our assessment and perform MRIs.

208. The patient typically has more than one MRI. As set forth above, while Insight has been represented as having an MRI facility, the MRIs are done at an imaging facility at which time is

"leased" by Insight. The images are uploaded to a PACS (Picture Archiving and Communications System), where they can be accessed and reviewed remotely by QI&I, to interpret the studies for a flat fee of around $50 per MRI.[32] The vast majority of the images are read by just three QI&I radiologists – Drs. Miguel Oneto, Julieta Oneto, and Susan Fan. In a 2024 deposition, Luis Khit stated these three physicians are the "consistent" radiologists that read for Insight.

209. QI&I radiologists review the images and use templates to prepare reports of their findings. Insight letterhead is affixed to the top of the radiologists' reports, typically identifying the facility address as that of Khit Chiropractic's Mission or North Austin clinics. The radiologists use highly technical terms to describe findings that would typically be referred to as "degenerative" changes, avoiding any use of that common, widely-understood term in reports prepared for Insight.

210. Insight bills a single, grossly inflated global charge to the personal injury patient. In mid-2018 when the scheme began, Insight charged $3,000 per MRI and later raised the charge to $3,750 per MRI around October 2022. By contrast, Central Park Imaging, an Austin facility which performs MRIs billed by Insight and read by QI&I – listed its own cash price for an MRI without contrast in the period at issue as $425. In a 2024 deposition, Luis Khit testified Dr. Miguel Oneto helped him determine Insight charges for MRIs. The Insight bills do not identify the imaging facility where the scans were performed or the radiologist that interpreted them; instead, all bills from Insight for imaging studies identify the referring Khit chiropractor or Kay Medical nurse practitioner as the "provider" of the services.

[32] Dr. Miguel Oneto and Dr. Susan Fan have filed Motions for Protective Orders in response to deposition subpoenas served in 2024 and 2025 in personal injury suits against Allstate insureds, asserting that documentation and testimony regarding QI&I's contract with Insight and the amount Insight paid QI&I to interpret imaging studies are "trade secrets" protected from disclosure. However, invoices attached as exhibits to a Petition filed on October 26, 2023 in *Miguel Oneto, M.D., P.A. v. South Texas Clinic for Pain Management, P.A.*, Cause No. CL-23-4370-I reveal that at least with respect to that practice for the period of October 2021 through February 2022, QI&I was paid $10 per x-ray and $50 per MRI interpreted by the radiologists.

### 7. Referral to Pain Management, Spinal Decompression, or Orthopedic Consultation

211. Based on the MRI results reported by the QI&I radiologist, the treating chiropractor refers the patient for further evaluation and treatment, typically including spinal decompression therapy, pain management, and/or consultation with an orthopedic surgeon. Like the orders for MRIs, these referrals are made regardless of the patient's response to care, which the chiropractors routinely characterize as "inordinately slow" using "macros" in their examination reports.

212. For example, Librado Torres, D.C. defended John Glade, D.C.'s referral of mother and daughter claimants for pain management and orthopedic evaluations despite significant improvement of their reported complaints:

> Q. And his assessment and prognosis were both good. That she's responded to care as expected, and that there's been improvement and she's headed towards the set treatment goals.
>
> A. That's correct.
>
> Q. Okay. And on this day, he's saying that he's recommending [redacted] to get a pain -- pain management evaluation of the lumbar spine, correct?
>
> A. That's correct. Yes, sir.
>
> Q. With the type of improvement that [redacted] had been showing, was there really a need for a pain management evaluation in this case?
>
> A. Again, I believe if you scroll up a little higher on the previous page, a little further down, sorry. It's on the assessment, I believe. The assessment. So -- let's see. So he -- on that day, he did a report of finding of [redacted]'s lumbar spine MRI. So based on the positive findings, and based on his assessment that there was still restricted range of motion, muscle spasm, trigger points, he made that conclusion of recommending pain management for [redacted] based on his assessment, and based on his MRI report -- on the MRI report.

Q. Okay. And I'm going to switch over to [redacted]' records for this day. And this is, again, Dr. Glade on November 2nd, 2022.

A. Yes, sir.

Q. And is it correct, he reports that the right shoulder pain is resolved?

A. According to Dr. Glade, yes.

Q. Okay. And for the cervical spine and thoracic spine, the symptoms have been improving, and the pains recorded to occur occasionally, one to 25 percent of the time, correct?

A. That's correct.

Q. And for the referral for her, he's referring both pain management and orthopedic evaluations?

A. That's correct. Yes, sir.

Q. Of the cervical spine, thoracic spine and right shoulder?

A. That's correct.

Q. Okay. But by this time, the right shoulder pain had totally resolved, correct?

A. That's according to the subjective finding, correct.

**8. Spinal Decompression & Remodeling Clinic**

213. Following the establishment of Spinal Decompression & Remodeling Clinic in late 2019, Khit Chiropractic patients were often referred to it for "vertebral axial decompression" of the cervical, thoracic, and or lumbar spine, which uses a special traction table to stretch the spine. The photo below shows Luis Khit, D.C. demonstrating use of the decompression equipment in the current Spinal Decompression practice website:



214. Spinal decompression therapy is performed alone or with "adjunct" therapies of interferential/electrical stimulation, heat/cryo therapy, ultrasound, manual therapy, low level laser therapy, whole body vibration plate exercise or therapeutic exercise and billed at $300-$745 per session. The standard treatment protocol for Spinal Decompression appears to be around 6-10 visits.

215. CAs perform all the therapy at Spinal Decompression – often the same CAs that treat the patients at Khit Chiropractic.[33] Treatment is recorded on form checklists that include two dates of service per page. The CAs fill in the date, patient's name, and traction force, and check to indicate the areas (cervical/lumbar) and duration of decompression therapy (15/30/45/60 minutes). The form also includes selections for any adjunct therapies provided and – although CAs are not qualified to determine this - assessment of the patients' progress/prognosis.

**9. Kay Medical Orthopedics**

216. Around the fall of 2020, Khit Chiropractic began referring personal injury patients to William Donovan, M.D. for orthopedic evaluations at Kay Medical. Dr. Donovan has continued to conduct these consultations since he became the titular delegating physician to the Kay Medical nurse practitioners in April 2022. While some of these evaluations are performed in-person, most are performed "via telemedicine," as Dr. Donovan resides in Houston. These consultations typically result in recommendations for injection procedures and surgery and include steep cost estimates. These surgical recommendations are made solely for the purpose of increasing the value of the patient's personal injury claim; the procedures recommended are rarely – if ever – performed.

[33] In fact, Luis Khit previously acknowledged that all CAs working at Spinal Decompression are actually employees of Khit Chiropractic, who have received additional, "specialized" training to use the spinal decompression machines.

217. The patient's attorney must approve of the referral before it goes forward. In a 2024 deposition, Librado Torres, D.C. verified this approval was needed. Torres also agreed it was possible a plaintiff in the case did not see Dr. Donovan, although referred by John Glade, D.C., because the attorney did not approve the referral.

**10. Kay Medical Pain Management**

218. Prior to August of 2022, Khit Chiropractic patients in the Rio Grande Valley were often referred to 911 Pain Management, a pain management practice owned by anesthesiologist Dr. Yixiang Liu. 911 Pain's office is in McAllen, but it also operates from the Khit Chiropractic clinic in Brownsville. Patients at the two Austin clinics are routinely referred to 512 Pain Management, a sister company of 911 Pain Management, that operates out of Khit Chiropractic's North Austin clinic. John Glade, D.C. testified in deposition that there was "a referral agreement" with 911 Pain Management, but it is unclear what the terms of that agreement were. Librado Torres, D.C. testified pain management referrals had to be approved by the patient's attorney.

219. In August of 2022, Kay Medical contracted with pain management physician Dr. Sannichie Quaicoe, M.D. to provide pain management services to Kay Medical patients. In 2023, Kay Medical installed fluoroscopy machines at the Kay Medical offices in Mission and Weslaco. Dr. Quaicoe is designated as the radiation safety officer of the facilities.

220. Since Dr. Quaicoe began working with Kay Medical, the Valley-based Khit Chiropractic patients have usually been referred to him for pain management evaluation and treatment, which typically consists of ESIs and other costly injection procedures. Dr. Quaicoe sees the patients at his own practice, Pain Containment Associates, or at Kay Medical offices. In either case, his reports are on Kay Medical letterhead and Kay Medical bills the consultations and procedures.

221. When a defendant insured by Allstate sought to depose Dr. Quaicoe in the spring of 2025 regarding his treatment of the plaintiff, Dr. Quaicoe went to extraordinary lengths to evade service

of the deposition notice and subpoena. Employees at his Mission clinic, Pain Containment Associates, insisted that Dr. Quaicoe needed to be served at Khit Chiropractic, claiming he worked at the chiropractic clinic after business hours. When the process server attempted to serve him at Khit Chiropractic, he was instructed to return to Dr. Quaicoe's clinic to effectuate service.

222. The process server ultimately served Dr. Quaicoe when he returned to his home. Remaining inside his vehicle, Dr. Quaicoe advised the process server that he would not be paid for his deposition testimony if he accepted service of the subpoena without first obtaining Luis Khit's approval, and refused to accept service. The process server placed the subpoena documents in Dr. Quaicoe's vehicle while he was still sitting in it, but Dr. Quaicoe threw the documents out of his car and insisted, "I didn't touch them."

223. Shortly before 5:00 p.m. the day before the scheduled deposition, an employee from Impact Professional Services notified defense counsel that Dr. Quaicoe would not appear for his deposition due to illness. After the defendant filed a motion to compel the deposition seeking sanctions against Dr. Quaicoe, the Khit entities' general counsel filed a motion for protection absurdly insisting that Dr. Quaicoe was not properly served because he refused to accept the documents from the process server.

224. When he was finally deposed on May 27, 2025, Dr. Quaicoe testified that he sees some Kay Medical patients at his own practice, Pain Containment Associates, located at 1406 S. Bryan Road in Mission, Texas. He sees others at the Kay Medical offices in Mission and Weslaco (which are adjacent to Khit Chiropractic clinics). When he sees patients at Kay Medical offices, Dr. Quaicoe brings his own medical assistant. He denied that there are any Kay Medical personnel present at their offices whenever he sees patients there. If he recommends the patients undergo additional treatment, like ESIs or trigger point injections, Dr. Quaicoe testified that he must first receive approval from the Khits before the patients can be scheduled.

225. Dr. Quaicoe's agreement with Kay Medical provides that Dr. Quaicoe is an independent contractor and may use his own means and methods to perform his medical services. According to the contract, Kay Medical does not control the details of his work. However, he is subject to Kay Medical's control with respect to "the results of his work." Dr. Quaicoe is required to comply with any "reasonable rules and policies" adopted by Kay Medical and communicated to him.

226. Under the contract, Kay Medical has the exclusive right to set fees and charges and bill for the services Dr. Quaicoe provides to Kay Medical patients. Dr. Quaicoe may not directly or indirectly bill any party for any services provided under the agreement, including Medicare beneficiaries or his carrier under Medicare Parts A and B.

227. As compensation for his services, Dr. Quaicoe receives a specified percentage of "gross charges, as set by Physician with approval of the Practice, of any medically necessary pain management procedure ordered and performed by Physician."[34] Although the contract provides that Dr. Quaicoe is not entitled to any compensation or benefits not specifically set forth in the agreement, the agreement is silent with respect to his compensation for consultations/examinations, follow up visits, and preparation of reports. If the contract produced by Dr. Quaicoe represents the entirety of the agreement between the parties, it appears that he is not paid for treating Kay Medical patients unless he orders and performs injections.

228. During the period at issue, Kay Medical billed personal injury patients around $1,200 for the initial pain management evaluation with Dr. Quaicoe and $500 for each follow-up visit. Patients were billed around $5,300 (cervical) or $7,600 (lumbar) for a single ESI procedure,

[34] It is not clear what "gross charges, as set by Physician with approval of the Practice" refers to, since Kay Medical has the exclusive right to set fees and charges, and Dr. Quaicoe is not permitted to bill "any party" – which would presumably include Kay Medical – for the services he provides to Kay Medical patients. It is also not clear from the single sentence of Exhibit B ("Compensation") to the contract who or what determines whether a pain management procedure ordered and performed by Dr. Quaicoe is "medically necessary."

including unbundled fluoroscopy charges, generally with a further $1,850 charged for anesthesia. Dr. Quaicoe testified he provided the anesthesia and operated the fluoroscopy machine himself.

**11. Final Reports To Support Future Medical Expenses**

229. Kay Medical's pre-printed "Trauma Patient Evaluation" forms include the following statement above the provider's signature line on the last page that may be endorsed and filled in when the patient is released from care:

> ☐ Patient has reached static maximum medical improvement. It is my opinion that this patient will need probable/ definite future medical care in the amount of $___________ for the next two years.

The pre-printed form reports do not specify the type, quantity, or frequency of medical care the provider believes the patient will probably/definitely need in the future for the injuries claimed to result from the accident.

230. In addition to any recommendations from Kay Medical or other referral providers for surgical intervention or pain management procedures in the future, following a personal injury patient's final visit to Khit Chiropractic, the chiropractor signs a final report containing templated language alleging that the patient "will continue to need chiropractic care in the future" with a standard estimate of the annual costs for thousands of dollars.

**B. Uniformity of Care**

231. Ironically, the home page of Khit Chiropractic's website proclaims:

> **"At Khit Chiropractic, we treat every patient like family by listening and providing care tailored to their unique needs."**
>
> **Dr. Luis & Alejandra Khit**
> Founders, Khit Chiropractic

Similarly, the "About Us" section claims:

We provide tailored chiropractic treatments that promote **healing, mobility, and a higher quality of life**, ensuring every patient receives personalized care in a compassionate environment.

232. These representations could hardly be further from the truth. Analysis of the medical bills and records for personal injury claimants that treated with one or more of the Khit healthcare entities confirms that treatment is *not* tailored to the unique needs of each patient; to the contrary, the patients received essentially the same evaluation and treatment regardless of the nature and severity of their injuries or response to care.

233. For example, claimants A.F. , age 22, and I.F. age 72, were both evaluated by Reynaldo Amador, D.C. on March 5, 2020, four weeks after the motor vehicle accident. Amador signed the narrative reports regarding his initial evaluation of the two claimants within two minutes of each other. Both reports state:

> Referral Necessary:
> I have determined that further evaluation is necessary at this time by an appropriate specialist. Despite all our efforts our care has not been able to resolve Mr.[redacted] condition to our expected outcome. Due to his clinical presentation outlined in our notes, my clinical examination and my review of the available diagnostic studies, I recommended that Mr. [redacted] get: medical evaluation in order to offer my patient another treatment option that in my opinion will help him improve his condition and allow us to continue our care with the focus on improving functional ability.

In accordance with Amador's recommendations, both claimants were referred for x-rays (billed by Insight) and evaluation at Kay Medical. Both patients were reportedly seen at Khit Chiropractic on twenty-three occasions without receiving any chiropractic adjustments and referred for two spinal MRIs, suggesting that - despite the 50-year age difference – each patient necessitated the exact same quantity, type, frequency, and duration of treatment.

234. In another example, claimant J.G. reported "no pain" with regard to his cervical, thoracic and lumbar spine when he was evaluated at Kay Medical on February 27, 2020:

| | | |
|---|---|---|
| Musculoskeletal<br><br>Cervical<br>Thoracic<br>Lumbar | ☐ Pain<br>☐ Tenderness<br>☐ Hypertonicity<br>☐ Spasms<br>☐ Swelling<br>☐ Restricted ROM<br>☐ Effusion<br>☐ Trigger Points<br>No pain |  |

The examining nurse practitioner, Julio Rios, FNP, noted:

> ***"Pt. stable no pain @ present, declined meds.***
> ***Cont. with therapies.***
> ***Release.***
> ***Pt. got meds in hospital, helped with pain."***

235. However, daily treatment notes from J.G.'s visit to Khit Chiropractic the same day allege that he reported current symptoms related to his head, cervical, and thoracic spine, and that "objective" findings on exam included pain, tenderness to palpation, hypertonicity, muscle spasms, trigger points, and restricted joint movement:

Current Symptomatic Areas:
posterior head, cervical spine and thoracic spine

**Objective:**
Palpation Evaluation:
Palpatory inspection of the left cervical, cervical spine, right cervical, left upper thoracic, thoracic spine, right upper thoracic, left mid thoracic, midline thoracic, right mid thoracic, left lower thoracic, midline lower thoracic and right lower thoracic area(s) revealed pain, tenderness to digital palpation, hypertonicity, muscle spasms, trigger points and restricted joint movement.

Extremity Palpation:
Palpation of the extremity(ies) revealed pain and tenderness to digital palpation in the following area(s): left shoulder.

236. Brian Schtupak, D.C. allegedly re-examined J.G. at Khit Chiropractic the following day, February 28, 2020. Although he also reported that the patient continued to have subjective complaints related to the posterior head, cervical spine and thoracic spine, and positive "objective" findings on

exam, he specifically acknowledged that his condition had improved and that he had responded as expected to care:

**Assessment:**
[redacted] was seen in our office today for evaluation of his injuries. It should be noted that Mr. [redacted]s injuries came as a result of the above mentioned accident.

Overall, the patients condition has improved. Mr. [redacted] has responded as expected to our care.

237. Nevertheless, *in the very next paragraph*, Schtupak characterized J.G.'s prognosis as "guarded" and reported that he was progressing slower than expected to justify the referral for MRIs, stating:

Due to the persistent pain, radicular symptoms, objective findings and slower than expected response to conservative care experienced by Mr. [redacted] further evaluation is necessary at this time. It is my opinion based on my experience and presenting clinical picture, that Mr. [redacted] at this stage of his care with us should have shown more progress. It is my recommendation as his treating doctor that Mr. [redacted] get: MRI of the cervical spine and thoracic spine, for a more complete study and evaluation of his primary complaint. Once this examination is done I will make the appropriate recommendation of care for my patient based on the whole clinical presentation and information at hand derived by my clinical exam, diagnostic studies available to me and any input available to me from other health care providers involved in the active care of [redacted]

238. At the time of the first re-examination at Khit Chiropractic, the vast majority of patients were reported to be "slightly better," suggesting that despite their differences, these unique patients all responded to care the same way. Nevertheless, almost all patients were referred for MRIs at the first reexamination based on the chiropractors' statements that the patient was "progressing slower than expected," and "should have shown more progress." Few patients were reported to be "progressing as expected."

239. Jonathan Hernandez, D.C. admitted that the language stating that the patient has responded slower than expected to care appears in the narrative reports unless altered:

Q. Okay. And was -- would you have written, "Ms. [redacted] has responded slower than expected to our care"?
A. No, that would have been a macro, but it would have been changed if necessary.

. . .

Q. Okay. So you would not have written that she was experiencing or exhibiting inordinately slow recovery.
A. Would I physically write it, no.
Q. Okay. But based on what you reported here at your re-examination, it was your opinion that she was exhibiting an inordinately slow recovery.
A. Yes.

**C. Treatment Provided by Unlicensed and/or Unqualified Individuals**

240. The Texas rules regarding the practice of chiropractic provide that a chiropractor should only delegate responsibility to "an unlicensed individual with adequate education, training, and skill to perform an act."[35] Although nearly all treatment provided to patients at Khit Chiropractic is performed by unlicensed CAs, it is unclear whether these individuals are adequately trained or qualified to provide the treatment prescribed by the chiropractors.

241. Job listings posted on Indeed by various Khit Chiropractic offices describe the CA position as follows:

> Seeking a reliable, personable, energetic, and detail-oriented full time chiropractic therapist for our Brownsville clinic. Must be able to perform well in a busy office, multi-task within a team environment, and have excellent communication skills. Able to speak Spanish is a plus. Company will provide training. Duties to include: Answer phones, schedule patient appointments, communicate with other health care professionals, complete patient therapy, supervise patients during rehabilitation exercises, and other basic front desk responsibilities.

There are no requirements regarding education or experience, although a recent job listing for the South Austin office also states "Rehab techs, medical assistants, massage therapists, etc. are encouraged to apply. People with a criminal record are encouraged to apply."

242. Luis Khit, D.C. testified that Khit Chiropractic issues its own "certification" to chiropractic assistants after three months of formal training. The CAs are trained by Luis Khit, D.C., Librado Torres, D.C., and/or the more experienced CAs. However, it is not clear what this training consists of, or whether it is completed by all of the employees that render services to patients. Khit admitted this "certification" is not recognized by the State of Texas.

[35] 22 Tex. Admin. Code §78.3(a).

243. John Glade, D.C., who has worked for Khit Chiropractic since he was licensed in Texas in 2013, testified that he considers every employee in a Khit Chiropractic office who is not a licensed chiropractor to be a CA:

> A. Yeah. Well, people at the reception desk, which anyone that works in our office that's not a chiropractor, I would consider a chiropractic assistant.
>
> Q. Okay.
>
> A. You know, like managers, assistant managers, they're all helping us out. It's -- it is a chiropractic office. I know that we also have other -- you know, other departments, but it's mainly just -- it is a chiropractic office.

244. This is consistent with a recent job listing posted on Indeed for a Patient Transport Van Driver, state the drivers are also involved in treatment:

> Seeking a reliable, personable, and energetic full time Patient Driver for our McAllen clinic. Must be able to work well independently and within a team environment. Able to speak Spanish a must. Candidate must be able to communicate clearly and effectively with Chiropractor, other clinic staff, and patients. Primary duties include to coordinate and schedule patient pick up appointments, plan driving routes, facilitate the patients' transportation to the clinics for their examinations/therapy, be able to check the company vehicle for safe operation before each shift, and take the vehicle for schedule maintenance. Complete patient therapy, supervise patients during rehabilitation exercises, and other basic front desk responsibilities, company will provide training. Candidate must possess a valid driver's license with no restrictions. Experience working with patients and driving a plus.

245. With the exception of chiropractic manipulations and adjustments, CAs may provide therapies under the supervision of a licensed chiropractor, but it is not clear whether Khit Chiropractic employs enough chiropractors to adequately supervise the numerous CAs on duty at any one time at each office. While it is questionable that one chiropractor could supervise up to five to ten CAs in a day, during most of the period at issue, the Khit Chiropractic website listed fewer chiropractors than clinics.

246. Jonathan Hernandez, D.C. testified in April of 2025 that although he was hired to work as the supervising chiropractor at Khit Chiropractic's Weslaco office,[36] he was not "officially" responsible for supervising the CAs at that clinic. Hernandez testified that the CAs there were "mostly…managed by the actual office manager," Veronica Perez, who he does not believe holds any professional license for healthcare.

247. When John Glade, D.C. was deposed in June of 2024, he testified that he worked at all eight of the Khit Chiropractic offices, although he said he hadn't worked in Austin for a couple of years. At that time, Glade testified that he saw patients at the clinic in Rio Grande City on Monday and Wednesdays, McAllen on Tuesday, and Mission on Thursdays and Fridays. When Librado Torres, D.C. was deposed in the same case just a week later, he testified that he was "the sole chiropractor" at the Mission clinic.

248. Although CAs cannot legally render a diagnosis, prescribe, or deviate from a treatment plan based on their own clinical observations or examinations,[37] the therapies provided by the CAs described in daily treatment notes are often inconsistent with the treatment plan ordered by the chiropractor at the patient's last examination.

249. In fact, the treatment plans prescribed by the chiropractors at Khit Chiropractic routinely state "treatment plan will be implemented but will be modified as needed depending on clinical observation." Records of treatment performed by CAs at Khit Chiropractic frequently include the following language discussing when an exercise or modality could be modified based on clinical observation and patient presentation even though a CA is not qualified to make such determinations:

> Progression into the next level or more challenging exercise will only be made when the activity is performed with good sensorimotor control and good quality of the performance and form (based on visual inspection by the therapist) and with minimal exertion and control of the movement (perceived by the patient).

---

[36] Hernandez worked for Khit Chiropractic from around 2021 through May or June of 2024.

[37] See Tex. Admin. Code §78.3(b).

250. As previously noted, there is some evidence that chiropractic manipulations or adjustments were reportedly performed at Khit Chiropractic visits where all treatment was provided by a CA.

**D. Unlawful Laypersons' Control of Healthcare Providers**

251. In Texas, individuals and entities may not practice medicine unless they hold a license issued by the Texas Medical Board.[38]

252. Luis and Alejandra Khit are the owners of Kay Medical Center. When he was deposed in 2024, Luis Khit confirmed that he and his wife are the sole owners. This was known to Kay Medical and Khit Chiropractic staff - Valerie Cruz testified "Mr. Khit and Mrs. Khit" owned Kay Medical and Chiropractors Glade and Torres identified Luis Khit as the owner.

253. Kay Medical Center is a medical practice. The services provided – examinations by nurse practitioners, trigger point injections and other intramuscular injections, orthopedic consultations with determinations the patient is a surgical candidate, pain management consultations, and pain management procedures such as ESIs – are outside the practice of chiropractic.

254. Luis and Alejandra Khit are chiropractors. Neither of them holds a license to practice medicine in the State of Texas.

255. Luis and Alejandra Khit have no lawful authority to direct or control professional medical service providers or services. They are unqualified to employ medical doctors and nurse practitioners.

256. The Khits, Kay Medical, Arturo Resendez, and/or Anna Gittins recruited and installed licensed medical professionals, including nurse practitioners and various physicians to misrepresent to the public, including Allstate, that Kay Medical Center was properly operated by licensed professionals to circumvent Texas law prohibiting the unlicensed practice of medicine. For example, in a 2024 deposition Nurse Practitioner Cruz testified Gittins interviewed her for the

[38] Tex. Occ. Code §155.001.

Kay Medical job. In a 2025 deposition, Dr. Quaicoe testified he negotiated his Kay Medical contract with Resendez and Luis Khit. While an entity of Dr. Levine's, Andrew Levine, M.D., P.A., was ultimately listed as a member in Kay Medical Clinic, P.L.L.C., it does not appear Nephrologist Levine, actually saw patients at Kay Medical, and he was merely the titular delegating physician to the nurse practitioners until April 2021.

257. According to multiple witnesses, including Luis Khit, D.C. who testified that he serves as the Clinical Director for Kay Medical, the Khits exercised supervisory responsibility over the staff, nurse practitioners, and physicians that worked for Kay Medical during the period at issue. Kay Medical billed the medical services and it or another Khit lay entity presumably collected the medical fee. Luis Khit, D.C. confirmed that the nurse practitioners and physicians were employees of Kay Medical, and paid a salary.[39]

258. The Khits' role at Kay Medical was not limited to providing administrative, managerial, or referral services; the Khits in fact controlled the treatment protocol administered by providers at Kay Medical, and were directly involved in medical decision-making.

259. Nurse practitioner Valerie Cruz testified that treatment protocols at Kay Medical were established by the Khits. Luis Khit, D.C. created the examination form reports used to document medical evaluations performed by the nurse practitioners at Kay Medical and instructed the nurse practitioners on how to complete them. She saw and spoke with her supposed delegating/supervising physician, Dr. Donovan, just one time, and only because she happened to be at the Mission office when he was there.

260. The contract signed by pain management physician, Dr. Sannichie Quaicoe, and Luis Khit, D.C. on behalf of Kay Medical specifically states that Kay Medical has the right to control "the

[39] Under the Medical Practices Act and its predecessors, when a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the corporation is unlawfully engaged in the practice of medicine. *Flynn Bros., Inc. v. First Medical Associates*, 715 S.W.2d 782, 785 (Tex. App. – Dallas 1986, writ ref'd n r.e).

results" of Dr. Quaicoe's work, and appears to provide that he is only compensated for the services he provides to Kay Medical patients if he performs injections or other pain management procedures, which Dr. Quaicoe admitted must first be approved by Kay Medical. The contract requires Dr. Quaicoe to comply with rules and procedures adopted by Kay Medical and communicated to him.

261. The Khits, through Kay Medical, dictated the amount that Dr. Quaicoe was to be paid by Kay Medical per injection/procedure performed (which was a mere fraction of the amount Kay Medical billed to the Allstate claimants for his services). Moreover, the Khits, through Kay Medical, dictated how much Kay Medical would charge for services.

262. The Khits, through Kay Medical, created and controlled the predetermined treatment protocol utilized at Kay Medical. Dr. Quaicoe confirmed that it was Kay Medical, rather than a licensed medical professional, that ultimately decided what type of treatment a patient would receive at Kay Medical. He testified:

> Q And you've done this examination and you've decided to recommend a lumbar ESI and lumbar facet blocks?
>
> A Correct.
>
> Q And you're going to be the doctor that actually does these procedures; correct?
>
> A Correct.
>
> Q Because there's no one else at Kay Medical that you know of that will be even qualified to perform this type of pain management injections?
>
> A I have no idea. Plus, when I recommend it -- when I make recommendations, and wait for the results.
>
> Q Okay. Who did you send the recommendation to at Kay Medical?

A I send it to Kay Medical. I don't know who assists on the other end.
Q You just generally send it to Kay Medical or?
A I think that there's a portal that they receive. The same people who send it to me, I send the report to them.
Q Okay. Do you know the name of the person though, that you send it to, or your office would send the recommendations to?
A I have no idea. My girls might know.
Q And why would you need to send the recommendation to Kay Medical Clinic since you're the doctor that's going to perform the procedures, and you're the doctor that did this examination?
A Because I'm a contractor. They send the patients to me, and I think they deserve the right for me to send it back to them.
Q Okay. So did Kay Medical Center then have to make the determination of whether the injections and the MRI will be done?
A I do not know how they make that decision.
Q Okay. But do they make the decision then?
A I don't know who makes the decision.
Q Okay. But it -- but somebody else has to make an okay decision to go ahead and go forward with these procedures; correct?
A I would say so.
Q Okay. Do you know if Kay Medical Center has to get authorization from the patient's attorney to go ahead and do the injections?
A I have no idea, and I don't ask them.

263. Not only did the Khits and/or Kay Medical control the treatment rendered by the physicians and nurse practitioners hired to work for Kay Medical, but upon information and belief, they targeted patients based upon their financial viability and reimbursement potential, rather than any determination of medical necessity.

264. The Defendants, Luis and Alejandra Khit and Kay Medical, intentionally obfuscated these facts from Allstate and others because they knew that Allstate would not have paid the claims had it known that Kay Medical was unlawfully operated by laypersons.

## VII.
## REPORTING PRACTICES AND PROCEDURES
### Relevant to All Causes of Action

265. Not only is the treatment billed by the Khit entities not tailored to the individual needs of the patients, the medical records created and produced by the Khit providers to support their billing do not accurately or reliably report the patient's actual condition(s) following the motor vehicle accident. Instead, the patient intake forms, pre-printed evaluation and treatment forms, and templated narrative reports used by the Khit providers are all carefully crafted to justify the standard protocol of treatment recommendations and referrals and inflate the patient's personal injury damages.

### A. Intentional Omission of Relevant Information

#### 1. Patient Intake Forms and Questionnaires

266. Unlike the comprehensive health questionnaires new patients are typically required to complete for most healthcare providers, the new patient forms given to personal injury patients at Khit Chiropractic, attached as **Appendix B, tab 1** ("Appendix B-1") seek only information to support personal injury damages. The forms notably refrain from asking for clearly relevant information that could be inconsistent with the providers' templated narrative reports describing the patient's alleged injuries and including conclusory statements that all of the injuries claimed are a direct result of the motor vehicle accident.

267. Although the patient's signature is required on the Khit Chiropractic forms consenting to treatment, disclosure of health information, email/text appointment reminders, and assignment of benefits, the patient's name is printed on the patient questionnaires, making it unclear whether these forms are completed or reviewed by the patient or filled out by the provider based on the patient's statements.

268. The new patient information questionnaire does not ask who referred the patient to Khit Chiropractic, or the reason they are being seen. It does not ask about the patient's occupation or employment. It does not ask whether the patient's injury was work-related. It does not ask for any insurance information or the availability of coverage, either for the patient or any liable third party. It does not ask about the patient's exercise habits or physical activity level, diet, or use of tobacco, alcohol, or drugs.

269. The information the patient is asked to provide about the incident is limited to the date it occurred, whether they were a driver or passenger, whether their body struck the inside of the vehicle, whether they lost consciousness and for how long, and whether they were taken to the hospital.

270. If the patient was taken to the hospital, they are asked for the name of the facility, whether they had imaging studies done, and whether they were given medications, injections, neck collar, or brace. When the patient was seen at a hospital following the accident, the chiropractors report that the patient's records will be requested from the hospital, but the medical records produced by Khit Chiropractic rarely include copies or any discussion of medical records from any provider the patient saw before the initial visit at Khit Chiropractic.

271. The new patient forms include a pain diagram which instructs the patient to mark the areas of the body where they have pain or symptoms. The forms do not ask the patient about the onset, nature, severity, frequency, duration, or progression of the symptoms.

272. The forms include a list of daily activities (i.e. lifting, carrying, bending, sitting, walking, computer work, standing, sweep/mop, vacuum, taking care of kids, cleaning, yardwork, transportation, dressing, eating, sleep, sexual activity, exercise) and instruct the patient to check the activities that are "painful and/or difficult to perform as a result of the injury(ies) you have sustained."

273. The medical history questionnaire consists of a single page form where the patient is asked to indicate whether they have any personal or family history of diabetes, high blood pressure, heart disease, asthma, cancer, ulcers, stroke, kidney disease, liver disease, and allergies. They are also asked to list "surgeries, fractures, and hospitalizations" and any current medications they are taking. The medical history questionnaire notably does ***not*** ask about any history of similar symptoms, neck, back, extremity, or joint pain, prior injuries other than fractures or prior treatment other than surgeries to the same areas of the body, prior motor vehicle accidents, head/brain injuries, mental health complaints, neurological disorders, or sleep disorders. Patients are not asked about any history of chiropractic care, orthopedic care, or pain management. Patients are not asked to identify their primary care physician or any other health care providers they saw prior to the accident.

274. The patient questionnaires for Kay Medical are even more limited. An example of these documents is attached as **Appendix B-2**. Like the intake paperwork for Khit Chiropractic, the forms are designed to include only information that supports personal injury damages, while omitting any information that may be inconsistent with the pre-determined causation "opinion."

275. Patients are asked to indicate any current or past history of the listed symptoms and medical conditions, which notably do **not** include neck, back, or extremity pain, stiffness, weakness, numbness, or tingling, or potentially contributory medical conditions such as arthritis, fibromyalgia, neuropathy, degenerative disc disease, or scoliosis. Patients are asked to disclose current medications, allergies, and any surgeries or hospitalizations, but are not asked about treatment for similar complaints or injuries in the past.

276. Information regarding the accident is limited to the date it occurred. In a section titled "Duties Under Duress," patients are asked to check boxes to endorse any current difficulty with

"work," "study," "domestic," "household," or "hobbies," and indicate whether that is due to difficulty with stability/mobility/posture, anxiety/depression, pain, spasms or fatigue.

277. The Social History section asks about the patient's use of tobacco, alcohol, caffeine, and recreational drugs, but patients are not asked to provide any information about their employment, job duties, work status, exercise habits, or recreational activities.

**2. Examination Reports**

278. At some point after the patient's examination at Khit Chiropractic, the information recorded on the forms or handwritten notes is entered into the computer. A narrative report regarding the patient's evaluation is generated by software using "macros" with templated language created by Luis Khit, D.C.. An example of the narrative report is attached as **Appendix B-3**. The narrative reports appear to be signed electronically by the examining chiropractor, but when John Glade, D.C. was deposed in 2024, he revealed that in fact, anyone with access to Khit Chiropractic's electronic records system, including the CAs, can affix a chiropractor's electronic signature to a report. Recent job postings by Impact for data entry clerks state the clerk's duties include "Conduct patient outreach to complete a comprehensive medical inventory," and assisting in generating reports.

279. The narrative reports regarding the patient's initial evaluation are frequently inconsistent with the symptoms endorsed by the patient on the intake forms. When questioned about a patient's intake forms, Jose Nadal, D.C., claimed that what patients tell him or what he observes during the examination is often different from what they reported on the forms they completed immediately prior to seeing him, testifying:

> Q. Okay. And then Page 76 is where Ms. [redacted] would have checked off where she was hurting?
>
> A. Well, this page many times does not correlate with what the patient -- when you see the patient, they tell you -- or when you check the patient, it -- sometimes it correlates and sometimes it does not, ma'am.

280. However, the Khit providers conveniently keep no record of what the patient said or what the chiropractor observed during the examination aside from the templated language included in the narrative reports to support the standard protocol of recommendations and referrals. Luis Khit, D.C., testified that once the chiropractor's narrative report is generated, which may be done at any time after the exam and before the next re-evaluation,[40] the evaluation forms and/or handwritten notes documenting the exam findings generated contemporaneously with the examination *are destroyed*:

Q. How were the -- the printed reports generated, the -- such as the first day report we're looking at now?
A. They're generated, they're just printed.
Q. Okay. Does the doctor, in this case, Dr. Torres, who saw her that day, does he have any type of template or handwritten notes that he keeps during the examinations?
A. I'm sure he does.
Q. Okay. Are those later used to put information into this printed report?
A. Yes.
Q. Okay. Is -- is the printed report like a template itself in a computer?
A. What we -- we do utilize a kind of shortcuts or -- not -- what is it called?
Macros. I'm sorry. They're macros that we -- we are able to use in order to cut down our time in transcribing these records.
Q. Okay. Does the chiropractor himself or herself complete the printed report?
A. Yes.
Q. Enter the -- entering the macros, so to say?
A. Yes.
Q. Okay. What happens with any of the -- the handwritten notes by the chiropractor?

[40] When asked how long it generally is before he generates the printed narrative report from the notes he made on the forms during the patient's exam, Librado Torres, D.C., admitted that is not done the same day as the exam. He testified that it can be a couple of days and is sometimes done right before the next re-evaluation.

A. Once they get used, they usually get shredded.

281. While a health care provider would reasonably need some information regarding the patient's condition prior to the incident, the details of the accident (i.e. type, size and speed of vehicles involved, rear/side/head-on impact, extent of damage to the vehicles), the onset of symptoms, and the patient's activities since the accident to determine based on reasonable medical probability that the claimed injuries are a direct result of the subject motor vehicle accident, none of this information is documented in the medical records or templated narrative reports prepared by the providers at Khit Chiropractic and Kay Medical, even when the information is disclosed by the patient or otherwise available to them.

282. Information regarding the mechanism of the patient's alleged injuries in medical reports from Khit Chiropractic is limited to a single templated statement: "On [date of exam], [patient's name] presented to the office for an initial examination and evaluation of his/her injuries arising from a motor vehicle collision on [date of accident.]"

283. Luis Khit, D.C. testified that even where a crash report is provided for their review, the providers at Khit Chiropractic do not consider the information reported to or by police at the scene:

Q. Okay. If the officer had found that there was a serious impact, would Khit have noted that in the first day report?

A. No. It's -- we only base it on the patient's interview.

284. However, the providers at Khit Chiropractic and Kay Medical do not maintain any record of the patient's statements to them, if any, regarding how they were injured. In fact, patients may not even be asked about the accident or onset of symptoms. Jonathan Hernandez, D.C., testified:

Q. Would you have been responsible in your initial examination report for describing the -- the accident that took place on July 2nd, 2023?
A. No. That's why they write their history down, so I can have a general idea.
Q. Okay. But it's not important to your examination.
MR. MIRELES: Objection, form.
A. No -- no, because I'm going to examine them either way.

. . .

Q. Okay. And dated injury here is listed as July 2nd, 2023. Is that right?
A. Yes.
Q. Would you have gone over with Ms. [redacted] what -- why she was only coming to you two months later?
A. No.
MR. MIRELES: Object to the form of the question.
Q. (By Ms. Frank) Why wouldn't you ask the patient about any delay in seeking treatment?
A. I guess -- the answer would be, I guess it wouldn't be any of my business. People have different issues for some reason, so I don't know.
Q. Would you want to know when her pain -- when she started experiencing pain?
MR. MIRELES: Objection, form.
A. Like I said, that has no bearing on why she's coming in, you know, in September versus July.

. . .

Q. (By Ms. Frank) It has no bearing on whether --
A. Meaning I'm not going to not treat her if she comes in a month later, two years later, a year later. That's not going to stop me from evaluating her and possibly treating her.
Q. Sure.
A. That's not something I ask patients pretty much.

285. Similarly, Valerie Cruz, FNP, testified that patients at Kay Medical were asked whether they'd experienced any of the symptoms listed on the examination form "since the date of the accident," rather than when their symptoms began:

Q. And would you have noted the date of onset for the dizziness in your report?
A. It's -- I would, I would always put -- I would always start with saying, since this -- since the date of the accident, have you been having these? But directly writing, the patient states at this time all these symptoms started, I would -- to me, the charting says they all started at that time.
Q. Okay.
A. I did, I did have a few patients who would say, oh, I've had dizziness but for X amount of years. And I would write, history of dizziness, has increased since accident, if something like that had happened.

286. Cruz explained that she did not report when the patient's symptoms began because she considered any symptom reported after the accident to be a result of the accident, regardless of the amount of time that passed between the incident and the date the patient first reported it:

Q. Okay. Now, on October 12th, 2023, it looks like Ms. [redacted] reported to you some sleep disturbance; is that right?
A. Correct.
Q. And would, would you have made note of the fact that she had not reported that at the initial exam three weeks prior?
A. No. No, I --
Q. And would you --
A. -- wouldn't -- huh?

Q. Would you note the onset of when, when that symptom began?
A. No. I would say -- because everything, to me, everything starts after her day of accident. So, okay. Now you're having sleep disturbance. When did this start? Okay. Was it after the accident? If it wasn't on the first assessment and now it is, it's definitely after the accident.
Q. Okay.
A. Which it was a very common symptom for patients.
Q. And this would have been approximately three, three or so months after --
A. Correct.
Q. -- her accident.
A. Correct.

287. Even when the patient discloses pre-existing injuries or conditions that may contribute to the current complaints, the providers at Khit Chiropractic do not ask for or record any details that could be inconsistent with the pre-determined templated "opinion" that all of the conditions diagnosed are the result of the subject accident.

288. For example, the narrative reports Librado Torres, D.C. prepared regarding his initial evaluation of mother (M.R.) and daughter (A.R.) claimants on September 8, 2022 both state:

> Ms. [redacted] denies any prior symptoms that might be contributory to the present condition and/or injuries/accidents that occurred in the past six months.
>
> Ms. [redacted] was in a motor vehicle accident on 5/10/2020. She receive therapy and she mentioned her symptoms resolved.

Other than this single sentence, the reports contain no other information regarding the patient's symptoms or treatment following the 2020 accident. When asked whether he knew what injuries the patients sustained as a result of the wreck two years earlier, Torres testified that "it wasn't important" since they said the injuries had resolved:

> Q. Is this something that [redacted] and [redacted] would have told you that first day?
>
> A. They did mention that, yes, sir.
>
> Q. Okay. Did you find out any further information about the prior accident?
>
> A. Regarding what, sir?
>
> Q. Well, the areas of injury that they had in the prior accident.
>
> A. Yes, sir.
>
> Q. Okay. Would you have recorded that anywhere?
>
> A. I didn't record anything on this specific, no, no, sir.
>
> Q. Okay. I mean, would that have been something important for you to know during the initial examination?
>
> A. I would but since they mentioned that it had resolved, it wasn't -- it wasn't important for this case.

Q. Okay. For this -- do you -- would you normally have asked a patient if they had any prior imaging from that accident?

A. Well, again, since they mentioned there was -- symptoms were resolved, it wasn't -- again, it wasn't important to what they were coming in for.

Q. Okay. So, you know, basically when they just said, I had been in a prior accident but it's totally resolved, you didn't have any further question for them at that point?

A. I did not, no, sir.

Q. Because with a May 2020 accident, that was just a little more than two years before you were seeing them, correct?

A. That's correct.

289. Although John Glade, D.C., had Torres' initial report available when he re-evaluated claimant M. R. on September 21, 2022, there is no mention of the previous accident in his report. Glade admitted that he did not know what injuries she sustained in 2020 or what treatment she received even though that would be important for the purposes of evaluating her current complaints:

Q. Okay. Was there any specificity about what type of treatment she had received for the 2020 accident?

A. No, we didn't -- we didn't get into that.

…

Q. (BY MR. WEATHERFORD) So, I mean, it's -- it's not listed what areas of her body she received treatment for, correct?

A. That's correct.

Q. Could that have been important in 2022 in your evaluation?

A. It -- it's important, but it's -- it's just -- we -- we did document that she had a previous accident and she received treatment at that time. And then --

and that the therapy that she went through actually helped her and she feels that the symptoms were gone. And then two years later, she gets in this collision, and now she's got neck, upper back pain and pain in the right shoulder from this accident.

Q. Right, but -- but you don't know if she had right shoulder pain from the 2020 accident, correct?

A. I don't -- that's correct. I don't know --

Q. All right.

A. -- if she had right shoulder pain.

Q. And -- and it's -- it's not recorded if they had had any imaging, such as MRIs or x-rays, from the prior accident, correct?

A. That's correct.

Q. Okay. If she had had, say, an MRI of the cervical area, the neck, is that something you would have wanted to have seen if there was a prior MRI of the neck?

A. That would -- that would be helpful, yes.

290. Although it is standard of practice for health care providers to ask patients to rate their pain on a scale of 0-10 at each visit in order to assess the patient's response to treatment, there are no pain scores documented in any of the records from Khit Chiropractic and Kay Medical. Valerie Cruz, FNP testified that nurse practitioners at Kay Medical are specifically instructed not to ask patients about or write down pain scores:

Q. Okay. And during your October 12th, 2023, evaluation of this patient, you noted decreased pain intensity, but would you have noted anywhere exactly how much her pain had decreased by?

A. No.

Q. And why is that?

A. I remember being told not to write pain scores.

Q. And who told you that?

A. The previous nurse practitioner.

Q. Did she tell you why?

A. No.

Q. Would you be told to not ask about their level of pain?

MR. MIRELES: Objection; form.

A. No, no. I would ask. I just wouldn't write it.

Q. (BY MS. FRANK) Okay. Did you find that odd?

A. Yes.

291. Without documentation of the patient's subjective pain ratings at each visit, there is no evidence to support – or refute—the templated language that the patient is progressing "slower than expected" used to justify the standard protocol of referrals for additional evaluation and treatment.

292. Nurse practitioners at Kay Medical do not prepare narrative reports. Documentation of the patient's initial evaluation and follow-up visits to Kay Medical is limited to the "check mark" examination form reports, attached as **Appendix B-4.** The forms include an initial section for the nurse practitioner to fill in the patient's identifying information, symptoms, weight, height, blood pressure and pulse, followed by a checklist of symptoms (headaches, dizziness, visual disturbance, anxiety, depression, sleep disturbance, "alteration in mental state at time or trauma or any time after that," and nausea/vomiting) commonly used by personal injury providers to support a diagnosis of traumatic brain injury ("TBI").

293. This is followed by sections for "Radiating Pain Numbness Tingling," "Skin," "Musculoskeletal Cervical Thoracic Lumbar" and "Extremities." Each section has a body diagram that may be marked and a list of symptoms and diagnoses that may be checked. For example:



294. Notably, there are no selections for orthopedic testing performed or the results of such tests. Selections for "Neurological" are limited to "normal," "abnormal," and "not examined;" there is nowhere to report the specific neurological tests performed or the results of such tests. There is nowhere to report the patient's range of motion aside from checking "Restricted ROM" which provides no information as to the area of the spine or extremity involved.

295. Analysis of the records for patients also established that consistent with the "facility note" QI&I provides to its radiologists, MRI reports from Insight do not include any mention of "degenerative" changes, even for the patients over age 65 where degenerative findings would reasonably be expected. The reports instead often identified small, 1-2 mm disc "herniations." Examples of these reports are attached as **Appendix B-5**.

296. In those claims where Allstate retained a radiologist to review the images associated with the studies Insight billed for, the re-reads were not consistent with the findings reported by the QI&I radiologists.

297. For example, Dr. Susan Fan's report for Insight regarding claimant B.R.'s cervical MRI on December 3, 2020 states:



**EXAM: MR CERVICAL SPINE WITHOUT CONTRAST**

**HISTORY:** Neck pain
TECHNIQUE: Multiplanar and multisequence MR images of the cervical spine obtained without IV contrast administration.
COMPARISON: None available.

**FINDINGS:**
Vertebrae: Normal vertebral bodies and posterior elements.
Vertebral alignment: Normal, including the craniocervical junction and cervicothoracic junction.No spondylolisthesis. There is preservation of the normal cervical lordosis.
C2/3: Normal disc height and morphology. Normal central canal and neuroforamina.
C3/4: Normal disc height and morphology. Normal central canal and neuroforamina.
C4/5: There is a 2 mm central disc herniation which does not compromise the central canal dimensions or neural foramina.
C5/6: 2 mm central disc herniation is seen. The neural foramina and central canal dimensions are adequate.
C6/7: A 2 mm central and left paracentral disc herniation moderately narrows the left neural foramen. The right neural foramen is patent and the central canal dimensions are adequate.
Cord: Unremarkable in signal and morphology.
Neck soft tissues: No prevertebral soft tissue swelling. There is no cervical adenopathy.

**IMPRESSION:**
Central disc herniations at C4-5 and C5-6 which do not compromise the central canal dimensions or neural foramina.
2 mm central and left paracentral disc herniation at C6-7, moderately narrowing the left neural foramen.

The report of defense expert Bruce Berberian, M.D. interpreting the same images states:

**MRI Cervical Spine, 12/03/2020:** The following sequences are submitted: Sagittal T1, T2, IR. Axial T1, T2, GRE (C2-T1). The study shows minimal degenerative endplate change at 2/3 and 3/4; mild at 4/5 and 5/6. Otherwise, vertebral body height, signal and alignment are normal. All discs show mildly decreased signal with preserved height. 4/5 shows a 1mm center-left disc osteophyte protrusion with negligible mass effect. 5/6 shows a 1mm central, focal disc osteophyte protrusion with negligible mass effect. The facets are normal. The spinal canal and cord are normal. The paraspinal soft tissues are normal.

**Impression:** 1) Early multilevel degenerative disc changes as described.
2) There are no acute traumatic findings on this exam.

## B. Templated Language to Support Recommendations and Referrals

298. As noted above, whether the patient provides any details regarding the accident during the examination or not, information regarding the mechanism of the patient's alleged injuries in medical reports from Khit Chiropractic is limited to a single generic templated statement that the patient was seen for an initial examination and evaluation of his/her injuries arising from a motor vehicle collision on the date specified, followed by the statement "[Patient's name] states that his/her [head or body part] struck the inside of the vehicle due to the impact."

299. Regardless of the past medical and surgical history reported by the patient, the majority of the narrative reports from Khit Chiropractic include the templated statement "[Patient's name] denied any prior symptoms that might be contributory to the present condition and/or injuries/accidents that occurred in the past six months." Other reports simply omit any discussion of the patient's reported medical or surgical history.

300. Although the patient questionnaires do not ask for any information about the patient's social history, the narrative reports include the templated statement "The patient's social history is non-contributory in that it does not contain any information that would have contributed to [his/her] present complaints."

301. Despite the notable absence of any details or discussion regarding the accident or the patient's past medical history, the narrative reports from Khit Chiropractic uniformly allege "Based on an assessment of the patient's history, along with [his/her] subjective complaints, objective findings and

other test results, it is evident from a standpoint of medical certainty that [his/her] current condition did result from the type of injury/onset described in this report."

302. Although the patient questionnaires do not ask about the nature, severity, frequency, duration or progression of symptoms, for each area of current complaints allegedly reported, the narrative report indicates that pain occurs constantly (100%-76% of the time), frequently (75%-51%) or intermittently (50%-25%), followed by the statements "This pain causes some diminution in [his/her] capacity to carry out daily activities. The symptoms have generally been unchanged." Jonathan Hernandez, D.C. admitted that this language in the reports is standard:

> Q. You wrote that her -- her pain causes some diminution in her capacity to carry out daily activities.
> A. Okay.
> Q. Which daily activities?
> A. Can I say off the top of my head? I couldn't tell you. But daily activities could -- encompasses a lot.
> Q. Would that have been documented specifically anywhere in your report?
> A. If it was something that was super specific, yes, it would be on that initial page.
>
> Q. I guess before we go any further --
> A. Okay.
> Q. -- I want to ask, is all of the language that's on this report just what you would have written yourself?
> A. As opposed to what?
> Q. As opposed to a template or macros.
> A. Both.
> Q. Okay. So, for instance, where it says she -- where did I pull up the diminution in pain. Is that a macro?
> A. That would be -- that would be a macro, yes. But of course they can be altered per patient.

303. While the chiropractors may be able to alter the macros/templated language in their narrative reports to reflect the condition of each unique individual patient, they rarely do. For example, during the same deposition, Jonathan Hernandez, D.C. admitted that he did not actually write the majority of the Assessment section of his report regarding the patient's initial evaluation:

Q. Okay. Did you write everything that is written under Assessment on page 23 of Exhibit 3?
A. Written everything? No. Like I said, there's macro, and there's stuff that I may have included in there extra.
Q. Would you please identify -- I'm sorry?
A. Yeah, I was going to say, did I specifically say? No, I couldn't say off the top of my head, no.
Q. Can you identify any of the macros that are within this assessment?
A. I will say the majority of it is macro, yes.

304. Analysis of the medical bills and records for personal injury claimants that treated with one or more of the Khit entities reveals that despite the diversity of the patient population with respect to factors like age, height, weight, employment, pre-existing conditions, nature and severity of the accident, time elapsed between the accident and presentation at a Khit Chiropractic clinic, and treatment provided before they were seen at Khit Chiropractic, the reports regarding their initial evaluations with different chiropractors at different Khit Chiropractic clinics demonstrates uniformity that defies any reasonable medical probability.

305. Patients at issue range from young children to adults in their 70s and 80s. Heights vary from small children to adults over six feet tall, with adult weights ranging from the 100s up to over 300 pounds. Some patients were reportedly seen at Khit Chiropractic the same day as the accident, while others were seen weeks or even months later.

306. With so many variables involved, there should be the same diversity in the examination findings reported at the initial visit. Instead, the vast majority of adult patients were reported to have a “guarded” prognosis at the initial examination, while minor patients were reported to have a “good” prognosis. Based on the initial exam, the Khit chiropractors reported that the vast majority of these patients were expected to have “permanent residuals” from their injuries. At the very first visit, most of the patients were characterized as “complicated” cases, although the reports contain no discussion or explanation of the basis for that assessment.

307. The vast majority of the patients reviewed were reported to have normal gait, motor strength of the upper and lower extremities within normal limits, and deep tendon reflexes of the upper and lower extremities and sensory exam within normal limits at the initial evaluation.

308. Nevertheless, even in cases where the patient was reportedly seen the same day as the accident, the Khit chiropractors uniformly reported at the first visit that the patient's condition significantly limited their capacity to carry out many activities of daily life, including self-care and personal hygiene (i.e. brush hair, brush teeth, shower, wash face, put clothing on, tie shoes, go to toilet, prepare meals), physical activity (i.e. stand, walk, recline, sit, bend at waist, twist to right/left, lean back/forward, kneel), functional activities (i.e. carry large/small objects, lift objects off the floor/table, climb up/down stairs, push/pull objects, grasp objects, hold objects), social and recreational activities (i.e. exercise, dine out, play sports, dance, swim, golf, job, bowl), travel and transportation (i.e. drive a car, drive a motorcycle, ride a bicycle, ride in a car as a passenger), sexual activity and sleep.

309. Although multiple chiropractors have admitted that they do not use any type of device to measure or record the patient's range of motion, the chiropractors routinely reported "objective" exam findings of "significant decrease" of normal range of motion for all cervical, thoracic, and lumbar planes of motion. They also routinely reported findings of "pain, tenderness to palpation, hypertonicity, muscle spasms, trigger points and restricted joint motion" with respect to every area of the body claimed to be affected by the accident, as well as "positive" results for every orthopedic test reportedly performed.

310. These boilerplate initial exam reports paint an ominous clinical future to justify orders for diagnostic imaging studies and referrals to other Khit-owned entities.

**C. Reuse of Prior Reports**

311. In addition to using templated language crafted to support treatment recommendations and referrals, it is evident that Khit providers reuse reports from prior visits or patients.

312. The Texas rules require that chiropractors "include in all records of a subsequent visit: (1) an updated history since last visit, if any; (2) the purpose of visit and changes in symptoms, if any; (3) an examination of the area involved in the diagnosis; (4) an assessment of any change in the patient's condition since last visit; (5) the treatment or service provided and the patient's response; and (6) change in treatment plan or planned referrals if indicated." 22 Tex. Admin. Code § 76.1(f).

313. Multiple Khit chiropractors, including Luis Khit himself, have testified that the information in the daily treatment notes regarding the treatment provided by CAs is taken directly from the report of the chiropractor's most recent examination. An example of the daily treatment notes is attached as **Appendix B-6.** As a result, these notes do not actually reflect the patient's condition on the listed dates of service as required by the rules.

314. While the daily treatment notes are the only reports that the Khit providers have specifically admitted to copying from earlier reports to date, the medical records are replete with inconsistent and conflicting information that can be explained no other way.

315. For example, Reynaldo Amador, D.C. reported that he performed an initial evaluation of claimant I. L. on July 27, 2020, the same day that the accident occurred:

**Subjective:**
Re: [redacted] Mr.
DOB: [redacted]

Date of Injury: 7/27/2020

On 7/27/2020, Mr. [redacted] presented to the office for an initial examination and evaluation of his injuries arising from motor vehicle collision that he was involved in on 7/27/2020.

[redacted] reported that he has an appoint ment with Physician's Injury Clinic on 7/28/2020.

We will request the medical records from that provider.

The billing records included charges for an initial evaluation on that date:

**Patient Information**

[redacted]

**Account:** [redacted]
**Date of birth:**
**Employer:**

**Dx:** (S13.4XXA) Sprain of cervical ligts, initl., (S16.1XXA) Strain of muscle, fascia and tendon at neck level, init, (S23.3XXA) Sprain of ligts of thoracic spine, (S29.019A) Strain of muscle and tendon of unsp wall of thorax, init, (S33.5XXA) Sprain of lumbar ligts, initl., (S39.012A) Strain of lower back, (G44.309) Post-traumatic headache, unspecified, not intractable, (M62.830) Muscle spasm of back

| Date | Type | Code | Mod | Units | Description | Date of injury | POS | Tax | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 07/27/2020 | CSV | 99203 | | 1 | NP Eval 99203 | 7/27/2020 | 11 | 0.00 | 325.00 |
| 07/27/2020 | CSV | A4595 | | 1 | Electrodes | 7/27/2020 | 11 | 0.00 | 125.00 |
| 07/27/2020 | CSV | 97014 | | 1 | Electrical Stimulation 97014 | 7/27/2020 | 11 | 0.00 | 65.00 |
| 07/27/2020 | CSV | 97010 | | 1 | Hot/Cold 97010 | 7/27/2020 | 11 | 0.00 | 45.00 |
| 07/27/2020 | CSV | 97140 | 59 | 1 | Manual Therapies 97140 | 7/27/2020 | 11 | 0.00 | 95.00 |
| 07/27/2020 | CSV | 97035 | | 1 | Ultrasound 97035 | 7/27/2020 | 11 | 0.00 | 65.00 |

However, the date and time stamp indicates that Amador electronically signed the report on July 24, 2020 at 7:05 p.m. – *3 days before the accident occurred*:

**Date 07/27/2020**
**Provider Reynaldo Amador, D.C.** ****** continued from previous page ******

Therapy Performed By: Paula Delgado, CA

**Diagnosis**
S13.4XXA: Sprain of cervical ligts, initl.
S16.1XXA: Strain of muscle, fascia and tendon at neck level, init
S23.3XXA: Sprain of ligts of thoracic spine
S29.019A: Strain of muscle and tendon of unsp wall of thorax, init
S33.5XXA: Sprain of lumbar ligts, initl.
S39.012A: Strain of lower back
G44.309: Post-traumatic headache, unspecified, not intractable
M62.830: Muscle spasm of back

Electronically Signed
Reynaldo Amador, D.C. 07/24/2020 07:05 PM

316. In another example, medical records from two providers claimant N. D. saw before presenting to Khit Chiropractic identify her sex as female, as does the Texas identification card copied by Khit Chiropractic at her initial visit. Jose Nadal, D.C. allegedly examined her on June 11, 2020 and authored a five-page narrative report regarding his evaluation, which he signed at 10:22 a.m. that day. Since the clinic opened at 9:00 a.m., Nadal's report could have been prepared no more than an hour after the patient was seen. Nevertheless, he incorrectly refers to the patient as male repeatedly throughout the report -- despite specifically noting that she'd had three Cesarean sections:

**Date** **06/11/2020**

**Provider** **Jose R Nadal, DC**

## Subjective:

Today we took the necessary measures to screen this patient, according to the CDC guidelines, for signs and symptoms compatible with COVID-19 infection. After this screening was performed and the patient responded in the negative, the patient was allowed to enter the clinic.

Re[redacted]

DO[redacted]

Date of Injury: 6/1/2020

On 6/11/2020, Mr. [redacted] presented to the office for an initial examination and evaluation of his injuries arising from a motor vehicle collision that he was involved in on 6/1/2020./ SHE WAS A PEDESTRIAN

Mr. [redacted] states that his right hip and right abdominal struck the inside of the vehicle due to the impact.

He informs that he was taken to the emergency room after the accident for further evaluation. At that time, the doctors at the emergency room did take radiographs. VBMC ON DOI, DNC HARLINGEN ON 6/2/20

These hospital reports will be requested by my office.

[redacted] reported that he saw on 6/11/2020 On this visit the Doctor take radiographs. As a treatment .

We will request the medical records from that provider.

Medical History:

Mr. [redacted] relates a history of anemia.

Surgical History:

Mr. [redacted] relates a history of 3 Cesarean section.

## Objective:

General Presentation:

[redacted] is a 36 year old Male. He was born [redacted]. Today his appearance and presentation would be described as: oriented to time, place and situation, mentally alert and average build.

Social History:

The patient's social history is non-contributory in that it does not contain any information that would have contributed to his present complaints.

Family History:

The patient's family history is non-contributory in that it does not contain any information that would have contributed to his present complaints.

Gait:

Gait: His walk revealed W/ CRUTCHES.CASTED LT LOWER LEG DUE TO INJURY

Height/Weight:

He is 5.6" tall. He weighs 170 pounds.

Blood Pressure:

His blood pressure was taken seated and the observed measurement was; 123/88.

Heart Rate:

His pulse was measured at 85 (bpm)beats per minute.

317. Although the claimant is referred to as "Ms." in eight subsequent daily treatment notes regarding visits with various CAs between June 12, 2020 and June 23, 2020, Nadal's report regarding the re-examination he allegedly performed on June 24, 2020 again uses primarily male pronouns throughout:

CURRENT COMPLAINTS:
An assessment of the current signs and symptoms were performed today.

His symptom is as follows:
Mr. [redacted] described that he has pain in his left ankle and left foot/ CASTED IMMOBILIZED area. This pain is reported to occur constantly, (100%-75%) of the time. This pain causes some diminution in his capacity to carry out daily activities. Since the pain began the symptoms have generally been unchanged. FU W/ DR PATIL/ ORTHO, SCHEDULED FOR 6/26/20

His symptom is as follows:
He has pain in his right anterior leg, right anterior knee and right posterior shoulder area. This pain is reported to occur intermittently, (50%-25%) of the time. This pain causes some diminution in his capacity to carry out daily activities. Since the pain began the symptoms have generally been improving.

His symptom is as follows:
He has pain in his midline lumbar and midline lower thoracic area. This pain is reported to occur constantly, (100%-75%) of the time. This pain causes some diminution in his capacity to carry out daily activities. Since the pain began the symptoms have generally been improving slightly.

Ms. [redacted] reported feeling radiating pain that originates at the lumbar area and extends to the right lumbar and right abdominal area.

His symptom is as follows:
He has pain in his right abdominal /LATERAL RIBS AREA. This pain is reported to occur intermittently, (50%-25%) of the time. This pain causes some diminution in his capacity to carry out daily activities. Since the pain began the symptoms have generally been improving slightly. ON MONDAY WENT TO SEE DR CASTILLO /WAS REFERRED FOR AN US OF THE AREA/ PENDING APPOINTMENT

318. This pattern continues throughout the records Khit Chiropractic produced for this claimant. All of the daily treatment notes correctly indicate that the patient is female, while all narrative reports signed by Jose Nadal, D.C. regarding his alleged examinations repeatedly refer to the patient as male.

319. Numerous reports regarding the patients' initial evaluations at Khit Chiropractic include language stating "despite all our efforts, our care has not been able to resolve [patient's] condition to our expected outcome," to support the medical necessity of referrals for x-rays and medical evaluations despite the fact that no care had been rendered yet.

320. Reports of telehealth visits with Khit Chiropractic frequently include the patient's vitals and "objective" exam findings that could not possibly have been performed by videoconference, such as the results of orthopedic testing, decreased passive range of motion, muscle spasms or hypertonicity present on palpation, and "normal" examination of the patient's chest, heart, lungs, abdomen and lymph nodes.

321. In addition to inconsistent and conflicting information contained in the reports, date and time stamps on the electronic signatures show that on numerous instances, Khit chiropractors signed the four to five page narrative reports for different patients seen the same day at the same time or within one to two minutes of each other.

322. For example, six related claimants who were involved in the same motor vehicle accident on May 3, 2020 reportedly saw Renaldo Amador, D.C. for initial evaluation at Khit Chiropractic on May 5, 2020. The table below shows the time that Amador signed the reports regarding each patient's initial evaluation and two subsequent re-examinations:

| **Patient** | **5/05/2020** | **5/18/2020** | **6/15/2020** |
|---|---|---|---|
| D.R. | 6:40 PM | 6:36 PM | 6:42 PM |
| J.C. | 7:01 PM | 6:58 PM | 6:41 PM |
| J.R. | 7:03 PM | 6:57 PM | 6:42 PM |
| R.R. | 7:05 PM | 6:54 PM | 7:01 PM |
| L.R. | 7:08 PM | 6:57 PM | 6:56 PM |
| R.R. | 7:13 PM | 6:55 PM | 6:57 PM |

323. In another example, Librado Torres, D.C., signed the reports regarding the three claimants' initial examination and two subsequent re-exams in similar fashion:

| **Patient** | **8/31/2020** | **9/14/2020** | **9/24/2020** |
|---|---|---|---|
| A.R. | 12:02 PM | 4:31PM | 5:02 PM |
| J.G. | 12:02 PM | 4:22 PM | 4:51 PM |
| K.G. | 11:58 PM | 4:26 PM | 4:57 PM |

324. Based on the dates and times when the reports were allegedly authored, it is highly unlikely that the four to five page narrative reports accurately reflect the subjective complaints reported and clinical findings on exam for each unique patient reportedly seen that day. Instead, the providers at Khit Chiropractic likely use the same boilerplate report, changing the patient names and signing them one right after the other.

325. Comparison of narrative reports for different patients seen the same day signed by the chiropractor within minutes of each other supports this. For example, Reynaldo Amador, D.C.

reportedly examined claimants H. G. and D. P. on February 18, 2020. Comparison of the reports he signed within two minutes of each other revealed that many of the passages and exam findings reported for the two unique individuals were *identical* but for the patient's name. Amador's report regarding the initial evaluation of H. G., signed on February 18, 2020 at 4:53 p.m. states:.

> Deep tendon reflexes:
> An examination of the deep tendon reflexes of the upper and lower extremities was performed in relation to the cervical and lumbar nerve roots on Ms. [redacted] These reflexes showed a normal reaction, with equal strength, one side being compared to the other.
>
> Sensory Examination:
> A sensory examination was performed to evaluate [redacted]s ability to detect and distinguish a variations of tactile stimuli on her upper extremities. Mrs. [redacted] was asked to differentiate between the left and right upper extremities response to a pinwheel over several dermatomes all were considered normal except C5 and C6, left.
>
> Sensory Examination:
> A sensory examination was performed to evaluate [redacted]s ability to detect and distinguish a variation of tactile stimuli on her lower extremities. Mrs. [redacted] was asked to differentiate between the left and right lower extremities response to a pinwheel over several dermatomes and all were normal except L3 and L4, right.

Amador's report regarding the initial evaluation of D. P., another patient seen that day, signed at 4:55 p.m. states:

> Deep tendon reflexes:
> An examination of the deep tendon reflexes of the upper and lower extremities was performed in relation to the cervical and lumbar nerve roots on Ms. [redacted] These reflexes showed a normal reaction, with equal strength, one side being compared to the other.
>
> Sensory Examination:
> A sensory examination was performed to evaluate [redacted]s ability to detect and distinguish a variations of tactile stimuli on her upper extremities. Mrs. [redacted] was asked to differentiate between the left and right upper extremities response to a pinwheel over several dermatomes all were considered normal except C5 and C6, left.
>
> Sensory Examination:
> A sensory examination was performed to evaluate [redacted]s ability to detect and distinguish a variation of tactile stimuli on her lower extremities. Mrs. [redacted] was asked to differentiate between the left and right lower extremities response to a pinwheel over several dermatomes and all were normal except L3 and L4, right.

The same was true of Amador's reports regarding the re-examination of both patients on March 2, 2020; the reports were signed at 4:55 p.m. and 4:57 p.m. and once again were virtually identical.

326. Like the reports authored by Khit Chiropractic providers, review of the medical records for the sample patient population identified numerous instances where the radiologists interpreting imaging studies for Insight electronically signed reports for two different patients at the same time or within one to two minutes of each other. MRI scans generate eighty or more images per study of

various configurations (axial, coronal, sagittal); it would be virtually impossible to pull up and look at all of the images, interpret them, and write or dictate a radiology report in one to two minutes.

327. Susan Fan, M.D., one of the radiologists with QI&I that interpreted imaging studies for Insight, testified that it typically takes her five to eight minutes to review the images for an uncomplicated cervical MRI, while reviewing an uncomplicated MRI of the shoulder would take a little longer. This makes it extremely unlikely that radiology reports completed within one to two minutes of each other accurately or reliably describe the findings shown on each individual patient's MRI.

328. Again, comparison of Insight radiology reports for different patients that were signed within minutes of each other supports the use of boilerplate reports that do not accurately or reliably reflect the actual findings for each unique patient. For example, comparison of x-ray reports for two different patients signed by Julieta Oneto, M.D. within forty-eight seconds of each other revealed that the findings reported were identical. Claimant J. R. reportedly had x-rays of her cervical spine done on June 23, 2020 at 10:55:40 a.m. The report Dr. Oneto signed at 2:42:14 p.m. on June 24, 2020 states:

**EXAM: CR CERVICAL SPINE, 3 VIEWS**

**History:** Neck pain post motor vehicle accident.
Technique: Frontal and lateral views of the cervical spine were obtained including an open-mouth view of the odontoid process.
Comparison: None available.

**FINDINGS:**
Vertebrae: Preserved vertebral body height. No fracture. The odontoid process and atlantoaxial joints are intact.
Vertebral alignment: Preservation of the normal cervical lordosis. No spondylolisthesis.
Discs: Disc spaces are preserved.
Neck soft tissues: No prevertebral soft tissue widening.
Lung apices: Clear.

**IMPRESSION:**
No evidence of fracture or spondylolisthesis. If symptoms persist MRI is recommended.

Signed By: Julieta Oneto, MD | Board Certified Radiologist | Jun 24, 2020 2:42:14 PM CDT QI&I

Claimant J. S. reportedly had x-rays of his cervical spine done on June 23, 2020 at 11:02:52 a.m. The report Dr. Oneto signed at 2:43:02 p.m. on June 24, 2020 states:

**EXAM: CR CERVICAL SPINE, 3 VIEWS**

**History:** Neck pain post motor vehicle accident.
Technique: Frontal and lateral views of the cervical spine were obtained including an open-mouth view of the odontoid process.
Comparison: None available.

**FINDINGS:**
Vertebrae: Preserved vertebral body height. No fracture. The odontoid process and atlantoaxial joints are intact.
Vertebral alignment: Preservation of the normal cervical lordosis. No spondylolisthesis.
Discs: Disc spaces are preserved.
Neck soft tissues: No prevertebral soft tissue widening.
Lung apices: Clear.

**IMPRESSION:**
No evidence of fracture or spondylolisthesis. If symptoms persist MRI is recommended.

*Signed By:* Julieta Onato, MD | Board Certified Radiologist | Jun 24, 2020 2:43:02 PM CDT

**D. Records Not Prepared By Service Provider**

329. Texas regulations require chiropractors to "ensure a patient record is timely created, accurately dated, legible, *signed or initialed by the individual who actually performed the treatment or service*, and contains a key to abbreviations." 22 Tex. Admin. Code §76.1(d) (emphasis added). However, Khit Chiropractic treatment records are routinely prepared by someone that did not perform the services.

330. The treatment reportedly provided to patients by CAs at Khit Chiropractic is documented on brief forms referred to as "charge sheets" or "walkouts," which are used by the front office staff to generate the patient's bill for that date of service. Examples of these forms are attached as **Appendix B-7**. Treatment for that day is checked, with a total charge filled in at the end. There are lines for the patient's signature and the initials of the therapist and a witness:

| | |
|---|---|
| ( ) Interferential/Electrical Stimulation $65<br>( ) Heat/Cold Therapy $45<br>( ) Manual Therapies $95<br>( ) Ultrasound $65<br>( ) Intersegmental Traction $65<br>( ) Paraffin $25<br>( ) Therapeutic Exercises $95 (1) (2) Units<br>(✓) New Patient Exam $125, $225, $325<br>(✓) E-stim Pads $125<br>( ) Other ________ $________<br>Total for: 7/16/20 $ 450<br>By signing, I acknowledge these services were rendered: [redacted]<br>Therapist: Witness: N | (✓) Interferential/Electrical Stimulation $65<br>(✓) Heat/Cold Therapy $45<br>(✓) Manual Therapies $95<br>(✓) Ultrasound $65<br>( ) Intersegmental Traction $65<br>( ) Paraffin $25<br>( ) Therapeutic Exercises $95 (1) (2) Units<br>( ) ROF $140<br>( ) Re-Exam $140, $205<br>( ) Other ________ $________<br>Total for: 7/17/20 $ 270<br>By signing, I ac [redacted] e services were rendered: [redacted]<br>Therapist: YA Witness: RB |
| (✓) Interferential/Electrical Stimulation $65<br>(✓) Heat/Cold Therapy $45<br>(✓) Manual Therapies $95<br>(✓) Ultrasound $65<br>(✓) Intersegmental Traction $65<br>( ) Paraffin $25<br>( ) Therapeutic Exercises $95 (1) (2) Units<br>( ) ROF $140<br>( ) Re-Exam $140, $205<br>( ) Other ________ $________<br>Total for: 7/23/20 $ 270<br>By signing, I acknowledge these services were rendered: [redacted]<br>Therapist: a.a. Witness: YB | (✓) Interferential/Electrical Stimulation $65<br>(✓) Heat/Cold Therapy $45<br>(✓) Manual Therapies $95<br>(✓) Ultrasound $65<br>( ) Intersegmental Traction $65<br>(✓) Paraffin $25<br>( ) Therapeutic Exercises $95 (1) (2) Units<br>( ) ROF $140<br>( ) Re-Exam $140, $205<br>( ) Other ________ $________<br>Total for: 7/24/20 $ 295<br>By signin [redacted] services were rendered: [redacted]<br>Therapist: DV Witness: RB |
| ( ) Interferential/Electrical Stimulation $65<br>( ) Heat/Cold Therapy $45<br>( ) Manual Therapies $95<br>( ) Ultrasound $65<br>( ) Intersegmental Traction<br>( ) Paraffin $25<br>( ) Therapeutic Exercises $95 (1) (2) Units<br>( ) ROF $140<br>(✓) Re-Exam $140, $205<br>( ) Other ________ $________<br>Total for: 7/27/20 $ 205<br>By signing, I acknowledge these services were rendered: [redacted]<br>Therapist: Witness: RB<br>Void | (✓) Interferential/Electrical Stimulation $65<br>(✓) Heat/Cold Therapy $45<br>(✓) Manual Therapies $95<br>(✓) Ultrasound $65<br>( ) Intersegmental Traction $65<br>(✓) Paraffin $25<br>( ) Therapeutic Exercises $95 (1) (2) Units<br>( ) ROF $140<br>( ) Re-Exam $140, $205<br>( ) Other ________ $________<br>Total for: 7/27/20 $ 295<br>By signing, [redacted] services were rendered: [redacted]<br>Therapist: YA Witness: RB |

331. There are no treatment records by the CA produced in claims, in regard to the modalities utilized on the particular day, the amount of time spent per modality, etc. While someone reviewing the records produced in claims would assume the above charge sheets were completed by the treating CA, these forms are not prepared by the CAs that provide the treatment. In a 2024 deposition, Luis Khit, D.C. testified that CAs document the treatment provided at each visit by using an erasable marker to mark the therapies performed on a plastic card. This erasable plastic card is the only 'record' regarding the patient's treatment completed by the CA that provided the services. The plastic card is given to the person doing the billing, and that billing person enters the information on the paper forms that reflect the therapies provided and total charges for each visit,

with six dates of service on each page. The plastic card is then erased and put back in the packet containing the patient's electrodes and treatment plan for reuse at the patient's next visit.

332. While many of the therapies provided at Khit Chiropractic are traditionally billed under CPT codes where the unit or level of service is based on the amount of time the provider spent performing the therapy, the CAs do not document the duration that services were provided. Luis Khit, D.C. testified:

> Q. Do the CAs document the time they spend on each modality?
>
> A. No. I mean, there's no documentation for it. Like I said, you know, we do have our -- our protocols for the treatment, so they -- they don't need to document.

333. A printed "Daily Treatment Note" listing the CA's name is generated for each treatment day. The daily treatment notes indicate some evaluation was done, including statements that the patient reports no new signs or symptoms, reports of radiating pain, reference to "Palpation Evaluation" and sometimes "Extremity Palpation," an "Assessment," Diagnosis, and Plan, etc. However, the treating CA does not generate this note. Based on the charge sheets prepared by the person doing the billing, a designated "scribe" – not the CA that provided the services – creates a daily treatment note for each visit. Luis Khit, D.C. admitted that the information included in the daily treatment notes is taken from the preceding chiropractic examination report:

Q. Okay. And in this case, I see it -- it does say today's therapy was performed by Jamie Villagomez, CA?

A. Yes.

Q. But it says entered by M.T.?

A. Correct.

Q. So M.T. would be the scribe?

A. Yes, sir.

Q. Okay. And it appears that the information in the daily treatment note is taken from the -- the proceeding chiropractic examination report, would that be correct?

A. Yes, yeah. We base it off of doctor's notes.

Q. Okay. Because -- and to me it seems that, you know, aside from the date and perhaps the identity of the CA and the scribe, that these eight aud- -- daily treatment notes are really the same until the next exam?

A. Yeah. Generally, they are.

In 2024 depositions, Librado Torres, D.C. verified the daily treatment notes are basically generated from information in the last prior chiropractor's examination report, and John Glade, D.C. also testified the daily treatment notes were based on the exam and the only information added by the staff would be the therapy done that day and the CA's name.

## VIII.
## BILLING PRACTICES AND PROCEDURES
## Relevant to All Causes of Action

### A. Medical Billing for Unnecessary Services

334. As outlined above, the Khit entities bill for unwarranted and predetermined healthcare services provided for the purpose of maximizing the Defendants' profits, rather than addressing the individual healthcare needs of the patients. In addition to the templated narrative reports created to justify the standard protocol of recommendations and referrals, the medical bills from the Khit entities are often accompanied by Texas Civil Practice & Remedies Code section 18.001 affidavits

signed by the custodian of records -- usually Luis Khit, D.C. -- swearing that the services provided were necessary and the amount charged for the services was reasonable. Pursuant to Texas Civil Practice & Remedies Code §18.001(b), if a tort lawsuit is filed by the patient, unless such affidavits are controverted they are sufficient evidence to support a finding of fact by the judge or jury that the amount charged was reasonable and the service was necessary.

**B. Fraudulent Misrepresentations in Patient Financial Agreements**

335. Since at least October of 2022, the Khit entities have required patients to sign an "Agreement To Pay/Contractual Lien and Assignment By Patient" at their initial visit avowing that there is no government healthcare program or private insurance carrier "offering" coverage for the patient's treatment, *or if there is, the patient is instructing the provider not to submit bills to the insurance carrier*. *See* **Appendix B-8**.

336. The purpose of this language is to give the appearance that treatment was provided under a letter of protection because there was no insurance available, payment was requested and denied by the insurer, or the patient voluntarily elected not to use the insurance available because it would result in "financial hardship," when in fact, none of the Khit entities accept any form of insurance, and all treatment is provided under LOPs to inflate the patients' personal injury damages and maximize the Defendants' profits.

337. Since the Khit entities do not submit claims to a government healthcare program or private insurance company for reimbursement, there is no reduction of the billed charges required by law or contract. Although the Khit entities routinely agree to substantial reductions of their fees to facilitate resolution of the patients' personal injury claims, treating under an LOP allows the patient to claim the full amount of the billed charges as damages for medical expenses "incurred" as a result of the accident, and the Khit entities to claim that they are owed the full amount of the grossly inflated billed charges, rather than the reasonable amount they would be paid for the

services under Medicare/Medicaid, workers' compensation, or negotiated contracts with private insurance carriers.

338. In addition, by requiring patients to waive their right to use any available insurance coverage, the Khit entities avoid having to show medical necessity, since providers treating patients under LOPs are not required to comply with the treatment guidelines and preauthorization requirements that apply to care covered by government programs or private insurance, and pursuant to the Agreement to Pay, the patient is personally liable for the full amount of the billed charges even if there is no recovery in the patient's personal injury claim.

**C. Incomplete and Inaccurate Information**

339. The Health Care Financing Administration ("HCFA") form, also known as the CMS-1500 form, is the standard form used by health care providers to submit claims for reimbursement of medical services provided to patients to Medicare, Medicaid, and private insurance companies. The form includes fields for the provider's name, address, telephone number, and National Provider Identifier ("NPI") number, as well as the patient's information, diagnosis information listed by ICD codes, and procedure and service information with corresponding CPT codes, units of service and charges. Failure to provide complete and accurate information on the form may result in denial of the provider's claim.

340. The Khit entities only treat patients under LOPs, requiring them to waive their right to have the medical bills for the treatment submitted directly to any available government healthcare program or private insurance company for payment. Instead of using the standardized form, an itemized statement or "superbill" for all services provided by each entity (Khit Chiropractic, Kay Medical, Insight, Spinal Decompression) is sent to the patient's attorney and ultimately submitted with the demand package to the liable third party's insurer. Examples of superbills from each are attached as **Appendix B-9**.

341. The information on these bills is rarely complete or accurate; to the contrary, the bills from the various Khit entities routinely fail to identify and/or misrepresent the location and provider of the services.

342. Although the vast majority of treatment patients receive at Khit Chiropractic is performed by CAs, the bills do not reflect that or identify the person that saw the patient for each date of service; instead, the superbills identify the chiropractor that performed the examination as the “provider” for all services.

343. Similarly, medical bills from Insight for MRIs do not identify the location or facility where the scans were done, or the radiologist that interpreted the images. The bills list the address of Insight’s corporate office, which does not have an MRI machine. The bills identify the chiropractor that ordered the imaging studies as the “provider,” although the testimony of each Khit chiropractor deposed to date confirms that they had no involvement in performing the scans or interpreting the images.

**D. Billing for Timed Services Not Supported**

344. Khit Chiropractic routinely bills for timed services that are not supported by the records.

345. The Current Procedure Terminology (“CPT”) Manual published by the American Medical Association provides that timed CPT codes are intended for face-to-face time with the patient and are only reported when the mid-point of time (for that CPT code) has passed.

346. The CPT codes involving “Physical Medicine and Rehabilitation” require constant attendance (CPT 97032-97039), and the CPT codes related to therapeutic procedures (CPT 97110-97546) require “direct (one-on-one) contact.”

347. In the Instructions for Use of The CPT Codebook, it is noted that “any service or procedure should be adequately documented in the medical record.” Services spanning less than eight minutes would not be reported/billed.

348. Although Khit Chiropractic routinely uses these timed CPT codes to bill for therapies performed by the CAs, the records do not document the time CAs spent performing any of the above modalities. To the contrary, Dr. Luis Khit specifically admitted that the CAs do not record the time spent performing each therapy. He testified that there was no need to, as their "protocols" for treatment specify the amount of time to use for each modality.

349. In addition, although the CPT Manual provides that CPT code S9090 is to be used to bill "per session" for vertebral axial decompression therapy, Spinal Decompression and Remodeling Clinic improperly bills for spinal decompression under CPT code S9090 and charges by the unit.

## IX.
## PRESENTMENT AND PAYMENT OF CLAIMS
## Relevant to All Causes of Action

### A. Submission of Fraudulent Records and Bills to Allstate

350. Allstate insures motor vehicles in the State of Texas.

351. In some cases, providers of healthcare services bill Allstate directly under applicable policies of insurance.

352. Providers of healthcare services routinely submit bills to Allstate in connection with bodily-injury claims made by Allstate claimants.

353. The scheme described by this Complaint was driven by laypersons in the State of Texas.

354. The Defendants' conduct constitutes an intentional violation of Texas law governing medical decision-making and unlawful medical referrals.

355. The primary objective of the Defendants' scheme was to deliver fraudulent and medically unnecessary treatment to personal injury patients, not for the benefit of the patients, but rather to maximize profits to the Defendants.

356. To achieve their goal, the Defendants colluded to unlawfully operate Khit Chiropractic, Kay Medical, Insight, and Spinal Decompression & Remodeling Clinic by submitting false

medical documentation and invoices for healthcare services that were unlawful, unnecessary, exaggerated, unrelated to the subject accident, and/or were not performed as represented.

357. The Defendants perpetrated their scheme by giving the appearance that the businesses were legitimate companies in the business of facilitating and/or providing healthcare.

358. To avoid having to comply with federal and state regulations, treatment guidelines, preauthorization requirements, and fee schedules that apply to healthcare provided under government healthcare programs and negotiated contracts with private insurance companies to ensure that treatment provided is medically necessary and the cost of treatment is reasonable, the Defendant healthcare entities do not accept any form of insurance.

359. Instead, the Defendants exclusively serve personal injury patients treating under LOPs, giving the Defendants a direct financial stake in the outcome of the patients' personal injury claims and requiring patients to waive the right to use any available insurance coverage to pay for the Defendants' services.

360. The Defendants market their services to personal injury attorneys throughout the Rio Grande Valley and Central Texas, representing that use of their services will assist the attorneys in securing favorable outcomes in their client's personal injury claims.

361. During the period at issue, the Defendants sought to bolster the appearance and extent of injury to Allstate claimants by routinely prescribing unwarranted and predetermined (a) courses of physical therapy and chiropractic treatment performed primarily by unlicensed CAs; (b) diagnostic imaging studies; (c) medical evaluations performed by nurse practitioners; (d) pain management consultations; (e) surgical injections and other pain management procedures and treatment; (f) orthopedic consultations; and (g) surgical recommendations, regardless of the claimants' ages, injury histories, and comorbidities.

362. The Defendants generated fraudulent medical records falsely representing that the healthcare services provided to the Allstate claimants were medically necessary for injuries the claimants sustained as a result of the subject motor vehicle accidents. Instead of completely and accurately reporting each individual patient's history or condition on the date of the examination, the Defendants reused reports from prior visits and/or patients and prepared boilerplate narrative reports using "macros" and templated language created by Luis Khit, D.C. to justify the predetermined protocol of recommendations and referrals. The Defendants deliberately did not request or record key information that could be inconsistent with the predetermined templated "opinions" stated in their reports. Records were routinely created by someone other than the person that actually saw the patient, while any handwritten notes made by the provider that examined the patient were shredded after a report was created.

363. The Defendants generated grossly inflated medical bills for the unwarranted predetermined services reportedly provided to the Allstate claimants. The Defendants' medical bills routinely misrepresented the location and provider of the services and included billing for timed services not supported by the documentation. Although evidence shows that the Defendants routinely approved virtually any reduction of their fees requested by the patients' attorneys to facilitate resolution of the patients' personal injury claims, accepting as little as 4% of the billed charges, the Defendants produced sworn affidavits attesting that they were owed the full amount of the billed charges, artificially inflating the Allstate claimants' damages for past medical expenses.

364. The false representations regarding the Defendants' services were intentionally placed on bills to be submitted to insurers such as Allstate for the specific purpose of obtaining payment in violation of Texas law.

365. The Defendants provided the fraudulent medical records and bills they created to the Allstate claimants' attorneys to support their clients' personal injury claims. The Defendants knew that personal injury attorneys would then use the bills and records to extract payment from Allstate.

366. The claimants' attorneys in turn submitted the fraudulent medical records and bills to Allstate as part of their clients' settlement demand packages, using the fraudulent bills and records from the Defendants to request settlements at or near the policy limits.

367. The Defendants knew Allstate would make payments on the claims based on the fraudulent bills and records, and Allstate used the U.S. Mail to send the payments.

368. In reasonable reliance on the Defendants' material representations that the claimed medical expenses were reasonable and necessary for injuries the Allstate claimants sustained as a result of the subject motor vehicle accidents, Allstate made payments to or for the benefit of the Defendants.

369. Allstate used the U.S. Mail to send settlement checks to the Allstate claimants' attorneys as payment for the claims.

370. The Allstate claimants' attorneys then paid Khit Chiropractic, Insight Diagnostics, Kay Medical Center, and/or Spinal Decompression & Remodeling Clinic using the settlement funds received from Allstate.

371. Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of demand packets, invoices, medical records, and payments, and caused various other mailings in the ordinary course of the claims process.

## X.
## DAMAGES

372. Allstate incorporates, as though fully set forth herein, each allegation contained in paragraphs 1-371 above.

373. Allstate has been damaged by the Defendants' practices outlined in this Complaint.

374. Allstate's damages calculation includes those monies that it paid to Defendants in connection with first-party insurance claims.

375. In addition, Allstate's damage calculation includes monies specifically allocated for the Defendants' bills from the payments made to bodily-injury claimants.

376. At the time it made these payments, Allstate was not aware of the fraud scheme alleged herein despite its reasonable due diligence because the Defendants went to great lengths to conceal their scheme.

377. Due to the Defendants' misrepresentations in their documentation, Allstate paid inflated amounts to resolve these claims.

378. All the payments were made based on the Defendants' material misrepresentations.

379. None of the payments identified in **Appendix A** were for legitimate healthcare services.

380. There is a direct relationship between the amount of the Defendants' fraudulent bills and the amount paid to claimants. *See* **Appendix A**.

381. As a result of these fraudulent claims, Allstate was damaged in that they paid sums in regard to these inflated bodily injury claims. Allstate seeks recovery of the amount by which the claims were inflated; specifically, recovery of the amounts paid attributable to the Defendants' charges for the services purportedly provided at Khit Chiropractic, Insight, Kay Medical, and Spinal Decompression in these cases. The cases known to date are set forth in the attached **Appendix A** and incorporated herein.

382. As set forth in **Appendix A**, the total amount of damages for these cases is $8,629,995.28. Regarding Counts One, Two and Three (RICO violations), Allstate is entitled to trebling of these damages pursuant to 18 U.S.C. § 1964(c), of $25,889,985.84, and is entitled to attorneys' fees and costs in an amount to be determined by the Court. Regarding Counts Four

and Five (common law fraud and conspiracy), Allstate is also entitled to exemplary damages to be determined at trial.

383. Regarding Count Six (unjust enrichment), Allstate is entitled to the amount by which Defendants' were unjustly enriched.

384. Regarding Count Seven, Allstate is entitled to restitution for the amounts which Defendants obtained, which in equity and good conscience belong to Allstate.

## XI.
## CAUSES OF ACTION
## COUNTS ONE AND TWO

## VIOLATION OF 18 U.S.C. §1962(c) (RICO)

385. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-384 as if set forth fully herein.

### A. COUNT ONE – THE ASSOCIATION-IN-FACT ENTERPRISE

(Against All Defendants for Violation of Title 18, United States Code, Section 1962(c))

386. As set forth herein, Defendants Luis Khit, D.C., Alejandra Khit, D.C., Khit & Associates, PLLC, and Khit Chiropractic and Rehabilitation, PLLC are an association-in-fact Enterprise, as that term is defined in Title 18, United States Code, Section 1961(4). The Enterprise has functioned as a continuing unit since mid-2018. The Enterprise has an identifiable structure, with each person fulfilling specific roles to carry out and facilitate its purpose.

387. The Enterprise exists separate and apart from the pattern of racketeering activity alleged herein. Throughout the period at issue, the Enterprise continued to evaluate and treat and administer the treatment and billing of patients other than automobile accident patients treating under letters of protection. These include patients paying cash for services, and treating for pain or conditions unassociated with any traumatic automobile accident event. Luis Khit, D.C. testified that Khit Chiropractic also treats walk-in patients on a self-pay basis. In a 2024 deposition, he also testified

providers other than Khit facilities referred patients to Kay Medical, to Insight, and to Spinal Decompression. Valerie Cruz, FNP testified in a 2024 deposition that some patients came to Khit Chiropractic clinics as self-pay patients, and she saw some self-pay, non-injury patients at Kay Medical. Throughout the period at issue, the Khit Chiropractic website stated its clinics treated automobile accident patients, but also treated other conditions such as sports injuries, arthritic shoulder joint pain, arthritic ankle pain, back pain from repetitive daily activities or lifting, pain from degenerative spinal discs, restless legs syndrome, and headaches including migraines. The website often stated that spinal adjustments were part of the treatment for these other conditions.

388. The Enterprise functioned as a continuing unit over the course of some six years (2018 – 2024). It has continued thereafter to the present, with the addition of new providers and with new locations recently built in Kyle, Texas and Edinburg, Texas. The Enterprise continues to provide business records affidavits and §18.001 affidavits in pending automobile collision lawsuits.

389. The Enterprise has an identifiable structure, with each person fulfilling specific roles to carry out and facilitate its purpose. For example:

a. Defendants Luis Khit, Alejandra Khit, Khit Chiropractic and Rehabilitation, Khit & Associates, Insight Imaging Center, Khit Property Management, and Arturo Resendez, later joined by Anna Gittins (who replaced Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of the Khit Chiropractic clinics and Insight offices within the clinics in Austin, Texas.

b. Defendants Luis Khit, Alejandra Khit, Khit & Associates, SKAK Investments, Khit Property Management, and Arturo Resendez, later joined by Anna Gittins (who replaced Arturo Resendez as chief operations officer) established, financed, owned,

operated, and/or participated in the management of the Khit Chiropractic clinics and Insight offices within the clinics in the Rio Grande Valley.

c. Other Chiropractor Defendants -- Librado Torres, Jose Nadal, John Glade, Liz Molina, Reynaldo Amador, Debbie Rivera, and Jonathan Hernandez -- participated in the management of the Khit Chiropractic clinics in Austin and the Rio Grande Valley at which they saw patients, training chiropractic assistants at the clinics and marketing of the clinic's services to personal injury attorneys and patients. In the period at issue, the chiropractors often saw patients at multiple clinics. For example, Glade and Molina examined patients both at Austin clinics and Rio Grande Valley clinics.

d. Defendants Luis Khit, Alejandra Khit, Librado Torres, Jose Nadal, John Glade, Liz Molina, Reynaldo Amador, Debbie Rivera, and Jonathan Hernandez, and also Khit Chiropractic and Rehabilitation and Khit & Associates (through other employed chiropractors) performed examinations and made unwarranted treatment recommendations and referrals in accordance with the Khit treatment protocols, including falsely finding that MRIs and referrals for medical examinations, orthopedic consults, and pain management consults were necessary. These Defendants also generated the printed templated examination reports containing these findings that were later presented to Plaintiffs. These Defendants hardly ever performed chiropractic manipulations or adjustments, delegating responsibility for treating the patients at Khit Chiropractic clinics and Spinal Decompression to chiropractic assistants with little or no supervision.

e. Defendants Luis Khit, Alejandra Khit, Spinal Decompression, Khit Property Management, and Arturo Resendez, later joined by Anna Gittins (who replaced

Arturo Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of additional chiropractic clinics doing business as Spinal Decompression & Remodeling Clinic, which has adjacent offices to, or offices within, Khit Chiropractic clinics in Austin and the Rio Grande Valley.

f. Defendants Khit & Associates and Khit Chiropractic and Rehabilitation provided chiropractic assistants to provide spinal decompression treatment and modalities at Spinal Decompression offices.

g. Defendants Luis Khit, Alejandra Khit, Khit Chiropractic and Rehabilitation, and Khit & Associates established the protocols for treatment, recommendations, referrals, and reporting used by the chiropractors and chiropractic assistants that saw patients at Khit Chiropractic clinics, which include referral of patients to other entities owned by or associated with Luis and Alejandra Khit for unwarranted imaging studies, medical evaluations, pain management injections and procedures, spinal decompression therapy and surgical consultations.

h. Defendants Luis Khit, Alejandra Khit, Khit Property Management, Kay Medical Center, and Art Resendez, later joined by Anna Gittins (who replaced Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of the Kay Medical offices within or adjacent to the Khit Chiropractic clinics in Austin and the Rio Grande Valley. None of these Defendants are licensed to practice medicine in the State of Texas, but they established the protocols for treatment recommendations, referrals and reporting to be used by the physicians and nurse practitioners that see patients at/for Kay Medical, which include recommendations for continued chiropractic care at Khit Chiropractic,

imaging studies at Insight, pain management injections, and surgical consultations. Luis Khit trained nurse practitioners in the use of the Kay Medical template report form, including selecting findings and recommendations. Resendez and Gittins negotiated with and/or interviewed physicians and nurse practitioners.

i. Defendant Kay Medical Center, through employed nurse practitioners, performed unnecessary initial and follow-up examinations, and starting around Spring 2021 performed unnecessary procedures such as trigger point injections, intramuscular injections, and iontophoresis on patients referred by Khit Chiropractic clinics.

j. Defendant William Donovan, staring in 2020, performed unnecessary orthopedic consultations of Khit Chiropractic clinic patients for Kay Medical, generally via telemedicine from Houston where he resides. Dr. Donovan made unnecessary recommendations for pain management injection procedures and surgeries in his examination reports to support damages for future medical expenses and inflate the value of the patients' personal injury claims. In addition, beginning around April 2022, Dr. Donovan became the supposed delegating physician of record to the nurse practitioners performing and treating patients at Kay Medical locations. This was a necessary role for the enterprise as Texas law requires a delegating physician in regard to the practice of nurse practitioners. In reality, Dr. Donovan provided no actual delegation as set forth in Texas law and did not supervise the nurse practitioners.

k. Defendants Luis Khit, Alejandra Khit, Insight Imaging Center, and SKAK Investments (which does business as Insight Diagnostic and Imaging Center, LLC), established, financed, owned, operated, and/or participated in the management of supposed imaging "centers" doing business as Insight Imaging Center, LLC (Austin offices) and Insight Diagnostic and Imaging Center (Valley offices).

"Insight" bills for x-rays performed at Khit Chiropractic clinics. Insight also leases blocks of time at existing imaging facilities located in Austin and the Rio Grande Valley that are used to perform imaging studies such as MRIs ordered by providers at Khit Chiropractic clinics and Kay Medical. Insight billed for these imaging studies and presented imaging reports under its own names representing the imaging was done at an "Insight" facility.

l. Defendant SKAK Investments contracted with Defendant Miguel Oneto, M.D., P.A. d/b/a Quality Imaging & Interventions ("QI&I") to provide teleradiology services for Insight during the period at issue. Defendant Luis Khit advised QI&I that all MRIs interpreted for Insight were "liability cases" and upon information and belief, instructed QI&I to have the radiologists use technical terms to describe findings and avoid use of the word "degenerative" and other terms commonly used to describe age-related wear and tear. QI&I communicated these instructions to the interpreting radiologists through a facility note included with images to be reviewed for Insight.

m. Defendants Miguel Oneto, Julieta Oneto, and Susan Fan ("the Defendant Radiologists") interpreted imaging studies for Insight under the contract with QI&I during the period at issue. The Defendant Radiologists reviewed imaging studies ordered by providers at Khit Chiropractic and Kay Medical and prepared reports of their findings on Insight's letterhead as instructed by the facility note from QI&I, omitting terms such as "degenerative" to make it appear that all noted abnormalities were the result of traumatic injury. The MRI findings reported by the Defendant Radiologists were used to justify the Khit Defendants' predetermined protocol of further chiropractic treatments, referrals for orthopedic consultations or pain

management evaluations and injections, spinal decompression therapy, and Kay Medical recommendations for surgery.

n. Defendants Luis Khit, Alejandra Khit, and Khit Property Management, leased, financed and/or purchased residential and commercial properties used to house offices for Khit Chiropractic, Insight, Kay Medical, and Spinal Decompression, and contracted for the construction or expansion of such offices.

o. Defendant Impact Professional Services operated as the custodian of records, and as of 2023, billing department for the Khit-owned healthcare entities. Impact provided medical record management for its affiliated companies, in its own words overseeing "data collection, review, input, attestation, and timely distribution," and provided patients' attorneys with affidavits, invoices, and medical documentation to submit to the insurance carrier with their client's demand for payment. Job listings posted recently indicate that Impact also employs "care coordinators" who are responsible for assisting the clinics with preauthorizations,[41] scheduling, billing, and appointment management, as well as helping patients remain compliant with the treatment plans, and "supporting attorneys with case related questions." This indicates that Impact also performs case management functions to increase the value and likelihood of recovery on the patients' personal injury claims.

p. Defendants Luis Khit, Alejandra Khit, and Elkay Enterprises, LLC d/b/a as Elkay Transport, LLC, established, financed, owned, operated, and/or participated in the management of a shuttle service used to transport personal injury patients to and from their appointments at the Khit Chiropractic clinics and related facilities and

---

[41] None of the Khit healthcare entities accept insurance. The testimony of the Khit Chiropractic and Kay Medical providers deposed in personal injury suits against Allstate's insureds indicates that the "preauthorizations" referenced in Impact's job listing relate to obtaining approval from the patients' attorneys before scheduling their clients for additional services or procedures.

offices. This ensured patients came appeared for appointments, to increase the value and likelihood of recovery on the patients' personal injury claims. Also, on information and belief, the drivers also act as chiropractic assistants.[42]

q. Defendants Khit Chiropractic and Rehabilitation, Khit & Associates, Insight Imaging Center, SKAK Investments, Kay Medical, and Spinal Decompression marketed the services they provided under LOPs to personal injury attorneys.

r. Defendant Arturo Resendez served as Chief Operating Officer ("COO") for the Khit entities until 2021, when Defendant Anna Gittens, formerly a Regional Manager for the Khit entities, took over that role. Defendant Resendez and Defendant Gittins participated in the management and operation of the Khit Chiropractic, Kay Medical, and Spinal Decompression offices. They were responsible for interviewing and/or hiring chiropractors, chiropractic assistants, nurse practitioners, and other staff, and negotiating service agreements with supposed independent contractors, including physicians that performed services for Kay Medical and with QI&I concerning teleradiology services.

s. Defendant Kay Medical contracted with Defendant Sannichie Quaicoe, M.D., a pain management physician, to evaluate and treat personal injury patients referred by providers at Khit Chiropractic and Kay Medical. Defendants Luis Khit and Arturo Resendez negotiated the relationship, and Resendez, and later Defendant Gittins, acted as liaisons with Defendant Quaicoe. As compensation, Defendant Quaicoe was paid a small percentage of the amount Kay Medical billed for any injections he performed. In accordance with the predetermined treatment protocols established by

[42] In a job posting by "Khit Chiropractic and Wellness" for a "patient transport van driver" the duties included, in addition to checking the vehicle and driving patients to and from clinics, "Complete patient therapy, supervise patients during rehabilitation exercises, and other basic front desk responsibilities."

the Khit Defendants and to increase his own profits under the arrangement, Defendant Quaicoe performed pain management consultations on patients for Kay Medical, and recommended and performed unnecessary injection procedures, including unnecessary IV or general anesthesia. Defendant Quaicoe destroyed his handwritten notes made during the consultations.

t. Defendants Khit Chiropractic and Rehabilitation, Khit & Associates, Kay Medical, Insight, and Spinal Decompression, through the chiropractors, chiropractic assistants, nurse practitioners, physicians and other staff they employed and/or contracted with, generated and produced examination reports, procedure reports, treatment records and bills to Defendant Impact, which in turn provided the false medical documentation to the law offices or attorneys referring the patients to Khit Chiropractic clinics for inclusion in demand packages sent to Allstate.

390. The Enterprise engages in, and its activities affect, interstate commerce. (See paragraphs 405-408 below).

391. The Enterprise Persons have been employed by and/or associated with the Enterprise, have participated in the management and operation of the Enterprise, and deliberately caused a fraud to be perpetrated upon Plaintiffs and other automobile insurers.

392. The Enterprise Persons operated the Enterprise to inflate automobile accident claims through a 'build up' of the claim by unnecessary healthcare services. This was accomplished through repeated violations of Title 18, United States Code, section 1341. As a direct and proximate result of the Defendants' conduct as set forth herein, Allstate was injured by paying sums in payment of fraudulently inflated bodily injury claims, arising from the pattern of racketeering activity. The predicate acts are set forth fully in paragraphs 401-404 herein below and the attached and incorporated **Appendix A**.

**B. COUNT TWO – THE KHIT & ASSOCIATES, PLLC ENTERPRISE**

(Against Defendants Luis Khit, DC Alejandra Khit, DC, Khit Chiropractic and Rehabilitation, PLLC,SKAK Investments, LLC, Insight Imaging Center, LLC, Kay Medical Center, PLLC, Spinal Decompression and Remodeling Clinic, PLLC, Elkay Enterprises, LLC, Impact Professional Services, LLC, Khit Property Management, LLC, Miguel Oneto, M.D., P.A., Anna G. Gittins, Art Resendez, Susan Fan, M.D., Miguel Oneto, M.D., Julieta Oneto, M.D., Sannichie Quiacoe, M.D., William Donovan, M.D., Jose Nadal, D.C., Librado Torres, D.C., John Glade, D.C., Liz Molina, D.C., Reynaldo Amador, D.C., Debbie Rivera, D.C., and Jonathan Hernandez, D.C. for Violation of Title 18, United States Code, Section 1962(c))

393. Pleading in the alternative, and in addition to the association-in-fact Enterprise alleged herein, Khit & Associates, PLLC is an "enterprise" as that term is defined in 18 U.S.C. §1961(4). It is hereinafter referred to as "the Khit Enterprise." Defendants are all "persons" within the meaning of 18 U.S.C. §1961(3). They are hereinafter referred to as the Khit Enterprise Persons.

394. The Khit Enterprise Persons are all employed by or associated with the Khit Enterprise, and conducted its affairs through a pattern of racketeering activity. For example:

a. Defendants Luis Khit, Alejandra Khit, Khit Chiropractic and Rehabilitation, Insight Imaging Center, Khit Property Management, and Arturo Resendez, later joined by Anna Gittins (who replaced Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of the Khit Chiropractic clinics and Insight offices within the clinics in Austin, Texas.

b. Defendants Luis Khit, Alejandra Khit, SKAK Investments, Khit Property Management, and Arturo Resendez, later joined by Anna Gittins (who replaced Arturo Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of the Khit Chiropractic clinics and Insight offices within the clinics in the Rio Grande Valley.

c. Other Chiropractor Defendants -- Librado Torres, Jose Nadal, John Glade, Liz Molina, Reynaldo Amador, Debbie Rivera, and Jonathan Hernandez -- participated in the management of the Khit Chiropractic clinics in Austin and the Rio Grande

Valley at which they saw patients, training of chiropractic assistants at the clinics, and participated in the marketing of the clinic's services to personal injury attorneys and patients. In the period at issue, the chiropractors often saw patients at multiple clinics. For example, Glade and Molina examined patients both at Austin clinics and Rio Grande Valley clinics.

d. Defendants Luis Khit, Alejandra Khit, Librado Torres, Jose Nadal, John Glade, Liz Molina, Reynaldo Amador, Debbie Rivera, Jonathan Hernandez, and Khit Chiropractic and Rehabilitation (through other employed chiropractors) performed examinations and made unwarranted treatment recommendations and referrals in accordance with the Khit treatment protocols, including falsely finding that MRIs and referrals for medical examinations, orthopedic consults, and pain management consults were necessary. These Defendants also generated the printed templated examination reports containing these findings that were later presented to Plaintiffs. These Defendants hardly ever performed chiropractic manipulations or adjustments, delegating responsibility for treating the patients at Khit Chiropractic clinics and Spinal Decompression to chiropractic assistants with little or no supervision.

e. Defendants Luis Khit, Alejandra Khit, Spinal Decompression, Khit Property Management, and Arturo Resendez, later joined by Anna Gittins (who replaced Arturo Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of additional chiropractic clinics doing business as Spinal Decompression & Remodeling Clinic, which has adjacent offices to, or offices within, Khit Chiropractic clinics in Austin and the Rio Grande Valley.

f. Defendants Luis Khit and Alejandra Khit established the protocols for treatment, recommendations, referrals, and reporting used by the chiropractors and chiropractic assistants that saw patients at Khit Chiropractic clinics, which include referral of patients to other entities owned by or associated with Luis and Alejandra Khit for unwarranted imaging studies, medical evaluations, pain management injections and procedures, spinal decompression therapy and surgical consultations.

g. Defendants Luis Khit, Alejandra Khit, Khit Property Management, Kay Medical Center, and Arturo Resendez, later joined by Anna Gittins (who replaced Resendez as chief operations officer) established, financed, owned, operated, and/or participated in the management of the Kay Medical offices within or adjacent to the Khit Chiropractic clinics in Austin and the Rio Grande Valley. None of these Defendants are licensed to practice medicine in the State of Texas, but they established the protocols for recommendations, referrals and reporting to be used by the physicians and nurse practitioners that see patients at/for Kay Medical, which include recommendations for continued chiropractic care at Khit Chiropractic, imaging studies at Insight, pain management injections, and surgical consultations. Luis Khit trained nurse practitioners in the use of the Kay Medical template report form, including selecting findings and recommendations. Resendez and Gittins negotiated with and/or interviewed physicians and nurse practitioners.

h. Defendant Kay Medical Center, through employed nurse practitioners, performed unnecessary initial and follow-up examinations, and starting around Spring 2021 performed unnecessary procedures such as trigger point injections, intramuscular injections, and iontophoresis on patients referred by Khit Chiropractic clinics.

i. Defendant William Donovan, starting in 2020, performed unnecessary orthopedic consultations of Khit Chiropractic clinic patients for Kay Medical, generally via telemedicine from Houston where he resides. Dr. Donovan made unnecessary recommendations for pain management injection procedures and surgeries in his examination reports to support damages for future medical expenses and inflate the value of the patients' personal injury claims. In addition, beginning around April 2022, Dr. Donovan became the supposed delegating physician of record to the nurse practitioners performing and treating patients at Kay Medical locations. This was a necessary role for the enterprise as Texas law requires a delegating physician in regard to the practice of nurse practitioners. In reality, Dr. Donovan provided no actual delegation as set forth in Texas law and did not supervise the nurse practitioners.

j. Defendants Luis Khit, Alejandra Khit, Insight Imaging Center, and SKAK Investments (which does business as Insight Diagnostic and Imaging Center, LLC), established, financed, owned, operated, and/or participated in the management of supposed imaging "centers" doing business as Insight Imaging Center, LLC and Insight Diagnostic and Imaging Center. "Insight" bills for x-rays performed at Khit Chiropractic clinics. Insight also leases blocks of time at existing imaging facilities located in Austin and the Rio Grande Valley that are used to perform imaging studies such as MRIs ordered by providers at Khit Chiropractic clinics and Kay Medical. Insight billed for these imaging studies and presented imaging reports under its own names representing the imaging was done at an "Insight" facility.

k. Defendant SKAK Investments contracted with Defendant Miguel Oneto, M.D., P.A. d/b/a Quality Imaging & Interventions ("QI&I") to provide teleradiology services for Insight during the period at issue. Defendant Luis Khit advised QI&I

that all MRIs interpreted for Insight were "liability cases" and upon information and belief, instructed QI&I to have the radiologists use technical terms to describe findings and avoid use of the word "degenerative" and other terms commonly used to describe age-related wear and tear. QI&I communicated these instructions to the interpreting radiologists through a facility note included with images to be reviewed for Insight.

l. Defendants Miguel Oneto, Julieta Oneto, and Susan Fan ("the Defendant Radiologists") interpreted imaging studies for Insight under the contract with QI&I during the period at issue. The Defendant Radiologists reviewed imaging studies ordered by providers at Khit Chiropractic and Kay Medical and prepared reports of their findings on Insight's letterhead as instructed by the facility note from QI&I, omitting terms such as "degenerative" to make it appear that all noted abnormalities were the result of traumatic injury. The MRI findings reported by the Defendant Radiologists were used to justify the Khit Defendants' predetermined protocol of further chiropractic treatments, referrals for orthopedic consultations or pain management evaluations and injections, spinal decompression therapy, and Kay Medical recommendations for surgery.

m. Defendants Luis Khit, Alejandra Khit, and Khit Property Management, leased, financed and/or purchased residential and commercial properties used to house offices for Khit Chiropractic, Insight, Kay Medical, and Spinal Decompression, and contracted for the construction or expansion of such offices.

n. Defendant Impact Professional Services operated as the custodian of records, and as of 2023, billing department for the Khit-owned healthcare entities. Impact provided medical record management for its affiliated companies, in its own words

overseeing "data collection, review, input, attestation, and timely distribution," and provided patients' attorneys with affidavits, invoices, and medical documentation to submit to the insurance carrier with their client's demand for payment. Job listings posted recently indicate that Impact also employs "care coordinators" who are responsible for assisting the clinics with preauthorizations,[43] scheduling, billing, and appointment management, as well as helping patients remain compliant with the treatment plans, and "supporting attorneys with case related questions." This indicates that Impact also performs case management functions to increase the value and likelihood of recovery on the patients' personal injury claims.

o. Defendants Luis Khit, Alejandra Khit, and Elkay Enterprises, LLC d/b/a as Elkay Transport, LLC, established, financed, owned, operated, and/or participated in the management of a shuttle service used to transport personal injury patients to and from their appointments at the Khit Chiropractic clinics and related facilities and offices. This ensured patients came appeared for appointments, to increase the value and likelihood of recovery on the patients' personal injury claims. Also, on information and belief, the drivers also act as chiropractic assistants.[44]

p. Defendant Arturo Resendez served as Chief Operating Officer ("COO") for the Khit entities until 2021, when Defendant Anna Gittens, formerly a Regional Manager for the Khit entities, took over that role. Defendant Resendez and Defendant Gittins participated in the management and operation of the Khit

[43] None of the Khit healthcare entities accept insurance. The testimony of the Khit Chiropractic and Kay Medical providers deposed in personal injury suits against Allstate's insureds indicates that the "preauthorizations" referenced in Impact's job listing relate to obtaining approval from the patients' attorneys before scheduling their clients for additional services or procedures.

[44] In a job posting by "Khit Chiropractic and Wellness" for a "patient transport van driver" the duties included, in addition to checking the vehicle and driving patients to and from clinics, "Complete patient therapy, supervise patients during rehabilitation exercises, and other basic front desk responsibilities."

Chiropractic, Kay Medical, and Spinal Decompression offices. They were responsible for interviewing and/or hiring chiropractors, chiropractic assistants, nurse practitioners, and other staff, and negotiating service agreements with supposed independent contractors, including physicians that performed services for Kay Medical and with QI&I concerning teleradiology services.

q. Defendant Kay Medical contracted with Defendant Sannichie Quaicoe, M.D., a pain management physician, to evaluate and treat personal injury patients referred by providers at Khit Chiropractic and Kay Medical. Defendants Luis Khit and Arturo Resendez negotiated the relationship, and Resendez, and later Defendant Gittins, acted as liaisons with Defendant Quaicoe. As compensation, Defendant Quaicoe was paid a small percentage of the amount Kay Medical billed for any injections he performed. In accordance with the predetermined treatment protocols established by the Khit Defendants and to increase his own profits under the arrangement, Defendant Quaicoe performed pain management consultations on patients for Kay Medical, and recommended and performed unnecessary injection procedures, including unnecessary IV or general anesthesia. Defendant Quaicoe destroys his handwritten notes made during the consultations.

r. Defendants Khit Chiropractic and Rehabilitation, Kay Medical, Insight, and Spinal Decompression, through the chiropractors, chiropractic assistants, nurse practitioners, physicians and other staff they employed and/or contracted with, generated and produced examination reports, procedure reports, treatment records and bills to Defendant Impact, which in turn provided the false medical documentation to the law offices or attorneys referring the patients to Khit Chiropractic clinics for inclusion in demand packages sent to Allstate.

395. The Khit Enterprise had an existence separate and apart from the pattern of racketeering activity. Throughout the period at issue, the Khit Enterprise continued to evaluate and treat and administer the treatment and billing of patients other than automobile accident patients treating under letters of protection. These include patients paying cash for services, and treating for pain or conditions unassociated with any traumatic automobile accident event. Luis Khit testified that Khit Chiropractic also treats walk-in patients on a self-pay basis. In a 2024 deposition, he also testified providers other than Khit facilities referred patients to Kay Medical, to Insight, and to Spinal Decompression. Valerie Cruz, FNP testified in a 2024 deposition that sometimes patients came to Khit chiropractic clinics as self-pay, and she saw some self-pay non-injury patients at Kay Medical. Throughout the period at issue, the Khit Chiropractic website stated its clinics treated automobile accident patients, but also treated other conditions such as sports injuries, arthritic shoulder joint pain, arthritic ankle pain, backpain from repetitive daily activities or lifting, pain from degenerative spinal discs, restless legs syndrome, and headaches including migraines. The website often stated that spinal adjustments were part of the treatment for these other conditions.

396. The Enterprise engages in, and its activities affect, interstate commerce. (See paragraphs 405-408 below).

397. The Enterprise Persons have been employed by and/or associated with the Enterprise, have participated in the management and operation of the Enterprise, and deliberately caused fraud to be perpetrated upon Allstate and other automobile insurers.

398. The Enterprise Persons operated the Enterprise to inflate automobile accident claims through a ‘build up’ of the claim by unnecessary healthcare services, including examinations, imaging studies, chiropractic/physical therapy services, pain management injections and procedures, and surgical consultations. This was accomplished through repeated violations of Title 18, United States Code, section 1341. As a direct and proximate result of the Defendants’ conduct as set forth herein, Allstate

was injured by paying sums in payment of fraudulently inflated bodily injury claims, arising from the pattern of racketeering activity. The predicate acts are set forth fully in paragraphs 401-404 herein below and the attached and incorporated **Appendix A**.

### C. THE PURPOSE OF THE SCHEME

399. The purpose of the scheme was to illicitly and illegally enrich the Defendants at the expense of Allstate and its policyholders.

400. As set forth set forth at length in paragraphs 47-399 above, and incorporated herein, the scheme is to create and pursue fraudulently inflated bodily injury claims.

### D. THE PATTERN OF RACKETERING ACTIVITIES

401. Defendants have knowingly conducted and/or participated, directly and indirectly, in the conduct of the affairs of the above-described Enterprises through a "pattern of racketeering activity" as defined by Title 18, United States Code, Section 1961(5).

402. Such racketeering activity consists of repeated violations of the federal mail fraud statute, Title 18, United States Code, section 1341, based upon the fraudulent, inflated claims made regarding the allegedly necessary treatment at Khit Chiropractic, Kay Medical, Insight and Spinal Decompression.

403. These predicate acts were part of a scheme and were not isolated events. The predicate acts at issue are set forth in the attached **Appendix A** and include acts of mail fraud. As set forth herein above, particularly at paragraphs 386-402, the scheme involved Defendants providing claimants' attorneys with certain records and bills, concerning purported services at Khit Chiropractic, Insight, Kay Medical, and Spinal Decompression. Defendants knew these attorneys would send these records and bills to Allstate and other automobile insurers, seeking Allstate and other insurers to pay amounts in settlement due to services provided by Khit Chiropractic, Insight, Kay Medical, and Spinal Decompression. Defendants anticipated payments by Allstate, in order to be paid by the claimants'

attorneys under LOPs or similar agreements with the attorneys. Demand packages including Defendants' records and bills were forwarded by claimants' attorneys to Allstate on or about the dates stated in **Appendix A**. As set forth above, in those records and bills Defendants made fraudulent representations regarding the necessity of chiropractic and medical services, imaging studies, and injection procedures, the extent of services, the location and provider of services, and whether services were actually rendered, and fraudulently inflated the service costs, which included:

a. The patients sustained severe injuries in the accidents at issue, beyond soft tissue injuries;

b. Treatment was provided under LOPs because there was no insurance coverage available to cover the cost of the patient's care, using the insurance coverage available would result in financial hardship to the patient, and/or the liable third-party's insurance carrier had refused payment;

c. Initial chiropractic examinations included detailed evaluations of the patient;

d. The chiropractor's treatment plan was individualized per patient, tailored to the patient's specific needs, and the modalities ordered were reasonable and necessary;

e. Patients' presenting condition(s) required x-rays to be conducted, and the referral to Insight was reasonable and necessary;

f. Insight was an actual imaging facility or facilities, which could perform x-rays, MRIs, and CTs;

g. Referrals to Kay Medical for medical evaluations were reasonable and necessary, and the examinations performed by the nurse practitioners were comprehensive and they spent considerable amounts of time examining and evaluating the patient;

h. Trigger point injections, intermuscular injections, and iontophoresis performed by Kay Medical nurse practitioners were reasonable and necessary;

i. The Kay Medical nurse practitioners performing examinations and treatment were properly supervised by a delegating physician, initially Dr. Andrew Levine and subsequently Dr. William Donovan, pursuant to Texas law;

j. The patients progressed "slower than expected" to chiropractic care;

k. Referrals to Insight for MRIs or CTs were reasonable and necessary;

l. The findings reported on Insight imaging reports by QI&I and Drs. Miguel Oneto, Julieta Oneto, and Susan Fan accurately represented conditions that were consistent with traumatic injuries that resulted from the accidents at issue;

m. Referrals to Spinal Decompression were reasonable and necessary;

n. Referrals to Kay Medical for orthopedic consultations by Dr. Donovan were reasonable and necessary;

o. Dr. Donovan performed high complexity examinations and spent considerable amounts of time examining and evaluating the patient;

p. Dr. Donovan's recommendations for injection procedures and surgical procedures were accurate, and the recommended procedures were reasonable and necessary;

q. Referrals to Kay Medical for pain management consultations by Dr. Quaicoe were reasonable and necessary;

r. Dr. Quaicoe performed high complexity examinations and spent considerable amounts of time examining and evaluating the patient;

s. Pain management injection procedures performed at or through Kay Medical were reasonable and necessary;

t. Kay Medical injection procedures were performed as represented in the operative reports;

u. IV anesthesia billed for Kay Medical injection procedures was reasonable and necessary; and

v. Facility and supply fees were properly charged separate from the injection.

w. The patients would continue to require treatment in the future as a result of the subject accident, such as chiropractic and medical evaluations, chiropractic treatment, injection procedures, and surgical interventions.

404. As set forth herein above, Defendants provided these documents to claimants' attorneys knowing they would be presented in demands to Allstate. In reliance on the settlement demand package documents, Allstate forwarded by U.S. mail on or about the stated dates in **Appendix A** settlement checks to the attorneys' offices in the amounts stated, including amounts attributable to the improper and fraudulent billing by Defendants as also set forth in **Appendix A**. But for the presentation of Defendants' records and bills, Allstate would not have issued payments based on the Defendants' claimed medical services, agreeing to settle claims that otherwise may not have been settled or paying more to settle the claims than would have been paid if the nature of Defendants' treatment had been known. Allstate and other automobile insurers were the direct target of Defendants' scheme. The Defendants caused the mailings described in this paragraph and shown in **Appendix A**.

## E. EFFECT ON INTERSTATE COMMERCE

405. The effect of each Enterprise on Interstate Commerce is substantial. Each Enterprise necessarily utilized the United States Postal Service in its fraud scheme.

406. Further, Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are national companies, with corporate home headquarters outside of Texas, and doing business throughout the

United States. The settlement funds from which Allstate's money was received by each Enterprise were drawn from accounts of national banks, doing business in the various states of the United States.

407. Additionally, each Enterprise must necessarily purchase goods and services within interstate commerce (equipment, supplies, etc.) to conduct business operations, and to carry out the scheme.

408. In addition, Defendants Miguel Oneto, M.D. and Julieta Oneto, M.D. have been residents of the State of Florida through all or a substantial portion of the period at issue, and evaluated x-rays, MRIs, and CTs transmitted from Texas by Insight or QI&I in Florida, and issued the resulting radiology reports from Florida.

### F. INJURY TO ALLSTATE

409. As a direct and proximate result of the Defendants' conduct, Allstate was injured by paying sums in payment of fraudulent bodily injury claims, arising from the pattern of racketeering activity. This injury is set forth more fully in paragraphs 47-408 above, and paragraphs 410-439 below, and in the attached and incorporated **Appendix A**.

410. By reason of their injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to title 18, United States Code, section 1964(c).

## XII.
## COUNT THREE-CONSPIRACY TO VIOLATE SECTION 1962(c)

(Against All Defendants Regarding the Association-in-Fact Enterprise; Against Defendants Luis Khit, DC Alejandra Khit, DC, Khit Chiropractic and Rehabilitation, PLLC,SKAK Investments, LLC, Insight Imaging Center, LLC, Kay Medical Center, PLLC, Spinal Decompression and Remodeling Clinic, PLLC, Elkay Enterprises, LLC, Impact Professional Services, LLC, Khit Property Management, LLC, Miguel Oneto, M.D., P.A., Anna G. Gittins, Art Resendez, Susan Fan, M.D., Miguel Oneto, M.D., Julieta Oneto, M.D., Sannichie Quiacoe, M.D., William Donovan, M.D., Jose Nadal, D.C., Librado Torres, D.C., John Glade, D.C., Liz Molina, D.C., Reynaldo Amador, D.C., Debbie Rivera, D.C., and Jonathan Hernandez, D.C. Regarding the Khit Enterprise, for Violation of Title 18, United States Code 1962(d))

411. Allstate incorporates as though fully set forth herein, each allegation contained in paragraphs 47-410 above.

412. Defendants willfully combined, conspired, and agreed with one another and with others to violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or to participate, directly or indirectly, in the affairs of the Enterprise, the activities of which were conducted through a pattern of racketeering activities, in violation of 18 U.S.C. section 1962(d).

413. As set forth above, two or more persons agreed to commit a substantive RICO offense. As also set forth herein, the Defendants knew of the essential nature of the Enterprise, and agreed to the overall objective of the RICO offense. The object of this conspiracy was to defraud Plaintiffs. As a direct and proximate result of the Defendants' conduct as set forth herein, Plaintiffs were injured by paying sums regarding fraudulently inflated bodily injury claims, arising from the pattern of racketeering activity. This injury is set forth more fully in paragraphs 47-412 above, and paragraphs 414-439 below, and in the attached and incorporated **Appendix A**.

## XIII.
## COUNT FOUR
## (Against All Defendants for Common Law Fraud)

414. Allstate incorporates, as though fully set forth herein, each allegation contained in paragraphs 47-413 above.

415. Defendants, personally or through agents (law office workers, etc.) acting at their direction, have made or caused to be made false and fraudulent material misrepresentations of fact to Plaintiffs; specifically, false and misleading statements and representations concerning the reasonableness and necessity of treatment. The scheme has been set forth herein at paragraphs 47-414.

416. The misrepresentations were conveyed to Plaintiffs through attorney settlement demand letters issued by the law offices, presenting the medical records, reports, and billings generated by Defendants. Defendants provided these documents to the law offices knowing they would be included with the demand letters in settlement demand packages, and to facilitate the settlement of the claims

in order to receive payment pursuant to the LOPs. The misrepresentations made to Allstate in these documents included:

a. The patients sustained severe injuries in the accidents at issue, beyond soft tissue injuries;

b. Treatment was provided under LOPs because there was no insurance coverage available to cover the cost of the patient's care, using the insurance coverage available would result in financial hardship to the patient, and/or the liable third-party's insurance carrier had refused payment;

c. Initial chiropractic examinations included detailed evaluations of the patient;

d. The chiropractor's treatment plan was individualized per patient, tailored to the patient's specific needs, and the modalities ordered were reasonable and necessary;

e. Patients' presenting condition(s) required x-rays to be conducted, and the referral to Insight was reasonable and necessary;

f. Insight was an actual imaging facility or facilities, which could perform x-rays, MRIs, and CTs;

g. Referrals to Kay Medical for medical evaluations were reasonable and necessary, and the examinations performed by the nurse practitioners were comprehensive and they spent considerable amounts of time examining and evaluating the patient;

h. Trigger point injections, intramuscular injections, and iontophoresis performed by Kay Medical nurse practitioners were reasonable and necessary;

i. The Kay Medical nurse practitioners performing examinations and treatment were properly supervised by a delegating physician, initially Dr. Andrew Levine and subsequently Dr. William Donovan, pursuant to Texas law;

j. The patients progressed "slower than expected" to chiropractic care;

k. Referrals to Insight for MRIs or CTs were reasonable and necessary;

l. The findings reported on Insight imaging reports by QI&I and Drs. Miguel Oneto, Julieta Oneto, and Susan Fan accurately represented conditions that were consistent with traumatic injuries that resulted from the accidents at issue;

m. Referrals to Spinal Decompression were reasonable and necessary;

n. Referrals to Kay Medical for orthopedic consultations by Dr. Donovan were reasonable and necessary;

o. Dr. Donovan performed high complexity examinations and spent considerable amounts of time examining and evaluating the patient;

p. Dr. Donovan's recommendations for injection procedures and surgical procedures were accurate, and the recommended procedures were reasonable and necessary;

q. Referrals to Kay Medical for pain management consultations by Dr. Quaicoe were reasonable and necessary;

r. Dr. Quaicoe performed high complexity examinations and spent considerable amounts of time examining and evaluating the patient;

s. Pain management injection procedures performed at or through Kay Medical were reasonable and necessary;

t. Kay Medical injection procedures were performed as represented in the operative reports;

u. IV anesthesia billed for Kay Medical injection procedures was reasonable and necessary;

v. Facility and supply fees were properly charged separate from the injection; and

w. The patients would continue to require treatment in the future as a result of the subject accident, such as chiropractic and medical evaluations, chiropractic treatment, injection procedures, and surgical interventions.

417. Defendants also deliberately concealed documents and information that would have revealed the actual nature of the examinations and treatment. This included the shredding of examination sheets and handwritten notes by the service providers such as chiropractors and Dr. Quaicoe made during the examinations, and the erasure and non-preservation of notes made by chiropractic assistants during treatment. This also includes referral forms showing authorization for treatment was required. Anesthesia records and fluoroscopic images for pain management injection procedures were rarely provided. Fluoroscopic images would be the only evidence that the procedures were performed correctly. Defendants also deliberately concealed documents showing attorneys ultimately decided whether imaging studies/diagnostic testing and injection procedures were done.

418. The circumstances concerning these misrepresentations are set forth herein above at paragraphs 47-417.

419. At the time the statements and representations were made, as detailed in paragraphs 47-418 above, Defendants were aware of the falsity of the misrepresentations.

420. Defendants made the misrepresentations with the intent to deceive Allstate, and with the intent that Allstate would act on the misrepresentations by paying sums of money in settlement of claims to the associated law offices, which would provide a portion of those funds to Defendants. The way the Defendants disbursed the money among themselves is solely within their knowledge.

421. Allstate relied on the misrepresentations, and thereby suffered injury by paying sums of money in settlement of the claims. This injury is set forth more fully in paragraphs 47-420 above and paragraphs 422-439 below, and in the attached and incorporated **Appendix A**.

422. Allstate is also entitled to consequential damages and exemplary damages in an amount to be determined at trial.

## XIV.
## COUNT FIVE
## (Against All Defendants for Common Law Conspiracy)

423. Plaintiffs incorporate, as though fully set forth herein, each allegation contained in paragraphs 47-422 above.

424. Beginning about mid-2018 and continuing through the present, Defendants have willfully combined, conspired, and agreed with each other and others to defraud Plaintiffs. Defendants, in combination with themselves and others, knowingly made false and misleading statements in regard to the existence, nature, and severity of the injuries to automobile collision patients, and the need for evaluation and treatment of the alleged injuries, including chiropractic, physical therapy and specialty services, diagnostics including x-rays, CT scans and MRIs, pain management injections and procedures, and surgical interventions.

425. The object of the conspiracy was to defraud Plaintiffs. There was a meeting of the minds and agreement on this course of action by each Defendant, and each Defendant played a specific role in the overall scheme to defraud Plaintiffs and other insurers. The Defendants, separately or in concert with other Defendants and/or other parties, committed overt, unlawful acts in furtherance of this course of action. The roles of the conspirators and overt acts are set forth herein above.

426. The false and fraudulent misrepresentations and omissions alleged above were made by Defendants and others with the purpose and intent to deceive Plaintiffs and to induce Plaintiffs to pay Defendants sums of money, through the associated law offices, to which Defendants were not legally entitled.

427. As a direct and proximate result of Defendants' conduct, Plaintiffs paid sums regarding the fraudulent treatment and billing arising from automobile collisions in which the claimant went to two

or more of the Khit-owned healthcare entities. This injury is set forth more fully in paragraphs 47-426 above and paragraphs 430-439 below, and in the attached and incorporated **Appendix A**.

428. Plaintiffs are also entitled to consequential damages and exemplary damages in an amount to be determined at trial.

**XV.**
**COUNT SIX**
**(Against All Defendants for Unjust Enrichment)**

429. Allstate incorporates, as though fully set forth herein, each allegation contained in paragraphs 47- 428 above.

430. As described above, Defendants have made false and fraudulent representations of fact to Allstate regarding the existence, nature, and severity of supposed injuries allegedly attributable to automobile collisions and the need for treatment, and willfully combined, conspired, and agreed with each other and others to defraud Allstate.

431. Additionally, as set forth herein above, Kay Medical is a professional entity in name only and the Insight entities are lay entities, and Kay Medical and Insight were operated by lay persons to support personal injury claims. This included coordination with attorneys in regard to referral of patients to Kay Medical and Insight, and allowing attorneys to determine treatment to be provided. Licensed providers such as physicians including Defendants Dr. Donovan and Dr. Quaicoe and nurse practitioners that worked for or contracted with Kay Medical and Insight allowed these non-physician lay persons to use their services in the scheme. The nurse practitioners were not properly overseen by the supposed delegating physicians, first Dr. Levine and then starting in April 2022, Dr. Donovan, pursuant to Texas law. Luis Khit, D.C., a chiropractor, trained the nurse practitioners in Kay Medical methods. At least in the case of Dr. Quaicoe, he split his medical fees with the laypersons and entities from August of 2022 through the end of the period at issue, taking a percentage of the amount Kay Medical billed for injection procedures he performed. QI&I and the Defendant Radiologists knew,

per instructions of lay Defendants, that the MRIs in Insight cases were all "liability cases" and followed lay person instructions in regard to reporting findings.

432. Defendants, most of whom are healthcare providers or healthcare entities, or purported to be, also took undue advantage of Allstate.

433. Defendants have unjustly obtained a benefit from Allstate, namely the payment for healthcare expenses that were unreasonable and unnecessary, and designed to enrich Defendants to Allstate's detriment.

434. As a direct and proximate result of Defendants' conduct, Allstate has paid sums, and Defendants have benefited from those payments, relating to the treatment and billing practices arising from automobile collisions at issue, in regard to claimants' referral to Khit Chiropractic, Kay Medical, Insight and Spinal Decompression.

435. The sums by which Defendants were unjustly enriched regarding the patients at issue are solely within Defendants' knowledge.

## XVI.
## COUNT SEVEN
## (Against All Defendants for Money Had and Received)

436. Allstate incorporates, as though fully set forth herein, each allegation contained in paragraphs 47-435 above.

437. Allstate conferred a benefit upon Defendants by paying sums to settle the claims at issue. The records and bills provided by Defendants concerning services at Khit Chiropractic, Kay Medical, Insight and Spinal Decompression were at the very least a substantial factor in inducing Allstate to settle these claims.

438. The money Defendants obtained in connection with the payment of the claims at issue in equity and good conscience belongs to and should be returned to Allstate.

439. The sums by which Defendants were unjustly benefited regarding the patients at issue are solely within Defendants' knowledge. However, based upon the substantial amounts of the Khit-owned entities' charges in the claims at issue, and the continued relationship between Defendants and attorneys to refer law office clients for supposed necessary healthcare services, the sums received by Defendants are likely substantial. As set forth above, these services were not medically necessary. Additionally, as set forth above, Kay Medical and Insight are lay entities or de facto lay entities, and were operated by lay persons to support personal injury claims. This included coordination with attorneys in regard to referral of patients to Kay Medical and Insight, and allowing attorneys to determine treatment to be provided. Licensed providers such as physicians including Defendants Dr. Donovan and Dr. Quaicoe and nurse practitioners that worked for or contracted with Kay Medical and Insight allowed these lay persons to use their services in the scheme. The nurse practitioners were not properly overseen by the supposed delegating physicians, first Dr. Levine and then starting in April 2022 Dr. Donovan, pursuant to Texas law. Dr. Khit, a chiropractor, trained the nurse practitioners in Kay Medical methods.. At least in the case of Dr. Quaicoe, he split his medical fees with the laypersons and entities from August of 2022 through the end of the period at issue, taking a percentage of the amount Kay Medical billed for injection procedures he performed. QI&I and the Defendant Radiologists knew, per instructions of lay Defendants, that the MRIs in Insight cases were all "liability cases" and followed lay person instructions in regard to reporting findings. In equity and good conscience, Defendants should be required to pay restitution to Allstate equal to the total amounts Defendants received as a result of Allstate settling the claims at issue.

## XVII.
## JURY DEMAND

440. Trial by jury is requested on all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs **Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate County Mutual Insurance Company** respectfully request that upon final trial of this cause, the Court enter a judgment against Defendants, each of them jointly and severally:

(1) Upon the First and Second Claims for Relief, all damages resulting from Defendants' violation of Title 18, United States Code, Section 1962(c), including prejudgment interest, the sum trebled pursuant to Title 18, United States Code, Section 1964(c);

(2) Upon the Third Claim for Relief, all damages resulting from Defendants' violation of Title 18, United States Code, Section 1962(d) by conspiracy to violate Title 18, United States Code, Section 1962(c), including prejudgment interest, the sum trebled pursuant to Title 18, United States Code, Section 1964 (c);

(3) Upon the Fourth Claim for Relief, all damages resulting from Defendants' fraudulent conduct;

(4) Upon the Fifth Claim for Relief, all damages resulting from Defendants' conspiracy;

(5) Upon the Sixth Claim for Relief, all sums to which Defendants were unjustly enriched to Plaintiffs' detriment;

(6) Upon the Seventh Claim for Relief all sums to which, in equity and good conscience, Defendants should be required to pay restitution to Plaintiffs as a result of the Plaintiffs settling the claims at issue.

(7) For the costs of suit including reasonable attorneys' fees in accordance with Title 18, United States Code, Section 1964(c);

(8) Prejudgment interest at the maximum rate allowed by law;

(9) Post-judgment interest at the maximum rate allowed by law;

(10) Exemplary damages in such amount as the finder of fact may award at its discretion; and

(11) All such other and further relief, legal and equitable, special or general, to which Plaintiffs may be justly entitled.

Respectfully submitted,

KNOX RICKSEN LLP
*/s/Laura Sherry*
Laura Sherry – Attorney in Charge
Texas State Bar No. 24056203
lrs@knoxricksen.com
Erin Holmes
Texas State Bar No. 24043732
ekh@knoxricksen.com
Katherine Frank
Texas State Bar No. 24105630
kf@knoxricksen.com
3626 North Hall Street (Two Oak Lawn)
Suite 610-K33
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765

ATTORNEYS FOR PLAINTIFFS