# EXHIBIT B

CAUSE NO. D-1-GN-24-001449

| | | |
|---|---|---|
| FREDRICK JACKSON, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | 459TH JUDICIAL DISTRICT |
| | ) | |
| JESUS CHAVEZ FISCAL, | ) | |
| | ) | |
| Defendant. | ) | TRAVIS COUNTY, TEXAS |

---

ORAL DEPOSITION OF
QI & INTERVENTIONS
BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
MIGUEL ONETO, M.D.
AND MIGUEL ONETO, M.D., INDIVIDUALLY
JUNE 18, 2025
(REPORTED REMOTELY)

---

ORAL DEPOSITION of QI & INTERVENTIONS, by and through its designated representative, MIGUEL ONETO, M.D., and MIGUEL ONETO, M.D., individually, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 18th of June, 2025, from 1:05 p.m. to 4:00 p.m., before Stacy L. Jordan, a CSR in and for the State of Texas, Registered Professional Reporter and Certified Realtime Reporter, all participants attending remotely via Zoom, with the witness located in Boca Raton, Florida, pursuant to Notice and the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

THE REPORTER: I'm sorry. Can you pronounce that again?

THE WITNESS: Universidad -- University of Salvador, S-a-l-v-a-d-o-r. Salvador.

Q. (BY MR. WEATHERFORD) Okay. And did you have radiology training following graduation from medical school?

A. Of course, in Florida.

Q. Okay. And where was that at?

A. Mount Sinai Medical Center and Jackson Memorial Hospital.

Q. Okay. And when did you complete your training there?

A. 1999.

Q. Okay. And when were you first licensed to practice medicine in Texas?

A. 2002.

Q. Okay. And what brought you to Texas?

A. A job opportunity in Harlingen Valley Baptist Hospital. A friend that was part of the group invited me to join the group.

Q. How long did you practice in the Harlingen area?

A. Approximately -- at that time, six, seven years. We're still practicing. We have clients in

Harlingen. So basically, I -- I never stopped practicing in Harlingen, but at -- at Valley Baptist, I was initially for maybe six, seven years, approximately.

Q. Okay. As a radiologist, you can be almost anywhere and read for films -- or for images that are done in another city or even another state, correct?

A. Yes. By having the license, yes.

Q. Are you licensed in any other states?

A. Yes. Yes. In Florida, yeah, New York, California, Colorado, Arkansas, Oklahoma. Although I don't practice in any other states other than Florida and Texas, so I'm not sure if one of those licenses are currently active. I know that many are, but I'm not using them.

Q. Have you ever had any disciplinary action taken on any of your licenses to practice medicine in any state?

A. No.

Q. Dr. Oneto, have you ever given a deposition before?

A. Yes.

Q. Okay. Do you know roughly how many occasions?

A. Maybe a couple of times. Related to medicine, probably once. And then about business relationships, once.

Q. Okay. And this is sort of for the sake of the lawyers that are going to be in the trial in this. Do you have any family members in Travis County, Texas?
A. Probably -- Travis County is -- is Dallas, isn't it?
Q. Austin.
A. No, no. Austin, no, I don't have family members.
Q. Okay. Do you have any business relationships in Austin or the Austin area?
A. No.
Q. And, Dr. Oneto, do you understand that this is sort of a dual deposition today and you're also designated as the representative of QI & Interventions?
A. Correct.
Q. So we're just doing them concurrently for convenience, and thank you for -- for agreeing to that.
A. My pleasure.
Q. Is QI & Interventions an assumed business name?
A. It's a d/b/a, doing business as, yes.
Q. Okay. And what entity is it doing business in the name of?
A. Miguel Oneto, M.D., PA.
Q. Okay. Are you the sole owner of Miguel Oneto,

M.D., PA?

A. I own 50 percent, and the other 50 percent, my sister, Dr. Julieta Oneto, also radiology.

Q. Okay. So would it -- would it also be correct to say that -- that you and your sister, Julieta Oneto, are the sole owners of QI&I?

A. Yes. Correct.

Q. Okay. Are you the -- are both of you the sole officers or directors in the entity?

A. Yes.

Q. And, actually, I looked at something on -- on Texas SOS as just sort of information. Are you aware that the assumed business name certificate actually expired back in 2021?

A. I was not aware.

Q. Okay. Now, earlier, I mentioned Qual- -- or QI & Interventions. If the MRI reports at issue concerning Mr. Jackson include the term QI&I, it's the same entity, correct?

A. Yes.

Q. Okay. And since May 18th of 2023, has Miguel Oneto, M.D., PA done business under any other name than QI & Interventions or QI&I?

A. No.

Q. Okay. And for this deposition, if I use --

use QI&I from now on, we understand that that's Miguel Oneto, M.D., PA doing business as QI & Interventions, correct? Is that okay?
A. Yes.
Q. And, Doctor, you've seen the deposition notices for today?
A. Yes.
Q. Okay. Including the one for QI&I?
A. Yes.
Q. Okay. Do you have knowledge to testify on the issues that are set forth in that deposition notice?
A. Yes.
Q. Okay. And, Dr. Oneto, broadly speaking, what is the business of QI&I?
A. Radiology, interpreting imaging studies.
Q. Okay. And would that include evaluating x-ray, MRI and CT images?
A. Correct.
Q. Okay. Does QI&I actually have a facility that does such imaging?
A. No.
Q. Has it ever had?
A. No.
Q. And I looked at the QI&I website, and the "Our Clients" section includes physicians' offices, imaging



Veritext Legal Solutions
800-336-4000

centers, healthcare centers, hospitals, and radiology centers. Are those your typical types of customers at QI&I?

A. Yeah, we don't have hospitals. We only have, at -- at this time, imaging centers, healthcare centers or physician offices, multispecialty clinics.

Q. Okay. Would that have been the same in July of 2023?

A. Yes.

Q. Does QI&I have a business office location?

A. No. Just the -- the residence where I'm at today.

Q. Okay. In the website, it mentioned a P.O. box in Dallas, Texas.

A. That's -- that's correct. That's for mailing purposes.

Q. Okay. And -- and it looked like it was probably a UPS store?

A. Yes.

Q. Okay. So is -- are all the employees basically remote employees?

A. We don't have independent contractors. Not -- our employees is just myself and -- and my sister.

Q. Okay. I saw some people just named on the website. There was another lady named Oneto.

A. That's -- that's my wife.
Q. And what was -- I can't remember --
A. Well, they told me call the website, but basically, maybe Julieta Oneto. That's my sister, Dr. Julieta Oneto. Marcela -- Marcela Cura Oneto is my wife.
Q. Okay. And I think there were some other people that were, like, business assoc- -- not business associates -- perhaps business-management or office-management-type people?
A. Yes, uh-huh.
Q. Back in July of 2023, when Mr. Jackson's MRIs were taken, how many radiologists did QI&I have?
A. Approximately -- I don't recall exactly, but it ranged between -- between part-time and full-time, maybe six or seven. Between five and seven, I would say.
Q. Were the -- you were one of these full-time ones, I suppose. Well, let me withdraw that question.
A. At that time --
Q. Back in -- in -- in July of 2023, you were a full-time radiologist, I presume?
A. Well, not full-time. Probably three-quarters of the time.
Q. Okay. And Dr. Julieta Oneto was one of the

full-time radiologists?
A. Yes.
Q. Dr. Susan Fan, was she one of your full-time radiologists at the time?
A. Correct. She -- she's an independent contractor, yes.
Q. Were there any other radiologists that were basically full-time for QI&I back in July of 2023?
A. Yes. Gujjarappa Srinivas.
THE REPORTER: I'm sorry. Repeat that.
A. Gujjarappa Srinivas.
THE REPORTER: Okay. You're going to have to spell that. I don't understand.
THE WITNESS: That's difficult. I cannot -- I need to look for that. It's Gujjarappa. It's G-u-j-j-a-r-p-p-a [sic]. Srinivas is H- -- S-h-r-i-n-i-v-a-s [sic].
A. He was full-time. Then Sam Nachar. S-a-m Nachar, N-a-c-h-a-r.
Q. (BY MR. WEATHERFORD) Anyone else you can think of at the time?
A. Oh, yeah. Yeah. It's Noor Punjwani. Noor Punjwani is based in Houston. He was working part-time. Still is. Patrick Lertdilok, Cary Rose, Jesus Zamora, Sonja Longbotham. And I think those were the ones.

mentioned -- in this case, Doctor, did you evaluate the MRIs that were done of the plaintiff, Mr. Jackson?

A. Can you repeat (inaudible)?

Q. Sure, sure. Dr. Oneto, were -- you were the doctor who evaluated the two MRIs that were done on Mr. Jackson in the case?

A. Yes, I was.

Q. One was the cervical MRI?

A. Yes.

Q. And -- and for the jury, cervical MRI, that deals with the neck, correct?

A. The bones of the neck, not the whole neck.

Q. Okay. And the other MRI was a lumbar MRI?

A. Correct.

Q. And would that deal with the bones of the lower back?

A. Correct.

Q. Okay. And we looked a minute ago at the Insight records, and they were under the letterhead of Insight Imaging Center, LLC. Do you recall that?

A. I (inaudible). Okay.

THE REPORTER: Okay. I didn't understand that. I didn't understand your answer.

A. I -- okay.

Q. (BY MR. WEATHERFORD) Let me re- -- let me

withdraw the question and -- and -- and reask. Dr. Oneto, the -- the documents that Insight produced in the case, the -- the -- your reports are under the letterhead of Insight Imaging Center, LLC?

A. The first time I'm seeing this. Yes, I see that. It's not what shows on WebFax.

Q. Okay. And then the other one was likewise. And -- and you said the Insight Imaging Center, LLC doesn't show up on a -- on a document that you have?

A. Yeah, the document that we produced, it doesn't have LLC. Neither it has the address, I think.

Q. Okay. I'll pull that up, in fact. Oops. I'm still there. Okay. Here we go. Doctor, do you see a different screen now, a different report?

A. Yes.

Q. Okay. Is this the report that you were mentioning a minute ago?

A. Yeah, that's the one that shows on -- on the fax, yes.

Q. Okay. And it appears the verbiage in both reports are the same, just the title is a little different?

A. Correct.

Q. Okay. From QI&I's viewpoint, are Insight Diagnostic & Imaging Center and Insight Imaging Center,



Veritext Legal Solutions
800-336-4000

Insight.

Q. Okay.

A. It's not even mentioned, Khit Chiropractic. I don't know.

Q. Do you know who the owners of Insight are?

A. No.

Q. Have you ever been a -- a medical director for Insight?

A. No.

Q. Or held any type of position with Insight?

A. Not at all. Not me nor anybody from QI&I.

Q. Okay. Well, looking at this photo, it doesn't -- let me rephrase.

Does it appear that there could be an MRI machine at this building?

MR. YZAGUIRRE: Objection: form.

A. I can't tell.

Q. (BY MR. WEATHERFORD) Okay. It looks like a converted house, correct?

A. I can't tell.

Q. Okay. Do you know if Insight has an MRI facility anywhere?

A. I don't know.

Q. Let me pull a different document up. Doctor, do you recognize this document?

A. Yes. It's our standard agreement, teleradiology agreement.
Q. So is this a standard QI&I form contract for clients?
A. Yeah, for all of our customers.
Q. Okay. And this particular agreement was made in -- on June the 15th, 2018 between Miguel Oneto, M.D., PA doing business as QI Interventions and Skak Investments doing business as Insight Diagnostic & Imaging Center; is that correct?
A. Yes.
Q. Okay. And it appears that it was -- that you signed it on behalf of QI&I?
A. Yes.
Q. And Art Rasendez signed it on behalf of Insight Diagnostic & Imaging Center?
A. Yes.
Q. Okay. And you had mentioned Mr. Rasendez before.
A. I don't think so.
Q. Okay. I may have been mistaken. Was this when the business relationship between QI&I and Insight first began in twenty-eight- -- was it in 2018?
A. That was the first time, correct.
Q. And then there was a -- a first amendment

professional services agreement that has a date of August the 18th, 2022. Do you see that, Doctor?

A. Yes.

Q. And the copy I have doesn't have signatures, but did this amendment go into effect?

A. It went into effect, but it was never signed. But the -- the fees start on that date. We increased those mentioned. That's what they -- they started to pay.

Q. And I'm going to go ahead and mark this contract with the amendment as Exhibit Number 3.

(Exhibit 3 marked.)

Q. (BY MR. WEATHERFORD) Doctor, this agreement and the amendment, was it still in effect at the time that Mr. Jackson had his MRIs in July 2023?

A. Yes.

Q. Okay. So this would have been the agreement in effect by which QI&I reviewed the MRIs of Mr. Jackson?

A. Correct.

Q. And scrolling up at the -- at the very beginning of the recitals, it says that QI&I had a principal office in Harlingen, Texas. Was that correct at that time?

A. Yes.

Q. Okay. Did you actually meet with either Dr. Luis Khit or Art Rasendez in person?
A. Yes, I mentioned I did a couple of times.
Q. Okay.
A. With Art, probably I did. I'm -- I'm not sure. With Luis Khit, a couple of times.
Q. I mean, they just accepted the contract as-is?
A. Yeah. That's a standard verbiage that we have in all the contracts.
Q. Okay. And I don't --
A. They accepted the fee, yeah.
Q. Yeah. Yeah, because, I mean, I don't see any, like, line-throughs or -- or anything like that. It -- it just looks like they accepted your standard contract.
A. Yeah.
Q. Okay. And pursuant to this agreement, what type of services was QI&I to provide, according to the contract?
A. Can you please scroll down?
Q. Okay.
A. It was still radiology, basically interpreting imaging studies remotely.
Q. Okay. And just for the jury's sake -- they may be unfamiliar with teleradiology -- when you do an MRI or -- or even x-rays nowadays, the images, what used


Veritext Legal Solutions
800-336-4000

to probably be called films, are really electronic, correct?

A. Correct.

Q. And instead of having a radiologist right there in the office where the MRI or the x-ray was done, it can be sent to a remote radiologist, you know, tele- -- by telephone or by electronic means?

A. Not telephone. Electronic means, yeah.

Q. And -- and that's actually very common today, right?

A. Correct.

Q. I mean --

A. Especially after (inaudible), yeah.

Q. There's -- there's no, you know, degradation of the images, or whatever. You see them very clearly?

A. Oh, absolutely not. Yes. I mean, that's -- yes.

Q. Okay. And in the contract, it talks about a -- a PACS system that would be set up.

A. Uh-huh.

Q. P-A-C-S, correct?

A. Yes.

Q. And I think that stands for -- correct me if I'm wrong -- picture archiving and communication system?

A. Correct.

Q. And is this the electronic system that allows the transmission of the images?
A. Yes, it's -- yes, the transmission and visualization and reporting.
Q. And what PACS system was in use at the time that Mr. Jackson's MRIs were done in summer 2023?
A. OnePACS.
Q. At the time that Mr. Jackson's MRI images were sent to QI&I in July of 2023, what did Insight pay QI&I per MRI study?
A. $70.
Q. Okay. And that was from the amendment to the document, correct?
A. That's correct.
Q. And actually, part of the contract, too, in 2018 was that Insight had to provide an e-mail to you to send your invoices?
A. Yes.
Q. Okay. And the e-mail -- e-mail that they provided for Insight to send invoices to -- let me rephrase.
The e-mail that Insight provided for QI&I to send its invoices to it is accounting@khitchiropractic.com, correct?
A. I see it, yes.

Q. Okay. So when you were dealing with them back then, was it -- did Insight seem to be just simply a branch of Khit Chiropractic?
A. I didn't inquire about it.
Q. Have you had to over the years -- well, let me re- -- let me withdraw that.
I understand that the -- actually, the agreement with Insight just recently was finally terminated. Is that correct?
A. Yes.
Q. December of 2024?
A. Correct.
Q. And -- and I think that was because Insight rejected your new price schedule?
A. Correct.
Q. So it was Insight that initiated the termination? Let me rephrase.
A. Yes.
Q. Was it Insight that decided to terminate the agreement?
A. Yes.
Q. Okay. Over the -- the period of 2018 into 2024, were there occasions that you had to, you know, contact somebody at Insight on an issue with the contract or an -- or an issue with the -- the PACS

portal or anything like that?

A. Regarding the PACS, we used a company called Interius, Interius, LLC that signed the agreement with OnePACS, and Interius was providing the technical support for us. So when our customers needed any assistance related to the PACS portal or technical aspects of the communication, they would contact Interius, LLC, that we paid Interius for those services.

Q. So Interius was sort of a vendor for QI&I?

A. No, not a vendor. They provided -- yeah, we're a third-party contractor. They provided technical support for QI&I for all of our customers.

Q. Okay.

A. 51 customers, yeah.

Q. Is Interius -- do you have an interest in that company?

A. No.

Q. From the -- the period of time that you worked with Insight Diagnostic, from 2018 until -- let me rephrase first. Going back, other than technical questions about the PACS system, was there any time that you had to contact or anyone at QI&I had to contact Insight about any other matters?

A. Just the invoices -- invoices that -- that was sent.

Q. About invoices?
A. Yeah, we send a monthly invoice. You know, at the beginning of the month, between the 1st and 5th of the month, we counted how many studies we read the prior month, and we send an invoice by -- by e-mail.
Q. Okay.
A. And if they were delaying payments, then, you know, we communicated for them to pay.
Q. Okay. Did you ever have to make any of the communications about, "You're -- you're a little late on the invoice, and we need you to pay," or anything like that?
A. No. My wife did.
Q. Okay. Do you know who she would talk to at Insight?
A. Initially, with Art, and then with Hugo.
Q. With who?
A. Hugo Marroquin, I think. Hugo, H-u-g-o.
Q. Okay. Were Art and Hugo Insight employees or were they also Khit Chiropractic employees?
A. Absolutely no idea.
Q. From your dealings with them, from -- from QI&I's dealings with Insight Diagnostic or Insight Imaging, what was your impression of what Insight was?
A. They -- at least the studies that were

Central Park Imaging any amount for them to perform the MRIs on Mr. Jackson?
A. I don't know.
Q. When QI&I signed the agreement with Insight in 2018, did QI&I become the exclusive radiology service to evaluate images such as x-rays and MRIs?
A. No, I mean, we never had exclusivity. No, we never had exclusivity.
Q. Okay. Do you know if Insight sent some of its -- some of the MRIs and x-rays to other radiologists to read?
A. I assume so, but I cannot confirm.
Q. Okay. In July of 2023, about what percent of QI&I's business was evaluating images received from Insight?
A. Between 3 and 4 percent.
Q. And in regard to you, personally, what percentages of -- of your reads at the time would have been from Insight?
A. About the same because all cases arrived, I mean, mixed up on -- on the PACS, on the work list. All facilities would read, you know, more than a thousand studies per day, and those cases are mixed.
Q. Are the Insight -- let me rephrase. Are the Insight patients always also patients of Khit

end of last year, did you have to send somebody down to disconnect that portal?

A. No. The -- the -- the facility was inactivated at -- at OnePACS. So everything was inactive. Nobody could -- I mean, nobody could access anything. I mean, we -- we stopped reading for them, so those computers were useless. They became inactive.

Q. Would Insight today be able to access any of the images from cases done in 2023/2024?

A. Not from OnePACS. I mean, they -- they were responsible to store their images because they were doing billing.

Q. Okay. Do you know if Insight did preserve images that it obtained?

A. I don't know.

Q. When the images arrived through the PACS system at QI&I, would they have come to a particular person at QI&I?

A. No.

Q. How would it have been -- how were you selected when the images came in to do the read of the images?

A. As -- as I mentioned before, we -- we have -- at that time, we had approximately 51 customers. Insight was one of the 51. And, you know, the thousand

images or so that we interpreted every day, the Insight images were mixed on those other 50 facilities, 50 other customers. And depending on the rotation, you know, I'm reading in the morning, in the afternoon, I -- I just read what's available to be read, and those studies would be mixed together with everything else that we read.

Q. Okay. So if I understand it correctly, when you were doing your periods of reading for a day, you'd go into the QI&I system and say, "Yeah, what's come in," basically?

A. Yeah.

Q. And then you would pick one to read?

A. Well, I'd read what -- as we read, you know, all this (inaudible). And sometimes they are -- we have many customers that need stats, so we take priority to those. Once the stats are read, we -- we read the oldest to newest.

Q. Okay. So basically, you go in the computer and see, okay, is -- you know, de- -- and basing it -- basing on which are the oldest, which ones came in, you know, the earliest and which ones of those might be stat, that would be how you would pick which one you would look at in what order?

A. The stats first.

two status and had no older status for me to compare. And then the -- the facility note.

Q. Okay.

A. And on the right is the box that we use to enter notes if there is any particular special information about the patient, images to repeat, communications, et cetera. But in this case, there were none.

Q. Okay. And you said when it came in from the machine. Do you mean this was within the -- the PACS machine or the actual MRI --

A. No, the MRI, the MRI machine.

Q. Okay. And you called this a report header?

A. That's correct.

Q. Okay. I mean, does this only appear when you're about to start to -- to draft your report?

A. Only.

Q. Okay. So by the point that you see this, you have already reviewed the images. Would that be correct?

A. No. When I -- on the work list, when I do one click on the right monitor, we open the images. On the left monitor, it will open this. And there -- the facility note, where it says in red x-rays is a blank part of the report where we dictate, we



Veritext Legal Solutions
800-336-4000

voice-recognition. The findings of the images, I look at the right monitor.

Q. And while I have this up, I'll -- I'll designate this as Exhibit 6.

(Exhibit 6 marked.)

Q. (BY MR. WEATHERFORD) So you -- you have this on one screen, and you have the images on another while you're doing your review of the images?

A. Correct.

Q. Okay. And how are you dictating or drafting the report?

A. Voice recognition.

Q. Voice recognition? Okay. And on this screen, would it actually start printing your words, say, underneath where it says "in all x-rays, please"?

A. Yeah. Yeah. Well, there, actually, it will prepopulate the standard form that we have that's, you know, blank on information. It will say, for example, this is an MRI cervical spine without contrast. It will say the title, MRI cervical spine, the history column and the name to dictate the history. It will say the technique column. And -- and the technique for that MRI cervical spine, we have contrast. And then the findings and the impression, and I need to fill it --

Q. Okay.

A. -- with information.

Q. You said on a typical day, you'd get about 1,000 images in -- or not 1,000. Let me -- let me rephrase. 1,000 studies in, correct?

A. Yeah.

Q. And that's a good point to bring up, is, you know, for the jury's sake, a study is, like, the lumbar MRI or the cervical MRI, correct?

A. Yes.

Q. But that study can have -- and, in fact, will have just multiple images within it?

A. Correct.

Q. And you have to go through each of the images, correct?

A. Yes.

Q. How many studies would you typically be reviewing a day in summer of 2023?

A. I don't recall exactly. I don't know.

Q. Typically, how long does it take to review a cervical MRI study?

A. It depends how many findings do we -- do we have. You know, normal studies usually takes less time. When there is a lot of pathology, it tends to be more. But I would say between four and eight minutes, something like that, seven minutes. It depends.

Q. Would a lumbar MRI --
A. Yeah, it would depend on what type of MRI, as well.
Q. Correct. Some of them are with contrast and some are without contrast, correct?
A. Well, yeah, it could be, you know, a brain MRI, a -- I mean, all body parts, not just --
Q. Okay.
A. We need just (inaudible).
Q. So is this screen a part of the -- the -- well, let me withdraw that question.
This one has a "facility note" section.
A. Right.
Q. Do you see that, Doctor? And the first thing it says is -- well, first off, who is the facility? Is this Impact? Or not Impact. Is -- is the facility referenced in the facility note, is that Insight?
A. Yes.
Q. Okay. And -- because different customers would have different notes. Would that be correct?
A. Yeah, this is a tool provided by OnePACS for teleradiology that's very useful to put reminders on requests of facilities or referring doctors because we don't have a physical contact with them, and there are too many -- too many locations. It's impossible to --

to handle otherwise.
Q. Okay. So if there was a customer that was at an MRI, you know, they could give you totally different notes than what Impact would give -- or Insight would give, correct?
A. Yes. Even sometimes our, you know -- we know that one facility will only send, you know -- you know, all doctors are kidney doctors. So we need to make -- or ob-gyns, or whatever. I mean, there are different types of notes, facility notes that we could implement or -- to do the reports with certain product orders.
Q. Okay.
A. We use those, yeah.
Q. So Insight's facility notes starts by saying "all MRIs are liability cases," correct?
A. Yes.
Q. And what does that mean to you?
A. I -- I wrote the text of that in 2018. I didn't input it into the PACS. I wrote the text. I told Interius to please enter that reminder.
Q. Okay. So that was your decision to put "all MRIs are liability cases" for Insight?
A. I mean, that's what Dr. Luis Khit told me at that time that he was going to refer to us. If he referred to us MRIs, all of those will be injury cases,

liability cases.

Q. Okay.

A. And -- yeah.

Q. And by a "liability case," is that a case where somebody is purportedly injured in an accident and is making a claim against somebody for liability?

A. I'm not sure about the claim. To me, it means that there were some accidents involved, and there may or may not be a claim. It's not just -- yeah.

Q. Okay. So Dr. Luis Khit told you back in 2018 that all the MRIs that come out of Insight are going to be liability cases?

A. The ones that we were going to receive, yes.

Q. Okay. And did he ask you to put this in the facility note, or did you just do that on your own?

A. No, I -- I -- I put that, because first of all, I never -- we never had any other customers that would send us only injury cases. This was the first one in my life and -- and the only one. So first of all, it was -- was something that -- special about this -- this facility, Insight, this new customer.

Q. Okay. We mentioned Baaxten earlier. If Baaxten sent you one that was not through Insight, you know, it could be for a prostate MRI, a -- you know, a brain MRI in a nonaccident case, anything like that,

correct?

A. Yeah, this -- this note was for Insight. If we receive a study from Baaxten, not Baaxten Insight, it wouldn't have a note. It may have a different note, perhaps, but not this one.

Q. Okay. But if it was a Baaxten Insight one, it would have this note?

A. Yeah, the same one. Exactly the same one.

Q. Okay. And then the next thing it says is: Please describe, if present, disk herniations and bulges with -- with "with" capitalized -- measurements and effect on foramina --

A. Foramina.

Q. -- foramina and nerves.

A. Uh-huh.

Q. Was this something that Dr. Khit had requested, as well?

A. Yes. He wanted us to be as specific, not to say "tiny" -- you know, radiologists, there are different styles to describe. And many times, it's kind of personal the way radiologists may describe a finding or quantify a finding. May say "severe," "moderate," "tiny," "moderate size." He didn't like those words. He, rather, wanted us to use a measurement, you know, 1 millimeter, 3 millimeter.

And, also, if -- not just mention the size, but, also, you know, next to the disks is where nerves come down and then go out to the sides. And he wanted us to be specific to see if those disks were touching or not touching the nerves and, you know, give as much detailed information on -- on the findings that we saw on the images.

Q. Okay. And then the next sentence in the instructions is -- is -- or in the note is: Customer wants "detailed descriptions."

Was that Dr. -- is that quote from Dr. Khit? Is that the -- the words he actually --

A. I -- I put the quote. That was a -- you know, that was the impression I -- I -- I got by talking to him, that he wanted, you know, for us to be detailed, not to try to simplify the -- whatever we see, you know. I mean, I could describe, you know, "multifactorial minor narrowing of neuroforamen with a small multifactorial was causing it." So he wanted us to say this, this and this, to be very specific.

Q. Okay. And then the final one on the line: Degenerative changes should not be simplified. Rather, describe each level in detail.

Was that another thing that Dr. Khit had impressed on you that he wanted?

A. Exactly. It's the same thing. Basically, in the -- you know, just be specific. If you read radiology reports for this type or size for spine studies, very commonly we tend to -- you know, to speed up -- the dictation is to just use terminology like saying "multifactorial," "degenerative changes" or -- not be as exactly specific of what's causing what. And also to describe on each level, because I could say "multilevel minor narrowing of neuroforamen, multilevel" and don't say, you know, "this level on the right" or "this level on the left," "this level (inaudible)." So he just wanted to be specific level by level.
Q. And just for the jury's sake, degenerative changes, those are sort of like wear-and-tear, so to say?
A. Yeah, chronic changes.
Q. Things that come with age?
A. Not necessarily age or use. I mean, you could be young or if you're a sports person and -- you know, you could have degenerative changes at a younger age, also.
Q. Okay. In this case, Mr. Jackson was about 51 years old. Would you expect to see degenerative changes normally in a 51-year-old starting?
A. Yeah, of course, and I describe those.

A. Yes.
Q. And, like, the -- the day and the time that you did it, correct?
A. The time I hit "complete."
Q. Okay. And once you hit "complete," does another person at Insight do -- not Insight. Let me rephrase.
Once you hit "complete," is there anyone else at QI&I that then goes into the report and does anything with it like adding the -- the Insight header or anything like that?
A. No. Prior I complete the report, by the way, I may have a secretary do improve-read of the -- of my dictation. But once I hit "complete," they -- the report goes away from the work list. The next report will -- on the work list will pop up here of any facility, any patient, any type of studies selected on that folder. And -- and I'm done with the report, and the next case will open and keep reading.
On the Insight side, like any other customers, we -- I mean, the technical part, not me, will provide them with user and passwords so they can log into a website of OnePACS, and they can view the images and the report of those images done at their facility. So somebody from Insight that has a login and

password would be able to log into the website of OnePACS and then filter out Jackson Fredrick, look for the report, open the report and download the report.

Q. Okay.

A. But you need --

Q. Go ahead. Sorry. No, go ahead, Doctor.

A. What -- what I saw on -- as -- as you've seen on the reports that we provided, it has the header that the technical people, Interius, set up in -- likely by instruction of Insight, into OnePACS that said Insight Imaging, or something like that. It doesn't have the LLC. They didn't -- they didn't have an address. So that information was added later by Insight, not by OnePACS, not by QI&I. The address and the LLC.

Q. Okay. So if I'm understanding you correctly, you hit "complete" and your report is now in the system. And Insight can -- at that point, somebody can go on and pull it up out of the PACS system?

A. Correct.

Q. You don't particularly send it to anybody at Insight; it's just you have the complete report that's in the PACS system, and then they pull it up themselves?

A. Exactly. They have a login and password, and we give each customer a couple of logins and passwords of the persons assigned on each of our customers to

download their reports that they own the studies they refer to us.

Q. Okay. And then when Insight pulls it up, they can attach their own header to it, such as --

A. They did.

Q. But that's your understanding of how -- how it works?

A. I mean, I guess if they copy the report or they paste it into -- or they added the header. I don't know.

Q. Okay. Let me go back to the reports. Actually, there I am. This is the -- the deposition on written question documents that were produced by Insight. In looking at the -- the cervical MRI report, at the bottom, it says signed by Miguel A. Oneto, M.D. and it has July the 14th, 2023, at 10:21.18 a.m. Do you see that, Doctor?

A. Yes.

Q. And that would have been put in when you hit "complete," correct?

A. Correct.

Q. Okay. Okay. And the -- here is -- the next page in the document is the lumbar MRI report. Do you see that?

A. Yes.

Q. And on that one, it's 10:21.34 a.m. Do you see that?
A. Yes.
Q. So, I mean, did you hit "complete" within 16 seconds on both of these reports?
A. Yeah, likely, they -- they were already improve-read by a secretary, so they were ready for me to release.
Q. Okay. So you still have it, basically, on the screen where a secretary can look at both of them before you hit the "complete"?
A. The secretary will do the improve-read for me so I don't waste the time to -- if I make errors on voice recognition. And when they -- when she tells me how she overread all of my reports, then I just went ahead and completed the reports.
Q. And on the cervical report, just going through it very quickly -- and these letters and numbers, for the sake of the jury, C2, C3, C4, C5, these are the -- the seven vertebrae, basically, in the cervical spine in the neck, correct?
A. Correct.
Q. Okay. And you had that -- for the -- for the cervical spine overall, normal vertebral bodies and posterior elements, correct?

A. Uh-huh.

Q. And then you had no evidence of fracture?

A. Uh-huh.

Q. And then you have there are small interior osteophytes in the mid and lower cervical levels.

A. Uh-huh.

Q. Doctor, what is an osteophyte?

A. It's a bone degeneration. It's like a -- it's a tiny bone touching this -- what's called degenerative changes and chronic change.

Q. Okay. Is this one of those examples of, you know, if it had not been for Insight, you might have said that there were degenerative changes in the mid and lower cervical levels?

A. No. That is -- that is why -- I mean, the example you would note on the impression. You see, for example, where it says --

Q. Oh, okay. Right.

A. -- C5/C6 or C6/C7? Look at the last sentence. It says: Diffuse annular 2-millimeter disk bulges.

And this is the part that is more specific than usual -- I mean, that -- what we used to do. Now we do -- every report that we do seems, you know, 10 years ago or more than -- I mean, 15 years ago. We do it like this. For all the customers -- I mean, all the

MRIs have been read like this. But the point is that at that time, when we started to add these on the impression, it says "with uncovertebral joint hypertrophy, resulting in mild narrowing of central canal and moderate narrowing of bilateral foramen."

So the uncovertebral joint hypertrophy in the past, we should say, you know, mild degenerative changes. I mean, those are degenerative -- chronic degenerative changes, that we're being very specific what part of the vertebral bodies have a degenerative change. It's (inaudible) processes between the two that's showing is -- what is degenerative, and that degenerative, you know, is produced in the mild narrowing of the central canal and moderate narrowing of the bilateral foramen. I mean, that specificity is what we have it, you know. Otherwise, we would have that specificity perhaps on the findings but not on the impression. But we started to do -- for every MRI, on the findings, on the impression, we just do it in detail. And actually, you know, everybody likes it, so we kept doing it for every -- all the customers.

Q. Okay. And if the accident in this case was on May 19th, 2023 and the study date for the MRI was July the 12th of 2023, you -- you would have seen these types of changes before the accident if you had an MRI of

the -- Mr. Jackson before the accident, correct?

A. Of course.

Q. These are just wear and tear, your maybe inactive life or -- because he was 51 years old, right?

A. Yeah. Yeah.

Q. I am 65. There's no -- no telling what you would find if you did an MRI of -- of my spine, correct?

A. Yeah, of course.

Q. Yeah.

A. Of course. And the 2-millimeter disk bulges is the same thing. I mean, it's -- it's completely nonspecific.

Q. Okay. And then on the -- the lumbar MRI, in this one, it says: Bone marrow Modic Type 1 and 2 changes in L5-S1 encompassing end plates.

What is a Type 1 Modic change?

A. That's a degenerative change at the L-plate, at the joints. Again, a chronic change.

Q. Would Modic 2 be the same, only more extensive?

A. It's more prominent, yeah.

Q. Okay. And just looking at the impression, at L5-S1, it says: Diffuse annular 2-millimeter disk bulge and mild hyper- --

A. Hypertrophy.

Q. I -- I'll need your help on that one. How do you pronounce that?
A. Hypertrophy.
Q. -- hypertrophy of the facets, resulting in mild narrowing of the right neural foramina and moderate on the left.
Is that a similar finding to the one in the cervical spine, that this is a, you know, normal degeneration?
A. Correct.
Q. Okay. And for L4-L5, there was a 3-millimeter disk herniation with a central annular tear and hypertrophic posterior elements causing mild narrowing of the central canal in both neural foramina. Is -- would any of that be degenerative?
A. I mean, certainly all could be degenerative. I just don't know. I mean, of course, 100 percent hypertrophic posterior elements causing narrowing of the canal in both foramina, that's chronic. The 3-millimeter disk herniation that has a small tear is like a -- a linear rupture. That -- it's impossible to know by MRI. I mean, that could be chronic. And could that be related to the trauma? Yes, but I don't know. So I just don't suggest anything.
Q. It'd be one of those things that you would

have had to have had an MRI immediately before the accident to be able to tell, correct?
A. That's the only way, correct.
Q. Were you provided any healthcare history of Mr. Jackson to use in your review of the MRIs?
A. We only know that (inaudible), is what the tech -- what I shared, nothing else. But not for this case, not on any other case from Insight, just the tech note.
Q. If Mr. Jackson had had a past surgical history of a diskectomy at level L5 in 2009, could that have been the condition that you saw in this MRI?
A. At what level you said?
Q. At L5.
A. We didn't have that information, so --
Q. Okay. Would that have been something you would have wanted to have known about or --
A. Of course. Yes.
Q. And if there had actually been imaging done back in 2008/2009, would you have wanted to see that?
A. Yes.
Q. Okay. Okay.
A. I mean, we really want to do good quality medicine. And to do that, of course, we need to compare with priors.

to keep the images, not ours, with any customer that we have.

Q. Is QI&I seeking any further payment in regard to Mr. Jackson beyond the $140 it's received for the two MRIs?

A. No. No, that's -- that's the arrangement we had with -- with Insight.

Q. Do you know the amount that Insight's billed the MRIs at?

A. No idea.

Q. Okay. Were you ever involved in Insight's billing in any way?

A. Absolutely not.

Q. Okay. Has --

A. Not me. Not me, not anybody from QI&I.

Q. Okay. Has Dr. Luis Khit or anyone else at Insight ever asked your advice on what they should charge for an MRI?

A. No.

Q. And actually, you're not an MRI provider yourself, correct; you're the radiologist that reads the MRI?

A. Correct.

Q. Have you ever had an ownership interest or a managerial role in an MRI facility?

A. No. Well, no, I take it back. In Harlingen, when I was in Valley Baptist Medical Center, their radiology group that we had, we co-invested with Valley Baptist Hospital on an imaging center, and I had a small ownership on that imaging center for a couple of years.

Q. Okay. Did you ever play a role in determining, like, the technical part of the MRI charges with them?

A. No, no. The hospital did. I have no idea.

Q. On the other hand, you probably have a lot of experience on the professional part of an MRI charge, you know, what the -- what to charge for the radiologists actually reviewing the MRI.

A. That part, I know, of course.

Q. Okay. Do you know if Insight bills for MRIs under Medicare or Medicaid?

A. No idea.

Q. I'm going to just pull one more thing up. And this is -- when I pull this up, this is actually the -- the website for Central Park Imaging, and -- and this is one from one of those historic websites from summer of 2023; although to me, it looked like their current one hasn't changed.

And Central Park -- Central Park Imaging in their -- their site states that: Our radiologists

Q. And you are, as I understand it from the imaging report, a board-certified radiologist?
A. Yes.
Q. Where did you go to medical school?
A. In Argentina, in Buenos Aires.
Q. Okay. And your board certification is from where or from who?
A. American Board of Radiology. I did seven years of (inaudible) training in the U.S.
Q. Okay. And where was that training you received here in the United States?
A. Mount Sinai Medical Center in Miami Beach and also in Jackson Memorial Hospital, the University of Miami.
Q. Okay. And as I understand it, board certification is the highest level of specialization for radiologists?
A. As a general radiologist, yes. Then I -- in addition, I did fellowships in breast imaging and in vascular interventional radiology, and I also have the -- what's called CAQ, certificate of added qualifications, on vascular interventional radiology. So for general radiology, yes, the American Board of Radiology have qualifications. Then there are other subspecialty qualifications which I have for vascular

interventional radiology.

Q. And so interpreting films like MRIs is exactly what you do, what you've been trained to do and what you're certified as a specialist to do?

A. Correct. I've done that for many years, yes.

Q. And my understanding is that you indicated that it takes you on the order of five to eight minutes to look at the actual films in this case?

A. On this particular case, I would say I could read those studies in five minutes.

Q. And when we say the "films," you're actually looking at the radiographic study that was done on Mr. Jackson; is that right?

A. The MRI study.

Q. Right. And so you're not -- for example, you're not a treating doctor; you're not seeing him, visiting with him; you're not recommending what he does or doesn't do. Your job is just to look at the films as a specialist and interpret them?

A. That's exactly what I did. I never examined the patient. I never talked to the patient. I never recommended any treatment. I never talked to any doctor or anybody after my report. The only interaction was look at the images. I read the report. Click "complete." Nothing else. I never heard anymore, not